# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: GENERIC PHARMACEUTICALS PRICING ANTITRUST LITIGATION<br>———————————————— | MDL 2724<br>16-MD-2724<br>HON. CYNTHIA M. RUFE |
| IN RE: DIVALPROEX ER CASES<br>———————————————— | LEAD CASE: 16-DV-27240<br>END-PAYER CASE: 16-DV-27242 |
| THIS DOCUMENT RELATES TO:<br><br>*ALL END-PAYER ACTIONS*<br>———————————————— | JURY TRIAL DEMANDED |
| 1199SEIU NATIONAL BENEFIT FUND, 1199SEIU GREATER NEW YORK BENEFIT FUND, 1199SEIU NATIONAL BENEFIT FUND FOR HOME CARE WORKERS, AND 1199SEIU LICENSED PRACTICAL NURSES WELFARE FUND; AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES DISTRICT COUNCIL 37 HEALTH & SECURITY PLAN; LOUISIANA HEALTH SERVICE & INDEMNITY COMPANY, d/b/a BLUE CROSS AND BLUE SHIELD OF LOUISIANA AND HMO LOUISIANA, INC.; PHILADELPHIA FEDERATION OF TEACHERS HEALTH AND WELFARE FUND; SELF-INSURED SCHOOLS OF CALIFORNIA; and UNITE HERE HEALTH; on behalf of themselves and all others similarly situated, | **CONSOLIDATED AMENDED END-PAYER CLASS ACTION COMPLAINT** |
| Plaintiffs, | |
| v. | |
| DR. REDDY'S LABORATORIES, INC.; MYLAN INC.; MYLAN PHARMACEUTICALS, INC.; PAR PHARMACEUTICAL INC.; and ZYDUS PHARMACEUTICALS (USA), INC., | |
| Defendants. | |

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

# TABLE OF CONTENTS

I.     NATURE OF THE ACTION ................................................................................. 1

II.    ONGOING FEDERAL AND STATE INVESTIGATIONS ................................ 5

III.   JURISDICTION AND VENUE ......................................................................... 10

IV.    PLAINTIFFS ..................................................................................................... 11

V.     DEFENDANTS .................................................................................................. 16

VI.    CO-CONSPIRATORS ....................................................................................... 18

VII.   INTERSTATE AND INTRASTATE COMMERCE .......................................... 18

VIII.  BACKGROUND ON THE GENERIC DRUG INDUSTRY ............................ 19

       A.     Generic Drugs Are Commodity Products ............................................ 19

       B.     Pricing in the U.S. Prescription Drug Industry ................................... 23

IX.    THE GENERIC DIVALPROEX ER CONSPIRACY ...................................... 25

       A.  Congressional Responses to Generic Drug Price Increases ................... 25

       B.  The Generic Divalproex ER Market ....................................................... 27

       C.  Divalproex ER Price Increases ............................................................... 29

       D.  Defendants' Conspiracy ......................................................................... 41

       E.  Defendants' Own Acknowledgements of Lack of Generic Drug
           Competition ............................................................................................. 57

       F.  Defendants' Concerted Efforts to Increase Prices for Divalproex ER
           Yielded Supracompetitive Profits ........................................................... 58

       G.  The Generic Divalproex ER Market Is Susceptible to Collusion ........... 62

X.     THE STATUTES OF LIMITATIONS DO NOT BAR PLAINTIFFS'
       CLAIMS ............................................................................................................. 76

i

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

  A.  The Statutes of Limitations Did Not Begin to Run Because Plaintiffs
     Did Not and Could Not Discover Defendants' Unlawful Conspiracy ................. 76

  B.  Fraudulent Concealment Tolled the Statutes of Limitations ............................... 78

XI. CONTINUING VIOLATIONS ........................................................ 80

XII. DEFENDANTS' ANTITRUST VIOLATIONS ................................ 81

XIII. CLASS ACTION ALLEGATIONS .................................................. 83

XIV. CAUSES OF ACTION ..................................................................... 87

  FIRST COUNT  Violation of Sections 1 and 3 of the Sherman Act
  (on behalf of Plaintiffs and the Nationwide Class) ............................................ 87

  SECOND COUNT  Violation of State Antitrust Statutes (on behalf of
  Plaintiffs and the Damages Class) ..................................................................... 89

  THIRD COUNT  Violation of State Consumer Protection  Statutes
  (on behalf of Plaintiffs and the Damages Class) ............................................. 112

  FOURTH COUNT  Unjust Enrichment (on behalf of Plaintiffs and the
  Damages Class) ................................................................................................ 150

XV. PRAYER FOR RELIEF ................................................................. 175

XVI. JURY DEMAND ............................................................................ 177

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

## I.    <u>NATURE OF THE ACTION</u>

1.     This suit brings claims on behalf of indirect purchasers ("End Payers" or "Plaintiffs") of generic divalproex sodium, extended-release tablets (250 mg and 500 mg) ("Divalproex ER") for injunctive relief and to recoup overcharges that resulted from an unlawful agreement among Defendants to allocate customers, rig bids, and fix, raise and/or stabilize the prices of generic Divalproex ER.[1]

2.     Divalproex ER is a commonly prescribed medication used to treat acute manic or mixed episodes associated with bipolar disorder and prevent migraine headaches.  Introduced in 2000 under the brand name Depakote ER®, generic Divalproex ER has been on the market since early 2009.

3.     For years, competition among sellers of generic Divalproex ER kept prices stable, at competitive levels.  But starting at least as early as June 2013, Defendants, who dominate the market for Divalproex ER, abruptly and inexplicably raised prices.  The price increases were extreme and unprecedented:  certain Defendants' prices increased their Divalproex ER prices ▮▮▮▮▮▮▮ and all Defendants' prices remain at elevated levels today.  In fact, the U.S. Government Accountability Office ("GAO") identified Divalproex ER as having "experienced an extraordinary price increase."[2]

4.     The price increases imposed by Defendant manufacturers of generic Divalproex ER cannot be explained by supply shortages or any other market feature or shock.  Nor were they

---

[1] Divalproex sodium also comes in a "delayed-release" formulation ("Divalproex DR"), which was marketed under the brand name "Depakote®".  Plaintiffs do not allege wrongdoing in connection with the marketing and sale of this formulation.

[2] GAO Report to Congressional Requesters, *Generic Drugs Under Medicare* (Aug. 12, 2016) ("GAO Report"), at Appx. III, *available at* http://www.gao.gov/products/GAO-16-706.

the result of unilateral business decisions.  Instead, the significant increases in the prices of Divalproex ER were the result of an illegal agreement among Defendants to fix prices.

5.     The market for Divalproex ER was highly conducive to collusion, as it was controlled almost exclusively by the Defendants and is subject to high barriers to entry, including substantial manufacturing costs and regulatory requirements.  Because Divalproex ER is a medically necessary product for which reasonable substitutes are not available and demand is inelastic, Defendants were able to raise prices in concert without suffering corresponding losses in sales volume.  Federal regulations require Defendants' Divalproex ER to contain the same type and amount of active pharmaceutical ingredient and to be therapeutically equivalent to one another.  They are therefore interchangeable commodity products.  Interchangeability facilitates collusion, as cartel members can easily monitor and detect deviations from a price-fixing or market allocation agreement.

6.     Because purchasers choose whose Divalproex ER product to buy based primarily on price, and unilateral price increases generally result in loss of market share, it would have been economically irrational for any one Defendant to dramatically raise its prices without assurance that its competitors would do the same.

7.     Defendants' attendance at trade association meetings, conferences, and workshops provided ample opportunities to agree on Divalproex ER prices and allocate markets and customers for Divalproex ER. As alleged below, Defendants implemented their conspiracy through numerous secret meetings and communications, including trade association meetings held by the Generic Pharmaceutical Association ("GPhA") (now the Association for Accessible Medicines), the National Association of Chain Drug Stores ("NACDS"), the Healthcare

2

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Distribution Management Association ("HDMA") (now the Healthcare Distribution Alliance ("HDA")), and Efficient Collaborative Retail Marketing ("ECRM"), among others.

8.     Defendants' unlawful and anticompetitive conduct in the Divalproex ER market is part of a larger conspiracy or series of conspiracies involving numerous generic pharmaceuticals and pharmaceutical manufacturers.

9.     Extreme and unprecedented price increases in the generic drug industry—like those imposed by manufacturers of Divalproex ER—have prompted close scrutiny of the industry by the U.S. Congress, federal and state enforcement agencies, and private litigants.

10.     An ongoing criminal investigation by the Antitrust Division of the U.S. Department of Justice ("DOJ") has, to date, resulted in price-fixing guilty pleas from two senior executives at Heritage Pharmaceuticals, Inc. relating to the sale of the generic drugs doxycycline hyclate and glyburide.  But DOJ has made clear that its "investigation is ongoing"[3] and the evidence uncovered during the course of its investigation into those drugs also "implicates . . . a significant number of the Defendants . . . [and] a significant number of the drugs at issue" in this Multidistrict Litigation.[4]

11.     The Attorney General for the State of Connecticut ("Connecticut AG"), whose office has been leading an investigation of the generic drug industry parallel to that of DOJ, confirms that its price-fixing investigation extends "way beyond the two drugs and the six

---

[3] DOJ, Division Update Spring 2017 (Mar. 28, 2017), *available at* https://www.justice.gov/atr/division-operations/division-update-spring-2017/division-secures-individual-and-corporate-guilty-pleas-collusion-industries-where-products

[4] Intervenor United States' Motion to Stay Discovery at 1-2 (May 1, 2017) (ECF No. 279).

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

companies.  Way beyond . . . .  We're learning new things every day."[5]  There is "compelling evidence of collusion and anticompetitive conduct across many companies that manufacture and market generic drugs in the United States . . . [and] evidence of widespread participation in illegal conspiracies across the generic drug industry."[6]

12.     Manufacturers of generic Divalproex ER are implicated in these ongoing investigations.  At least three of the Defendants named here, including Dr. Reddy's, Mylan, and Par, have received a federal grand jury subpoena or an investigative demand from the Connecticut AG as part of the generic drug price-fixing investigations.

13.     As end payers in the chain of pharmaceutical distribution, Plaintiffs bear the brunt of Defendants' illegal conduct.  Plaintiffs have paid many millions of dollars more for generic Divalproex ER than they would have paid in a competitive market.

14.     Plaintiffs bring this action against Defendants on account of their past and ongoing violations of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3) and the state laws set forth below.  Plaintiffs bring this action both individually and on behalf of (a) a national injunctive class of persons or entities in the United States and its territories who indirectly purchased, paid and/or provided reimbursement for some or all of the purchase price of generic Divalproex ER (generic divalproex sodium 250 or 500 mg extended release 24 hour sustained action tablets) manufactured by any Defendant, other than for resale, from June 2013 to the present ("Class Period"), and (b) a damages class of persons or entities in the states and

---

[5] *How Martinis, Steaks, and a Golf Round Raised Your Prescription Drug Prices*, Kaiser Health News (Dec. 21, 2016) *available at* http://www.thedailybeast.com/how-martinis-steaks-and-a-golf-round-raised-your-prescription-drug-prices

[6] Connecticut AG, Press Release (Dec. 15, 2016) *available at* http://www.ct.gov/ag/cwp/view.asp?Q=588538&A=2341

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

territories identified herein who indirectly purchased, paid and/or provided reimbursement for some or all of the purchase price of generic Divalproex ER manufactured by any Defendant, other than for resale, from June 2013 to the present.

## II.   ONGOING FEDERAL AND STATE INVESTIGATIONS

15.   Now in its third year, the federal criminal investigation into generic drug price fixing has begun to bear fruit. On December 12 and 13, 2016, DOJ filed criminal charges against former Heritage executives Jeffrey Glazer (CEO) and Jason Malek (President).  The government alleged that they conspired with others "to allocate customers, rig bids, and fix and maintain prices" of glyburide and doxycycline hyclate in violation of the Sherman Act (15 U.S.C. § 1).[7]

16.   On January 9, 2017, Glazer and Malek pleaded guilty to those charges.[8]  Deputy Assistant Attorney General Brent Snyder of the Justice Department's Antitrust Division explained: "These charges are an important step in correcting that injustice and in ensuring that generic pharmaceutical companies compete vigorously to provide these essential products at a price set by the market, not by collusion."[9]  As they await sentencing, Glazer and Malek are cooperating with DOJ's continuing investigation.  More criminal charges and guilty pleas are expected to follow.[10]

---

[7] Information ¶ 6, *United States v. Glazer*, No. 2:16-cr-00506-RBS (E.D. Pa. Dec. 12, 2016) (ECF No. 1); Information ¶ 6, *United States v. Malek*, No. 2:16-cr-00508-RBS (E.D. Pa. Dec. 13, 2016) (ECF No. 1).

[8] *See* Tr. of Plea Hearing, *United States v. Glazer*, No. 2:16-cr-00506-RBS (E.D. Pa. Jan. 9, 2017) (ECF No. 24); *see also* Tr. of Plea Hearing, *United States v. Malek*, No. 2:16-cr-00508-RBS (E.D. Pa. Jan. 9, 2017) (ECF No. 24).

[9] DOJ Press Release (Dec. 14, 2016) *available at* https://www.justice.gov/opa/pr/former-top-generic-pharmaceutical-executives-charged-price-fixing-bid-rigging-and-customer

[10] *See, e.g.,* Eric Kroh, *Generic Drug Price-Fixing Suits Just Tip Of The Iceberg*, Law360 (Jan. 6, 2017) ("'Once somebody starts cooperating, it leads to many more indictments.'"),

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

17. Although initial public disclosures suggested that the federal and state investigations were focused on one or two drugs, it is now clear that both investigations are much, much broader.  The investigations reportedly cover two dozen drugs and more than a dozen manufacturers.[11]  Press reports indicate that "[t]he Department of Justice (DoJ) believes price-fixing between makers of generic pharmaceuticals is widespread."[12]

18. According to one report, prosecutors see the investigation of the generic drug industry much like DOJ's antitrust probe of the auto parts industry, which has morphed into DOJ's largest criminal antitrust probe ever.  *See In re Automotive Parts Antitrust Litig*., No. 2:12-md-02311 (E.D. Mich.).  As in the *Auto Parts* case, prosecutors expect "to move from one drug to another in a similar cascading fashion."[13]

19. DOJ and a federal grand jury empaneled in the Eastern District of Pennsylvania have focused on at least seventeen generic drug manufacturers as part of the growing investigation, including the four Defendants here: Dr. Reddy's Laboratories, Inc. ("Dr. Reddy's); Mylan Inc. ("Mylan"); Par Pharmaceutical, Inc. ("Par"); and Zydus Pharmaceuticals USA, Inc. ("Zydus"); as well as Actavis Holdco U.S., Inc. ("Actavis"); Aurobindo Pharma USA, Inc. ("Aurobindo"); Citron Pharma LLC ("Citron"); Heritage Pharmaceuticals, Inc. ("Heritage");

---

*available at* https://www.law360.com/articles/877707/generic-drug-price-fixing-suits-just-tip-of-the-iceberg

[11] David McLaughlin & Caroline Chen, *U.S. Charges in Generic-Drug Probe to Be Filed by Year-End*, Bloomberg (Nov. 3, 2016) *available at* http://www.bloomberg.com/news/articles/2016-11-03/u-s-charges-in-generic-drug-probe-said-to-be-filed-by-year-end

[12] PaRR Report, *DoJ Believes Collusion over Generic Drug Prices Widespread* (June 26, 2015) ("PaRR Report"), *available at* http://www.mergermarket.com/pdf/DoJ-Collusion-Generic-Drug-Prices-2015.pdf

[13] *Id.*

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Impax Laboratories, Inc. ("Impax"); Lannett Company, Inc. ("Lannett"); Mayne Pharma, Inc. ("Mayne"); Perrigo New York, Inc. ("Perrigo"); Sandoz, Inc. ("Sandoz"); Sun Pharmaceutical Industries, Inc. ("Sun"); Taro Pharmaceuticals USA, Inc. ("Taro"); and Teva Pharmaceuticals USA, Inc. ("Teva"). And as recently as August 10, 2017, Pfizer, Inc. ("Pfizer") also disclosed that DOJ is investigating its Greenstone generics business.[14]

20.    The fact that these companies and/or their employees received subpoenas from a federal grand jury is significant.  DOJ does not empanel grand juries lightly.  The *Antitrust Division Manual* admonishes that "staff should consider carefully the likelihood that, if a grand jury investigation developed evidence confirming the alleged anticompetitive conduct, the Division would proceed with a criminal prosecution."  Accordingly, before a grand jury investigation proceeds, it requires a series of approvals, first by the relevant field chief, who then sends the request to the Antitrust Criminal Enforcement Division.  "The DAAG [Deputy Assistant Attorney General] for Operations, the Criminal DAAG, and the Director of Criminal Enforcement will make a recommendation to the Assistant Attorney General[,]" who must give final approval and authorize all attorneys who will participate in the investigation.[15]

21.    As the former assistant chief of the National Criminal Enforcement Section of DOJ's Antitrust Division, noted:  "A DOJ investigation into the alleged exchange of pricing

---

[14] Further discussion of these generic drug manufacturers and their receipt of subpoenas or other inquiries from DOJ is included *infra* at ¶ 171.

[15] DOJ, Antitrust Division Manual (5th ed. 2015) at Chapter III-81 to 83, *available at* http://www.justice.gov/atr/public/divisionmanual/chapter3.pdf

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

information in the pharmaceutical industry likely indicates that the agency anticipates uncovering criminal antitrust conduct in the form of price-fixing or customer allocation."[16]

22.     Another significant indication of criminal price fixing in the generic drug industry is that DOJ has received assistance from a privately-held company that came forward as a leniency applicant:  "It is understood that Heritage is cooperating with prosecutors in exchange for amnesty from criminal prosecution under DOJ's leniency program[.]"[17]  As explained on DOJ's website, an applicant for amnesty "must admit its participation in a criminal antitrust violation involving price fixing, bid rigging, capacity restriction, or allocation of markets, customers, or sales or production volumes, before it will receive a conditional leniency letter."  The applicant must also establish that "[t]he confession of wrongdoing is truly a corporate act, as opposed to isolated confessions of individual executives or officials."[18]

23.     In addition to the federal criminal investigation, the Connecticut AG began an investigation in July 2014 into the dramatic price increases in generic drugs.  Now joined by the Attorneys General of 43 other states and the District of Columbia, the Connecticut AG has filed a civil complaint in the U.S. District Court for the District of Connecticut alleging price fixing and customer allocation.[19]  Although the States' present complaint focuses on two generic drugs

---

[16] Mark Rosman & Seth Silber, *DOJ's Investigation Into Generic Pharma Pricing Is Unusual*, Law360 (Nov. 12, 2014), *available at* https://www.wsgr.com/publications/PDFSearch/rosman-1114.pdf

[17] Richard Vanderford, *Generic Pharma Investigation Still Broad, Prosecutor Says*, mLex (Feb. 21, 2017).

[18] DOJ, *Frequently Asked Questions about the Antitrust Division's Leniency Program* (updated Jan. 26, 2017), *available at* https://www.justice.gov/atr/page/file/926521/download

[19] On August 3, 2017, the U.S. Judicial Panel on Multidistrict Litigation ("JPML") issued an order directing that the State AG case be transferred to this Court and coordinated as part of MDL 2724 (ECF No. 417).

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

(doxycycline hyclate delayed release and glyburide), the States make clear that they have "uncovered wide-ranging conduct implicating numerous different drugs and competitors" and suggest that additional drugs and manufacturers will be added "at the appropriate time."[20]

24.  The publicly available version of the State AG Complaint is heavily redacted. Among the obscured portions are the contents of conspiratorial communications, which the Connecticut AG has described as "mind-boggling."[21]  The State AG Complaint explains that the generic drug industry is structured in a way that facilitates these types of collusive communications.  "Generic drug manufacturers operate, through their respective senior leadership and marketing and sales executives, in a manner that fosters and promotes routine and direct interaction among their competitors."  This affords them opportunities to "exploit their interactions at various and frequent industry trade shows, customer conferences and other similar events, to develop relationships and sow the seeds for their illegal agreements."[22]

25.  The criminal informations and guilty pleas relating to Glazer and Malek, the grand jury subpoenas, and evidence divulged in the State AG Complaint are merely the tip of the iceberg.  The government investigations have uncovered the existence of "a broad, well-coordinated and long-running series of schemes to fix the prices and allocate markets for a number of generic pharmaceuticals in the United States."[23]

---

[20] *State of Connecticut v. Aurobindo Pharma USA, Inc.*, No. 3:16-cv-2056 (VLB) (D. Conn.) (Doc. 168 at ¶ 9) (State AG Complaint), *available at* http://www.ct.gov/ag/lib/ag/press_releases/2016/20161215_gdms_complain.pdf.

[21] Mark Pazniokus, *How a small-state AG's office plays in the big leagues*, CT Mirror (Jan. 27, 2017), *available at* http://ctmirror.org/2017/01/27/how-a-small-state-ags-office-plays-in-the-big-leagues/

[22] State AG Complaint ¶ 7.

[23] State AG Complaint ¶ 1.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

### III.   JURISDICTION AND VENUE

26.     Plaintiffs bring Count One of this action under Section 16 of the Clayton Act (15 U.S.C. § 26) for injunctive relief and costs of suit, including reasonable attorneys' fees, against Defendants for the injuries sustained by Plaintiffs and the members of the Classes described herein by reason of the violations of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

27.     This action is also instituted under the antitrust, consumer protection, and common laws of various states and territories for damages and equitable relief, as described in Counts Two through Four below.

28.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1332(d) & 1337 and Section 16 of the Clayton Act (15 U.S.C. § 26).  The Court has subject matter jurisdiction over state-law claims pursuant 28 U.S.C. § 1367.

29.     Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a) & 22; 28 U.S.C §§ 1391(b)-(d) & 1407; and the MDL Order dated April 6, 2017 (ECF No. 291), and because, during the Class Period, Defendants resided, transacted business, were found, or had agents in this District, and a substantial portion of the affected interstate trade and commerce described below has been carried out in this District.

30.     Venue is also proper in this District because the federal grand jury investigating the pricing of generic drugs is empaneled here and therefore it is likely that acts in furtherance of the alleged conspiracy took place here. According to DOJ guidelines, an "investigation should be conducted by a grand jury in a judicial district where venue lies for the offense, such as a district

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

from or to which price-fixed sales were made or where conspiratorial communications occurred."[24]

31.    This Court has personal jurisdiction over each Defendant because, among other things, each Defendant: (a) transacted business throughout the United States, including in this District; (b) sold Divalproex ER throughout the United States, including in this District; (c) had substantial contacts with the United States, including in this District; (d) was engaged in an illegal scheme and nationwide price-fixing conspiracy that was directed at, had the intended effect of causing injury to, and did cause injury to persons residing in, located in, or doing business throughout the United States, including in this District; and/or (e) took overt action in furtherance of the conspiracy in this District or conspired with someone who did, and by doing so could reasonably have expected to be sued in this District.  In addition, nationwide personal jurisdiction was authorized by Congress pursuant to the Clayton Act and by 28 U.S.C. § 1407.

## IV.    PLAINTIFFS

32.    Plaintiffs 1199SEIU National Benefit Fund, 1199SEIU Greater New York Benefit Fund, 1199SEIU National Benefit Fund for Home Care Workers, and 1199SEIU Licensed Practical Nurses Welfare Fund are jointly administered health and welfare funds (collectively, "1199SEIU Benefit Funds").  The 1199SEIU Benefit Funds are among the largest labor-management funds in the nation, providing comprehensive health benefits to hundreds of thousands of working and retired healthcare industry workers and their families.  They provide health and welfare benefits to 400,000 members, retirees, and their families, who reside in numerous locations in the United States.  During the Class Period, the 1199SEIU Benefit Funds

---

[24] DOJ, Antitrust Division Manual at III-83.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

indirectly purchased and paid for some or all of the purchase price for one or more generic Divalproex ER prescriptions, other than for resale, manufactured by the Defendants. Plaintiffs made such payments and/or reimbursements in California, Connecticut, District of Columbia, Florida, Georgia, Indiana, Kansas, Maine, Maryland, Massachusetts, Missouri, New Hampshire, New Jersey, New York, Pennsylvania, South Carolina, Tennessee, Texas, Virginia and Puerto Rico, thereby suffering injury to its business and property. During the Class Period, the 1199SEIU Benefit Funds paid and reimbursed more for these products than they would have absent Defendants' anticompetitive conduct to fix, raise, maintain, and stabilize the prices and allocate markets and customers for those products. As a result of the alleged conspiracy, the 1199SEIU Benefit Funds were injured in their business or property by reason of the violations of law alleged herein. The 1199SEIU Benefit Funds intend to continue purchasing and/or reimbursing for these drugs and will continue to be injured unless the Defendants are enjoined from their unlawful conduct as alleged herein.

33.     Plaintiff American Federation of State, County and Municipal Employees District Council 37 Health & Security Plan ("DC 37") is a health and welfare benefit plan headquartered in New York, New York. District Council 37 (the "Union") is New York City's largest public employee union. The Union includes 51 local unions, representing public sector employees serving in thousands of job titles from Accountants to Zoo Keepers. Members covered by DC 37's benefit plan work in almost every agency in New York City, including but not limited to the City's police and fire departments, hospitals, schools, libraries, social service centers, water treatment facilities, and city colleges. DC 37 provides supplemental health benefits, including a prescription drug benefit, to approximately 313,000 individuals, including both active members

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

and their families and 50,000 retirees, who reside in numerous locations in the United States. During the Class Period, DC 37 indirectly purchased and paid for some or all of the purchase price for one or more generic Divalproex ER prescriptions, other than for resale, manufactured by the Defendants.  Plaintiff made such payments and/or reimbursements in Arizona, California, Colorado, Connecticut, Florida, Georgia, Kansas, Massachusetts, Mississippi, Nevada, New Jersey, New York, North Carolina, Pennsylvania, South Carolina, and Virginia, thereby suffering injury to its business and property.  During the Class Period, DC 37 paid and reimbursed more for these products than it would have absent Defendants' anticompetitive conduct to fix, raise, maintain, and stabilize the prices and allocate markets and customers for those products.  As a result of the alleged conspiracy, DC 37 was injured in its business or property by reason of the violations of law alleged herein.  DC 37 intends to continue purchasing and/or reimbursing for these drugs and will continue to be injured unless the Defendants are enjoined from their unlawful conduct as alleged herein.

34.     Plaintiff Louisiana Health Service & Indemnity Company d/b/a Blue Cross and Blue Shield of Louisiana and HMO Louisiana, Inc. (collectively, "BCBS-LA") is headquartered in Baton Rouge, Louisiana, and is Louisiana's oldest and largest domestic health insurer, with over 1 million members.  During the Class Period, BCBS-LA indirectly purchased, paid, and/or provided reimbursement on behalf of its members for some or all of the purchase price for one or more generic Divalproex ER prescriptions, other than for resale, manufactured by the Defendants.  Plaintiff made such payments and/or reimbursements in Alabama, Alaska, Arizona, Arkansas, California, Colorado, Florida, Georgia, Idaho, Illinois, Indiana, Kansas, Kentucky, Louisiana, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska,

13

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Virginia, Washington, West Virginia, Wisconsin and Wyoming, thereby suffering injury to its business and property. During the Class Period, BCBS-LA paid and reimbursed more for these products than it would have absent Defendants' anticompetitive conduct to fix, raise, maintain, and stabilize the prices and allocate markets and customers for those products. As a result of the alleged conspiracy, BCBS-LA was injured in its business or property by reason of the violations of law alleged herein. BCBS-LA intends to continue purchasing and/or reimbursing for these drugs and will continue to be injured unless the Defendants are enjoined from their unlawful conduct as alleged herein.

35.     Plaintiff Philadelphia Federation of Teachers Health and Welfare Fund ("Philadelphia Teacher's Fund") is a voluntary employee benefits plan organized pursuant to § 501(c) of the Internal Revenue Code to provide health benefits to its eligible participants and beneficiaries.   Philadelphia Teacher's Fund maintains its principal place of business in Philadelphia, Pennsylvania.  It provides health benefits, including prescription drug benefits, to approximately 34,000 beneficiaries and covered spouses and dependents.  During the Class Period Philadelphia Teacher's Fund indirectly purchased and paid for some or all of the purchase price for one or more generic Divalproex extended-release tablet prescriptions, other than for resale, manufactured by the Defendants.  Plaintiff made such payments and/or reimbursements in Arkansas, California, Delaware, Kansas, New Jersey, North Carolina and Pennsylvania.  During the Class Period, Philadelphia Teacher's Fund purchased and paid more for these products than it would have absent Defendants' anticompetitive conduct to fix, raise, maintain, and stabilize the

14

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

prices and allocate markets and customers for these products.  As a result of the alleged conspiracy, Philadelphia Teacher's Fund was injured in its business or property by reasons of the violations of law alleged herein.  Philadelphia Teacher's Fund intends to continue purchasing and/or reimbursing for these drugs and will continue to be injured unless the Defendants are enjoined from their unlawful conduct as alleged herein.

36.      Plaintiff Self-Insured Schools of California ("SISC") is a Joint Powers Authority under California law that serves the interests of California public school district members. It is headquartered in Bakersfield, California.  It provides health benefit plans to approximately 300,000 members who reside in numerous locations in the United States. During the Class Period, SISC indirectly purchased and paid for some or all of the purchase price for one or more generic Divalproex prescriptions, other than for resale, manufactured by the Defendants. SISC made such payments and/or reimbursements in Arizona, California, Colorado, Hawaii, Idaho, Illinois, Indiana, Louisiana, Maryland, New Hampshire, New Mexico, New York, Ohio, Oklahoma, Oregon, South Carolina, Texas, Utah, Virginia, and Washington thereby suffering injury to its business and property. During the Class Period, SISC paid and reimbursed more for these products more than it would have absent Defendants' anticompetitive conduct to fix, raise, maintain, and stabilize the prices and allocate markets and customers for those products. As a result of the alleged conspiracy, SISC was injured in its business or property by reason of the violations of law alleged herein. SISC intends to continue purchasing and/or reimbursing for these drugs and will continue to be injured unless the Defendants are enjoined from their unlawful conduct as alleged herein.

15

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

37.     Plaintiff Unite Here Health ("UHH") is a multi-employer trust fund composed of union and employer representatives, whose mission is to provide health benefits that offer high quality, affordable healthcare to its participants at a better value and with a better service than is otherwise available in the market. Headquartered in Aurora, Illinois, UHH has served union workers in the hospitality, food service, and gaming industries for the past several decades. During the Class Period, UHH indirectly purchased and paid for some or all of the purchase price for one or more generic Divalproex prescriptions, other than for resale, manufactured by the Defendants. Plaintiff made such payments and/or reimbursements in Arizona, California, Connecticut, Florida, Georgia, Illinois, Indiana, Kentucky, Maryland, Massachusetts, Michigan, Minnesota, Missouri, Nevada, New Hampshire, New Jersey, New York, North Carolina, Ohio, Pennsylvania, Rhode Island, South Carolina, Texas, and Virginia.  During the Class Period, UHH purchased and paid more for these products than it would have absent Defendants' anticompetitive conduct to fix, raise, maintain, and stabilize the prices and allocate markets and customers for these products. As a result of the alleged conspiracy, Plaintiff UHH was injured in its business or property by reason of the violations of law alleged herein. UHH intends to continue purchasing and/or reimbursing for these drugs and will continue to be injured unless the Defendants are enjoined from their unlawful conduct as alleged herein.

### V.     DEFENDANTS

38.     Dr. Reddy's Laboratories, Inc. ("Dr. Reddy's") is a New Jersey corporation with its principal place of business in Princeton, New Jersey.  It is a wholly-owned subsidiary of Dr. Reddy's Laboratories Ltd., which is an Indian company with its principal place of business in Hyderabad Telangana, India. Dr. Reddy's is registered with the Pennsylvania Department of

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

State as a foreign corporation and maintains a registered agent in Pennsylvania.  During the Class

Period, Dr. Reddy's sold generic Divalproex ER in this District and other locations in the United

States.

        39.      Defendant Mylan Inc. is a Pennsylvania corporation with its principal place of

business in Canonsburg, Pennsylvania.

        40.      Defendant Mylan Pharmaceuticals, Inc. is a West Virginia corporation with its

principal place of business in Morgantown, West Virginia.  It is a subsidiary of Mylan Inc.

Mylan Pharmaceuticals Inc. is registered with the Pennsylvania Department of State as a foreign

corporation and maintains a registered agent in Pennsylvania.

        41.      Mylan Inc. and Mylan Pharmaceuticals Inc. are wholly-owned subsidiaries of

Mylan N.V., a Dutch pharmaceutical company.  Unless addressed individually, Mylan Inc. and

Mylan Pharmaceuticals, Inc. are collectively referred to herein as "Mylan."  During the Class

Period, Mylan sold generic Divalproex ER to customers in this District and other locations in the

United States.

        42.      Defendant Par Pharmaceutical Inc. ("Par") is a New York corporation with its

principal place of business in Chestnut Ridge, New York.  Par is a wholly-owned subsidiary of

Endo International plc ("Endo"), an Irish corporation with its principal place of business located

in Dublin, Ireland.  In September 2015, Endo completed an acquisition of Par Pharmaceuticals

Holdings, Inc. and combined it with its existing generics subsidiary, Qualitest Pharmaceuticals,

naming the segment Par Pharmaceutical, Inc. Par is registered with the Pennsylvania Department

of State as a foreign corporation and maintains a registered agent in Pennsylvania.  During the

17

Class Period, Par sold generic Divalproex ER to customers in this District and other locations in the United States.

43.     Defendant Zydus Pharmaceuticals (USA), Inc. ("Zydus") is a New Jersey corporation with its principal place of business in Pennington, NJ. It is a subsidiary of Cadila HealthCare, and Indian company headquartered in Mumbai. Zydus is registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania.  During the Class Period, Zydus sold generic Divalproex ER to customers in this District and other locations in the United States.

## VI.     CO-CONSPIRATORS

44.     Various other persons, firms, corporations and entities have participated as co-conspirators with Defendants in the violations and conspiracy alleged below.  These co-conspirators have performed acts and made statements in furtherance of the antitrust violations and conspiracies alleged below.  Plaintiffs may amend this Complaint to allege the names of additional co-conspirators as they are discovered.

## VII.    INTERSTATE AND INTRASTATE COMMERCE

45.     During the Class Period, Defendants sold and distributed generic Divalproex ER in a continuous and uninterrupted flow of interstate commerce to customers throughout the United States, including in this District.

46.     Defendants' and their co-conspirators' conduct, including the marketing and sale of generic Divalproex ER, took place within the United States and has had, and was intended to have, a direct, substantial, and reasonably foreseeable anticompetitive effect upon interstate commerce within the United States.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

47.     Defendants' anticompetitive conduct occurred in part in trade and commerce within the states and territories set forth herein, and also had substantial intrastate effects in that, *inter alia*, retailers within each state and territory were foreclosed from offering less expensive generic Divalproex ER to Plaintiffs inside each respective state and territory. The foreclosure of these less expensive generic products directly impacted and disrupted commerce for Plaintiffs within each state and territory and forced Plaintiffs to pay supracompetitive prices.

## VIII.   BACKGROUND ON THE GENERIC DRUG INDUSTRY

### A.     Generic Drugs Are Commodity Products

48.     Approximately 88% of all pharmaceutical prescriptions in the United States are filled with a generic drug.[25]   In 2015, generic drug sales in the United States were estimated at $74.5 billion.[26]

49.     According to the U.S. Food & Drug Administration ("FDA"), a generic drug is "the same as a brand name drug in dosage, safety, strength, how it is taken, quality, performance, and intended use."[27]   Once the FDA approves a generic drug as "therapeutically equivalent" to a brand name drug, the generic version "can be expected to have equal effect and no difference when substituted for the brand name product."[28]

50.     In a competitive market, generic drugs cost substantially less than branded drugs. The U.S. Congressional Budget Office ("CBO") estimates that, "[o]n average, the retail price of

---

[25] GPhA, *Generic Drug Savings in the U.S.* (2015) ("GPhA Report") at 1, *available at* http://www.gphaonline.org/media/wysiwyg/PDF/GPhA_Savings_Report_2015.pdf

[26] Connecticut AG, Press Release (Dec. 15, 2016), *available at* http://www.ct.gov/ag/cwp/view.asp?Q=588538&A=2341

[27] FDA Website, *available at* http://www.fda.gov/Drugs/InformationOnDrugs/ucm079436.htm#G

[28] *Id.*

19

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

a generic drug is 75 percent lower than the retail price of a brand-name drug."[29]  And that may be conservative.  According to a Federal Trade Commission ("FTC") study, in a "mature generic market, generic prices are, on average, 85% lower than the pre-entry branded drug price."[30] Mature generic markets—like that for Divalproex ER—typically have several manufacturers that compete for sales, hence keeping prices in check.

51.     Generic drug price competition provides enormous savings to consumers, pharmacies, and other drug purchasers, as well as to private health insurers, health and welfare funds, and state Medicaid programs.  Indeed, one study found that the use of generic medicines saved the U.S. healthcare system $254 billion in 2014 alone, and $1.68 trillion between 2005 and 2014.[31]

52.     The significant cost savings provided by generic drugs motivated Congress to enact the Drug Price Competition and Patent Term Restoration Act of 1984, more commonly known as the "Hatch-Waxman Act" (Pub. L. No. 98-417, 98 Stat. 1585).  The Act streamlines the regulatory hurdles that generic drug manufacturers have to clear prior to marketing and selling generic drugs. Generic drug manufacturers may obtain FDA approval in an expedited fashion through the filing of an Abbreviated New Drug Application ("ANDA") that establishes that its product is bioequivalent to the branded counterpart.

53.     Since passage of the Hatch-Waxman Act, every state has adopted substitution laws requiring or permitting pharmacies to substitute generic drug equivalents for branded drug

---

[29] CBO, *Effects of Using Generic Drugs on Medicare's Prescription Drug Spending* (Sep. 15, 2010), *available at* https://www.cbo.gov/publication/21800

[30] FTC, *Pay-For-Delay: How Drug Company Pay-offs Cost Consumers Billions* (Jan. 2010), *available at* http://www.ftc.gov/os/2010/01/100112payfordelayrpt.pdf

[31] GPhA Report at 1.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

prescriptions (unless the prescribing physician specifically orders otherwise by writing "dispense as written" or similar language on the prescription).

54.     Because each generic is readily substitutable for another generic of the same branded drug, pricing is the main differentiating feature.  As recognized by the FTC, "generic drugs are commodity products" and, as a consequence of that, are marketed "primarily on the basis of price."[32]  In a competitive market, generic manufacturers cannot significantly increase prices (or maintain high prices in the face of a competitor's lower price) without losing a significant volume of sales.

55.     It is well-established that competition among generic manufacturers drives down price.  Before generic drugs enter a market, the branded drug has a monopoly and captures 100% of sales.  When lower-priced generics become available, the branded drug quickly loses market share as purchasers switch to the less expensive alternatives.  Over time, the price of a generic drug approaches the manufacturers' marginal costs.  As illustrated in the following chart, the price of a generic drug tends to decrease as more generic drug manufacturers enter the market:

---

[32] FTC, *Authorized Generic Drugs: Short-Term Effects and Long-Term Impact* (Aug. 2011), *available at* http://www.ftc.gov/os/2011/08/2011genericdrugreport.pdf

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER



**Generic Competition and Drug Prices**

Source: FDA analysis of retail sales data from IMS Health, IMS National Sales
Perspective (TM), 1999-2004, extracted February 2005

56.     When new entrants join a competitive generic market, they typically price their product below the prevailing market price in order to gain market share.  A recent government report confirmed this phenomenon in interviews with generic manufacturers: "[M]anufacturers said that if a company is bringing a generic drug into an established drug market, it typically offers a price that is lower than the current market price in order to build its customer base. Manufacturers also said that as each new manufacturer enters an established generic drug market the price of that generic will fall, with one manufacturer noting that it is typically a 20 percent price decline per entrant."[33]

57.     When there are multiple generic manufacturers in an established generic market—as with generic Divalproex ER—prices generally remain low, and should not increase absent a market disruption or, as is the case here, anticompetitive conduct.

---

[33] GAO Report at 23.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

### B.     Pricing in the U.S. Prescription Drug Industry

58.     In simple terms, the generic pharmaceutical supply chain flows as follows: Manufacturers sell drugs to wholesalers. Wholesalers sell drugs to pharmacies. Pharmacies dispense the drugs to consumers, who pay the full retail price if they are uninsured, or a portion of the retail price (*e.g.*, a co-pay or co-insurance) if they are insured.  The insured consumers' health plans then pay the pharmacies additional amounts that are specified in agreements between them and the pharmacies.  These agreements are sometimes arranged by middlemen known as Pharmacy Benefit Managers ("PBMs").

59.     Because the prices paid by purchasers of generic drugs differ at different levels of the market and most of the transactions occur between private parties according to terms that are not publicly disclosed, the price of a given drug is not always obvious.  Market-wide pricing for a given drug, however, may be observed through the Centers for Medicare & Medicaid Services ("CMS") survey of National Average Drug Acquisition Cost ("NADAC").  NADAC was "designed to create a national benchmark that is reflective of the prices paid by retail community pharmacies to acquire prescription . . . drugs."[34]  "NADAC is a simple average of the drug acquisition costs submitted by retail pharmacies."[35]  In effect, NADAC is "a single national average."[36]  Thus, NADAC is one way to track general price trends in the marketplace.

---

[34] CMS, Methodology for Calculating the National Average Drug Acquisition Cost (NADAC) for Medicaid Covered Outpatient Drugs at 5, *available at* https://www.medicaid.gov/medicaid-chip-program-information/by-topics/prescription-drugs/ful-nadac-downloads/nadacmethodology.pdf.

[35] *Id.* at 15.

[36] *Id.*

23

60.     While NADAC provides the average price level across all manufacturers of a given drug, other prices are manufacturer specific.  Drug manufacturers typically report benchmarks—like WACs (Wholesale Acquisition Costs)—for their drugs, which are then published in compendia used by participants in the pharmaceutical industry.  The benchmarks are not actual transaction prices; rather, they are the manufacturer's reported price.  Accordingly, WAC prices do not take into account discounts that may be provided, *e.g.*, for volume sales.[37]

61.     The amount that an end payer will pay a pharmacy for a generic drug typically is determined with reference to a benchmark or list price like a WAC.  The end payer pays the pharmacy an amount based on the manufacturer's list price for the drug, plus a small mark-up or dispensing fee.  Over time, third-party payers and PBMs have learned that manufacturers' list prices for some generic drugs can be substantially higher than the actual costs incurred by certain pharmacies to acquire the drugs.  As a consequence, end payers were paying more than simply the acquisition cost plus a small amount.

62.     To combat this, some third-party payers and PBMs have implemented their own proprietary benchmark prices—Maximum Allowable Costs ("MACs")—that set the amounts they will pay pharmacies for some generic drugs.  A MAC caps the amount that an end payer

---

[37] Average Wholesale Price ("AWP") is another benchmark price that is used in the pharmaceutical industry.  And QuintilesIMS's National Sales Perspectives ("NSP") is another measure of manufacturer specific pricing.  NSP data "captures 100% of the total U.S. pharmaceutical market, measuring sales at actual transaction prices rather than using an average wholesale price" and includes sales by manufacturers into various outlets.  IMS Institute for Healthcare Informatics, HSRN Data Brief: National Sales Perspectives at 1, *available at* https://www.imshealth.com/files/web/IMSH%20Institute/NSP_Data_Brief-.pdf.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

will pay a pharmacy for a given strength and dosage of a generic drug, regardless of the pharmacy's acquisition costs.

63.     Third-party payers and PBMs set the MAC of a drug based on several factors, one of which is believed to be the lowest acquisition cost in the market for that generic drug.  So, for example, if there are three manufacturers offering the same generic drug at three different prices, a PBM or third-party payer might set the MAC price at or near the lowest of the three prices.  A pharmacy could elect to buy from a manufacturer with a higher price, but upon resale to a customer of the PBM or third-party payer, the pharmacy would only be paid the MAC price.

64.     Drug purchasers always should have an incentive to buy the least expensive available drug.  Because MAC prices further incentivize pharmacies to choose the lowest priced option, a generic manufacturer that increases its price for a drug should expect to lose sales to a competitor with a lower price.  Consequently, in the absence of coordinated pricing activity among generic manufacturers, an individual manufacturer should not be able to significantly increase its price (or maintain a higher price in the face of a significantly lower competitor price) without incurring the loss of a significant volume of sales.  A manufacturer can only raise its price if it knows its competitors will raise their prices, too, *e.g.*, if they are conspiring.

## IX.     THE GENERIC DIVALPROEX ER CONSPIRACY

### A.     Congressional Responses to Generic Drug Price Increases

65.     In addition to the investigations by DOJ and the Connecticut AG, Congress has raised concerns about the alarming price spikes for numerous generic pharmaceuticals.  These concerns were prompted by the very real hardship suffered by end payers as a result of the

25

unprecedented price increases.  As noted above, the GAO identified Divalproex ER as one of the drugs that had experienced extraordinary price increases.

66.     In the Fall of 2014, Senator Bernie Sanders and Representative Elijah Cummings requested information from manufacturers of 10 drugs that had experienced extraordinary price increases.  Six of those drugs, including Divalproex ER, are now the subject of complaints in this MDL.[38]  Defendants Dr. Reddy's, Mylan, Par, and Zydus each received letters from Senator Sanders and Representative Cummings concerning their pricing of Divalproex ER, which requested, among other things: (1) "gross revenues from the company's sales of [Divalproex ER]", (2) "total expenses relating to the sales of [Divalproex ER]", (3) "a description and valuation of the specific financial and non-financial factors that contributed to your company's decisions to increase the prices of [Divalproex ER]", and (4) "the identity of company official(s) responsible for setting the price of [Divalproex ER] over the [period January 1, 2012 to the present]".[39]

67.     In November 2014, the Senate Subcommittee on Primary Health and Aging conducted a hearing entitled, "Why Are Some Generic Drugs Skyrocketing in Price?" ("Senate Hearing").  The presidents and CEOs of three generic manufacturers refused to testify at the hearing, but pharmaceutical industry experts testified that generic drug prices were not following traditional pricing patterns and were instead undergoing substantial increases.[40]

---

[38] Senator Sanders, Press Release, *Congress Investigating Why Generic Drug Prices Are Skyrocketing* (Oct. 2, 2014), *available at* https://www.sanders.senate.gov/newsroom/press-releases/congress-investigating-why-generic-drug-prices-are-skyrocketing

[39] *See, e.g.*, Ltr. to Paul V. Campanelli, CEO, Par Pharmaceutical Companies Inc. at 3.

[40] Senate Hearing (Nov. 20, 2014), *available at* https://www.help.senate.gov/hearings/why-are-some-generic-drugs-skyrocketing-in-priced

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

68.     Senator Sanders and Representative Cummings followed up with a request to the Office of the Inspector General of the Department of Health & Human Services ("OIG"), asking it to investigate the effect that price increases of generic drugs have had on the Medicare and Medicaid programs.[41]   The OIG issued its report in December 2015, confirming that price increases for numerous generic drugs far out-stripped inflation.[42]

69.     In response to another Congressional request—this one from Senators Susan Collins, Claire McCaskill, Bill Nelson and Mark Warner—the United States Government Accountability Office ("GAO") issued a report in August 2016 entitled "Generic Drugs Under Medicare: Part D Generic Drug Prices Declined Overall, but Some Had Extraordinary Price Increases."[43]   The GAO investigation confirmed that in a competitive market, generic drug prices decline and remain stable, absent shortages or other market disruptions.[44]   And this was the case for most generics.   But it identified numerous drugs, including Divalproex ER, that experienced "extraordinary" increases, which it defined as an increase of more than 100%.[45]

**B.      The Generic Divalproex ER Market**

70.     Divalproex ER is indicated to treat acute manic or mixed episodes associated with bipolar disorder, as well as prophylaxis (prevention) of migraine headaches.   Divalproex ER is derived from valproate (specifically, valproate sodium), a compound that has been known since the late 19th century and has been used for medicinal purposes since the 1960s.   Valproate has

---

[41] https://www.sanders.senate.gov/download/sanders-cummings-letter?inline=file.

[42] HHS OIG, *Average Manufacturer Prices Increased Faster than Inflation for Many Generic Drugs* (Dec. 2015), *available at* https://oig.hhs.gov/oas/reports/region6/61500030.pdf

[43] GAO Report.

[44] *Id.* at 23-25.

[45] *Id.* at 1 & Appendix III.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

become so common in its use that it is listed as an "Essential Medicine" by the World Health Organization.

71.   AbbVie manufactures and sells a branded version of Divalproex ER under the name Depakote ER®. AbbVie's predecessor-in-interest, Abbott Laboratories, submitted NDA 21-168 for the approval of Depakote ER, in the 250 mg and 500 mg strengths, on September 30, 1999.  The FDA approved Depakote ER on August 4, 2000, and Abbott Laboratories began selling the drug soon thereafter.  Depakote ER was a blockbuster drug for AbbVie, generating U.S. sales of over $900 million in the 12 months leading up to September 30, 2008 alone.

72.   Mylan received approval to market generic versions of Divalproex ER in January 2009, and began marketing in February 2009.[46]   Par's predecessor-in-interest, Anchen Pharmaceuticals, received approval to market generic versions of Divalproex ER in March 2009, and began marketing in February 2009.[47]  Dr. Reddy's received approval to market generic versions of Divalproex ER in March 2012, and began marketing in August 2013.[48]  Zydus received approval to market generic versions of Divalproex ER in February 2009, and began marketing in August 2013.[49]

---

[46] Mylan Divalproex ER Label, https://dailymed.nlm.nih.gov/dailymed/fda/fdaDrugXsl.cfm?setid=00332c65-edad-a153-9c78-628931daa732&type=display.

[47] Par Divalproex ER Label, https://dailymed.nlm.nih.gov/dailymed/fda/fdaDrugXsl.cfm?setid=47ef5501-1408-41fa-b0e5-f078f18129f5&type=display.

[48] Dr. Reddy's, Press Release, *Dr. Reddy's announces the Launch of Divalproex Sodium Extended – Release Tablets*, USP (Aug. 22, 2013), http://www.drreddys.com/media/press-releases/22aug-2013.html.

[49] Zydus Divalproex ER Label, https://dailymed.nlm.nih.gov/dailymed/fda/fdaDrugXsl.cfm?setid=44941df2-1f25-706c-6544-b146d109634b&type=display.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

73.     Drug market analysts have noted that Divalproex ER is a "low competition" market, which means it is concentrated among only a few competitors.  During the Class Period, the Defendants dominated the market with about a ▮▮▮ share.

74.     In terms of revenue, in 2014, Defendants' sales were roughly ▮▮▮▮▮▮: Defendant Dr. Reddy's sales were about ▮▮▮▮▮; Defendant Mylan's sales were about ▮▮▮▮ ; Defendant Par's sales were about ▮▮▮▮▮   and Defendant Zydus's sales were about ▮▮▮▮.

75.     Thus, at all relevant times, Defendants had substantial market power with respect to generic Divalproex ER.

### C.     Divalproex ER Price Increases

76.     In a competitive market, sellers have incentives to cut prices to maintain or increase market share.  It would be economically irrational for an individual seller to drastically increase prices without assurances that its rivals would do the same.  Absent such assurances, the seller would risk a loss of market share that would more than offset the higher prices it was charging.  In the Divalproex ER market, however, Defendants knew that they would not lose market share because they had *all* agreed to raise prices so that customers would have no less expensive source of supply and no choice but to pay the skyrocketing prices for Divalproex ER.

77.     Only Defendants Mylan and Par were selling any significant amounts of the relevant Divalproex ER products before the Class Period.  Before the Class Period, their effective prices remained stable for years, as is typical in a mature market.  From December 2010 through May 2013, *i.e.*, for over two years leading up to the price-fixing conspiracy, the standard deviation percentage of mean prices for Defendants Mylan and Par was no more than ▮▮▮

29

78.     As seen in the graphs and tables below, Mylan's and Par's generic Divalproex ER prices rose rapidly.  Dr. Reddy's and Zydus, when they entered the market in August 2013, set their prices at similar levels to Mylan and Par. Significantly, Defendants' price increases coincided with trade association meetings attend by representatives of each Defendant. For example, the June 2013 price increases by Mylan and Par coincided with Defendants' attendance at the GPhA CMC Workshop on June 4-5, 2013, and the HDMA Business and Leadership Conference on June 2-5, 2013. Similarly, Dr. Reddy's and Zydus's respective market entries and decisions to price at Mylan's and Par's levels coincided with Defendants' attendance at the NACDS Total Store Expo on August 10-13, 2013.

79.     As illustrated below, Mylan and Par's effective prices inexplicably increased sharply beginning in June 2013:

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER



31



80.   **Mylan**: For over two years before the Class Period began, the average effective price per unit of its products was: █████████ for its 250 mg and 500 mg strengths of Divalproex ER.

81.   ███████████████████████████████████ ████████

███████████████████████████ [50]

---

[50] Plaintiffs calculate Defendants' effective prices based on IMS Health's National Sales Perspectives (NSP) data, which "captures 100% of the total U.S. pharmaceutical market, measuring sales at actual transaction prices[.]"  IMS Institute for Healthcare Informatics, HSRN Data Brief: National Sales Perspectives at 1, *available at* https://www.imshealth.com/files/web/IMSH%20Institute/NSP_Data_Brief-.pdf.  Effective prices are calculated to multiple decimals.  For ease of reference, prices in this complaint are rounded to the nearest cent.  However, percentage increases are calculated based on the more precisely calculated price.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

| Product | Price May 2013 | Hike Date | Hike Price | Percentage Increase |
|---------|----------------|-----------|------------|---------------------|
| ER TAB 250 MG | ■ | ■ | ■ | ■ |
| ER TAB 500 MG | ■ | ■ | ■ | ■ |

82. ████████████████████████████████████████████████

████████████████████████████████████████████:

| Product | Price Date | Peak Price | Percentage Increase |
|---------|-----------|------------|---------------------|
| ER TAB 250 MG | ■ | ■ | ■ |
| ER TAB 500 MG | ■ | ■ | ■ |

83. ████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████:

| Product | Price May 2013 | Price Nov. 2016 | Percentage Increase |
|---------|----------------|-----------------|---------------------|
| ER TAB 250 MG | ■ | ■ | ■ |
| ER TAB 500 MG | ■ | ■ | ■ |

84. **Par**: For over two years before the Class Period began, the average effective price per unit of its products was: ███████████ for its 250 mg and 500 mg strengths of Divalproex ER.

85. ████████████████████████████████████████████████

████████████████████████████████████:

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

| Product | Price May 2013 | Hike Date | Hike Price | Percentage Increase |
|---|---|---|---|---|
| ER TAB 250 MG | ██ | ██ | ██ | ██ |
| ER TAB 500 MG | ██ | ██ | ██ | ██ |

86.    ████████████████████████████████████████

████████████████████████████████████████:

| Product | Price Date | Peak Price | Percentage Increase |
|---|---|---|---|
| ER TAB 250 MG | ██ | ██ | ██ |
| ER TAB 500 MG | ██ | ██ | ██ |

87.    ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████

| Product | Price May 2013 | Price Nov. 2016 | Percentage Increase |
|---|---|---|---|
| ER TAB 250 MG | ██ | ██ | ██ |
| ER TAB 500 MG | ██ | ██ | ██ |

88.    **Dr. Reddy's**: With the exception of a few isolated sales of its 500 mg product, Dr. Reddy's did not enter the Divalproex ER market until August 2013.  Instead of competing on price, Dr. Reddy's effective prices generally peaked within a few months after entering the market at supracompetitive prices, comparable to the other Defendants.  Likewise, even today its prices are far above Defendants' pre-conspiracy prices.

34

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

89.     **Zydus**: Similarly, Zydus did not enter the Divalproex ER market until August 2013.  Instead of competing on price, Zydus entered the market at supracompetitive prices, comparable to the other Defendants.  Likewise, even today its prices are far above Defendants' pre-conspiracy prices.

90.     Defendants coordinated not only their effective sales prices to customers, but also their *benchmark* prices such as WAC.

91.     The following tables show the dramatic increases in Defendants' Divalproex ER WACs:

| Product | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---------|-----------|-----|---------|---------|------------------|---------------------|
| 250 mg ER, 100 ct. | Mylan | 00378-0472-01 | $0.60 | $1.96 | 14-Jun-13 | 230% |
| 250 mg ER, 500 ct. | Mylan | 00378-0472-05 | $0.57 | $1.96 | 14-Jun-13 | 247% |
| 250 mg ER, 90 ct. | Mylan | 00378-0472-77 | $1.34 | $1.96 | 14-Jun-13 | 46% |
| 250 mg ER, 100 ct. | Par | 10370-0510-10 | $0.60 | $1.96 | 26-Jun-13 | 230% |
| 250 mg ER, 500 ct. | Par | 10370-0510-50 | $0.57 | $1.96 | 26-Jun-13 | 247% |
| 250 mg ER, 100 ct. | Dr. Reddy's | 55111-0533-01 | * | $1.96 | 19-Aug-13 | * |
| 250 mg ER, 500 ct. | Dr. Reddy's | 55111-0533-05 | * | $1.96 | 19-Aug-13 | * |

35

| Product | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 250 mg ER, 100 ct. | Zydus | 68382-0314-01 | * | $1.96 | 14-Aug-13 | * |

| Product | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 500 mg ER, 100 ct. | Mylan | 00378-0473-01 | $0.74 | $3.26 | 14-Jun-13 | 338% |
| 500 mg ER, 500 ct. | Mylan | 00378-0473-05 | $0.71 | $3.26 | 14-Jun-13 | 361% |
| 500 mg ER, 90 ct. | Mylan | 00378-0473-77 | $2.36 | $3.26 | 14-Jun-13 | 38% |
| 500 mg ER, 100 ct. | Par | 10370-0511-10 | $0.74 | $3.26 | 26-Jun-13 | 338% |
| 500 mg ER, 500 ct. | Par | 10370-0511-50 | $0.71 | $3.26 | 26-Jun-13 | 361% |
| 500 mg ER, 100 ct. | Dr. Reddy's | 55111-0534-01 | * | $3.26 | 19-Aug-13 | * |
| 500 mg ER, 500 ct. | Dr. Reddy's | 55111-0534-05 | * | $3.26 | 19-Aug-13 | * |
| 500 mg ER, 100 ct. | Zydus | 68382-0315-01 | * | $3.26 | 14-Aug-13 | * |
| 500 mg ER, 500 ct. | Zydus | 68382-0315-05 | * | $3.26 | 14-Aug-13 | * |

36

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

92.     The Centers for Medicare & Medicaid Services ("CMS") also tracks average drug prices in its National Average Drug Acquisition Cost ("NADAC") database.  That data, too, shows a sharp price increase for Divalproex ER following an extended period of extremely stable prices:



37

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER



93.     Defendants' generic Divalproex ER pricing cannot be explained by the operation of competitive market forces.  For example, the price increases cannot be attributed to the need to fund research, development and advertising because generic pharmaceutical firms do not incur the large research, development and advertising costs that brand firms absorb in developing and marketing new drugs.

94.     Nor can shortages in raw materials explain the sudden and dramatic increases in the prices of generic Divalproex ER.  Federal law requires that drug manufacturers report drug shortages.[51]   Divalproex ER is not listed on the FDA's list of Current and Resolved Drug Shortages and Discontinuations Reported to FDA.  Divalproex ER also does not appear on any

---

[51] FDA Safety and Innovation Act of 2012, Pub. L. No. 112-144, §§ 1001-1008, 126 STAT. 995, 1099-1108, *codified as*, 21 U.S.C. §§ 356c, 356c-1, 356d, 356e, 826a, 356f.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

archived lists of the American Society of Health-System Pharmacists ("ASHP") Current Shortage Bulletins from July 3, 2012 through the present, nor does it appear on the current list of ASHP Resolved Shortage Bulletins (which includes drug shortages dating back to August 2010). None of the Defendants reported any drug shortages or supply disruptions to the FDA.

95.    In addition, demand for Divalproex ER has not materially changed between 2010 and the present.  If anything, in defiance of rational economic behavior, demand for Divalproex ER was actually *decreasing* when prices were *increasing*.  This phenomenon was demonstrated in Senator Sanders and Representative Cummings' joint letter to the Office of the Inspector General, Department of Health and Human Services.  In their letter, the congressmen noted that Medicare and Medicaid reimbursements (*i.e., **dollars spent***) for Divalproex ER increased ***over 233%*** between the periods (1) July 1, 2012 through June 30, 2013 and (2) July 1, 2013 through June 30, 2014, even though ***prescriptions*** for Divalproex ER ***fell over 23%*** at the same time.[52] The following table shows the specific numbers:

---

[52] Ltr. from Sen. Bernard Sanders & Rep. Elijah Cummings to Hon. Daniel R. Levinson, OIG, HHS (Feb. 24, 2015), at 3, https://www.sanders.senate.gov/download/sanders-cummings-letter?inline=file.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**Table 3. Estimated Medicaid FFS Drug Expenditures for Selected Generic Drugs**
July 1, 2012 to June 30, 2013 and July 1, 2013 to June 30, 2014

| Selected Drugs | 07/01/2012-06/30/2013 | | 07/01/2013-06/30/2014 | | Percentage Change | |
|---|---|---|---|---|---|---|
| | Number of Prescriptions | Medicaid Paid[a] | Number of Prescriptions | Medicaid Paid[a] | Number of Prescriptions | Medicaid Paid[a] |
| Albuterol Sulfate 2 MG Tablet | 4,255 | $162,700 | 3,300 | $823,953 | -22.44% | 406.4% |
| Doxycycline Hyclate 100 MG Capsule | 436,778 | $7,331,824 | 272,456 | $16,225,250 | -37.62% | 121.3% |
| Divalproex Sodium ER 500 MG Tablet | 604,801 | $24,048,150 | 463,085 | $80,131,865 | -23.43% | 233.2% |
| Pravastatin Sodium 10 MG Tablet | 63,380 | $491,351 | 76,759 | $996,004 | 21.1% | 102.7% |
| Benazepril-Hydrochlorothiazide 20-25 MG Tablet | 12,702 | $177,912 | 10,866 | $328,323 | -14.4% | 84.5% |
| Digoxin 250 MCG Tablet | 75,128 | $594,952 | 63,303 | $1,130,834 | -15.7% | 90.1% |
| Total for these Drugs | 1,197,044 | $32,806,890 | 889,769 | $99,636,229 | -25.7% | 203.7% |

**Source:** CRS analysis of CMS Medicaid drug utilization data. Medicaid data are for fee-for-service (FFS) prescriptions only and are based on data reported by states and DC. The Medicaid paid amount in Table 3 includes both state and federal expenditures. No attempt was made to verify these data or to determine if all states submitted data.

Notes: a. Before all Medicaid rebates.

96.     Although Defendants' Divalproex ER prices have eroded somewhat since their June 2013 price increases, they still remain substantially above their pre-June 2013 prices. Defendants' coordinated pricing has deprived, and continues to deprive, Plaintiffs and members of the Classes the benefits of free and open competition—namely, lower prices for generic versions of Divalproex ER.  As a result, Plaintiffs and members of the Classes have paid and continue to pay supracompetitive prices for generic Divalproex ER.

97.     The overcharges arising from Defendants' conduct are directly traceable through the pharmaceutical distribution chain to Plaintiffs.  Manufacturers first sell generic drugs to direct purchasers, such as wholesalers and large retail pharmacy chains, based on the listed WAC or AWP, minus applicable discounts and chargebacks.  Wholesalers then sell the generic drugs to retail pharmacies, which in turn sell them to consumers.  These purchases are often reimbursed in whole or in part by health plans, including the self-funded plans that are Plaintiffs in this action.

40

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

98.     As explained above, at ¶¶ 60-61, price benchmarks such as WAC often serve as the basis for reimbursement schedules that determine how much of the generic drug's cost a health plan is required to cover.  Thus, Defendants' pricing—whether actual transaction-level pricing or benchmark pricing—permeates the entire generic drug distribution chain.

99.     Because of this, Defendants' price hikes caused extreme hardship to end payers, including Plaintiffs.  Defendants' price increases for Divalproex ER resulted in corresponding increases to the prices paid by Plaintiffs and members of the Classes.

**D.     Defendants' Conspiracy[53]**

100.    During the Class Period, Defendants conspired, combined, and contracted to fix, maintain, and stabilize prices, rig bids, and engage in market allocation for Divalproex ER, which had the intended and actual effect of causing Plaintiffs and the other members of the proposed Class to pay artificially inflated prices above prices that would exist if a competitive market had determined prices for Divalproex ER.

101.    To sustain a conspiracy, conspirators often communicate to ensure that all are adhering to the collective scheme.  Here, such communications occurred primarily through (1) trade association meetings and conferences, (2) private meetings, dinners, and outings among smaller groups of employees of various generic drug manufacturers, and (3) individual private communications between and among Defendants' employees through use of the phone, electronic messaging and similar means.

---

[53] The allegations included in this section pertaining to HDMA, ECRM and NACDS are based in part upon documents produced to plaintiffs pursuant to subpoenas *duces tecum* issued in *In re Propranolol Antitrust Litigation*, No. 16-cv-9901 (S.D.N.Y.).

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

102.    The purpose of these secret, conspiratorial meetings, discussions, and communications was to ensure that all Defendants agreed to participate in, implement, and maintain an unlawful bid-rigging, price fixing, and market and customer allocation scheme.

103.    The industry intelligence-gathering reporting firm *Policy and Regulatory Report* has reportedly obtained information regarding the investigation of generic drug companies by DOJ, and has indicated that DOJ is investigating the extent to which trade associations and industry conferences have been used as forums for collusion among competing generic drug companies.[54]   The State AGs have similarly noted the centrality of trade associations and industry conferences in their investigation, stating that they have uncovered evidence that certain generic drug companies "routinely coordinated their schemes through direct interaction with their competitors at industry trade shows, customer conferences and other events, as well as through direct email, phone, and text message communications."[55]

104.    Defendants were members of numerous trade associations, which they used to facilitate their conspiratorial communications and implement their anticompetitive scheme, including the GPhA, HDMA, NACDS, and ECRM.   These trade associations held regular meetings that were attended by Defendants' representatives, among others.

---

[54] Eric Palmer, *Actavis gets subpoena as DOJ probe of generic pricing moves up food chain*, FiercePharma (Aug. 7, 2015), *available at* http://www.fiercepharma.com/story/actavis-gets-subpoena-doj-probe-generic-pricing-moves-food-chain/2015-08-07.

[55] CTAG Website, Press Release, *40 State Attorneys General Now Plaintiffs in Federal Generic Drug Antitrust Lawsuit* (Mar. 1, 2017), *available at* http://www.ct.gov/ag/cwp/view.asp?Q=590616&A=2341.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

105.   **GPhA:** The GPhA is the "leading trade association for manufacturers and distributors of generic prescription drugs . . . ."[56]  GPhA was formed in 2000 from the merger of three industry trade associations: the Generic Pharmaceutical Industry Association, the National Association of Pharmaceutical Manufacturers, and the National Pharmaceutical Alliance. GPhA's website touts, "By becoming part of GPhA, you can participate in shaping the policies that govern the generic industry" and lists its "valuable membership services, such as business networking opportunities, educational forums, access to lawmakers and regulators, and peer-to-peer connections."[57]  GPhA's "member companies supply approximately 90 percent of the generic prescription drugs dispensed in the U.S. each year."

106.   Defendants Dr. Reddy's, Mylan, Par, and Zydus have been regular members of the GPhA during the Class Period.  Regular members "are corporations, partnerships or other legal entities whose primary United States business derives the majority of its revenues from sales of (1) finished dose drugs approved via ANDAs; (2) products sold as authorized generic drugs; (3) biosimilar/biogeneric products; or (4) DESI products."[58]

107.   Several of Defendants' high-ranking corporate officers have served on GPhA's Board of Directors before and during the Class Period:

> (a)   **2012 Board of Directors**:  Joseph Renner, President & CEO of Zydus;
> and Tony Mauro, President of Mylan Pharmaceuticals;

---

[56] GPhA, The Association, *available at* http://web.archive.org/web/20150413013801/http://www.gphaonline.org:80/about/the-gpha-association.
[57] GPhA, Membership, *available at* http://web.archive.org/web/20150413013008/http://www.gphaonline.org:80/about/membership/.
[58] *Id.*

43

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

(b)   **2013 Board of Directors:**  Joseph Renner, President & CEO of Zydus; and Tony Mauro, President of Mylan;

(c)   **2014 Board of Directors:**  Joseph Renner, President & CEO of Zydus; and Tony Mauro, President of Mylan;

(d)   **2015 Board of Directors:**  Joseph Renner, President & CEO of Zydus; Tony Pera, Chief Commercial Officer of Par;

(e)   **2016 Board of Directors:**  Joseph Renner, President & CEO of Zydus; Tony Pera, Chief Commercial Officer of Par; Heather Bresch, CEO of Mylan; and Alok Sonig, EVP and Head of North America Generics of Dr. Reddy's.

108.   Former Heritage CEO Jeffrey Glazer, who pleaded guilty to federal criminal charges relating to price fixing and other anticompetitive activity concerning generic pharmaceuticals, also served on GPhA's Board of Directors.

109.   Defendants (or their affiliates) attended the GPhA meetings shortly before and during the Class Period.  These meetings provided Defendants opportunities to collude.  For example, on October 1-3, 2012, GPhA held a meeting in Bethesda, Maryland which was attended by representatives of each of the Defendants, including at least the following key executives:

(a)   **Dr. Reddy's:** Victor Borelli, VP & Head, National Accounts, N.A. Generics; Jinping McCormick, VP Rx Marketing, US Generics; Jeff Burd, VP, Sales & Marketing; Jake Austin, Director, National Accounts; and

(b)   **Mylan**: Marcie McClintic, Vice President and General Counsel.

44

110.    Other GPhA meetings attended by Defendants include:

| Event | Attendees |
|---|---|
| 2013 GPhA Annual Meeting<br><br>February 20-22, 2013<br>Orlando, Florida | • Dr. Reddy's Laboratories<br>• Mylan Inc.<br>• Mylan North America<br>• Mylan Pharmaceuticals Inc.<br>• Par Pharmaceutical Companies<br>• Zydus Pharmaceuticals USA Inc. |
| 2013 GPhA CMC Workshop<br><br>June 4-5, 2013<br>Bethesda, Maryland | • Dr. Reddy's Laboratories Limited<br>• Dr. Reddy's Laboratories, Inc.<br>• Mylan Institutional<br>• Mylan Pharmaceuticals Inc. North America<br>• Mylan Technologies Inc.<br>• Par Pharmaceutical Inc.<br>• Zydus Pharmaceuticals |
| 2013 GPhA Fall Technical Conference<br><br>October 28-30, 2013<br>Bethesda, Maryland | • Dr. Reddy's Laboratories Limited<br>• Dr. Reddy's Laboratories, Inc.<br>• Dr. Reddy's Laboratories Louisiana, LLC<br>• Mylan Institutional<br>• Mylan Laboratories LTD<br>• Mylan Pharmaceuticals Inc.<br>• Mylan Technologies, Inc.<br>• Par Formulations Pvt Ltd<br>• Par Pharmaceutical Inc.<br>• Zydus Pharmaceuticals USA |
| 2014 GPhA Annual Meeting<br><br>February 19-21, 2014<br>Orlando, Florida | • Dr. Reddy's Laboratories<br>• Mylan North America<br>• Mylan Pharmaceuticals Inc.<br>• Mylan Pharmaceuticals ULC<br>• Mylan, Inc.<br>• Par Pharmaceutical Companies, Inc.<br>• Zydus Pharmaceuticals USA, Inc. |

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

| Event | Attendees |
|---|---|
| 2014 GPhA CMC Workshop<br><br>North Bethesda, Maryland<br>June 3-4, 2014 | • Dr. Reddy's Laboratories Limited<br>• Mylan Inc.<br>• Mylan Institutional<br>• Mylan Pharmaceuticals<br>• Mylan Technologies Inc.<br>• Par Pharmaceutical Inc.<br>• Par Sterile Products, LLC<br>• Zydus Pharmaceuticals |
| 2014 GPhA Fall Technical Conference<br><br>October 27-29, 2014<br>North Bethesda, Maryland | • Dr. Reddy's Laboratories Limited<br>• Dr. Reddy's Laboratories TN, LLC<br>• Dr. Reddy's Laboratories, Inc.<br>• Mylan Inc.<br>• Mylan Institutional<br>• Mylan Laboratories<br>• Mylan Laboratories Limited<br>• Mylan Pharma UK Ltd<br>• Mylan Pharmaceuticals Inc.<br>• Mylan Pharmaceuticals<br>• Mylan Technologies Inc.<br>• Par Pharmaceutical<br>• Par Sterile Products, LLC<br>• Zydus Healthcare (USA), LLC |
| 2015 GPhA Annual Meeting<br><br>February 9-11, 2015<br>Miami Beach, Florida | • Dr. Reddy's Laboratories, Inc.<br>• Mylan Inc.<br>• Mylan Pharmaceuticals Inc.<br>• Par Pharmaceutical, Inc.<br>• Zydus Pharmaceuticals USA Inc. |
| 2015 GPhA CMC Workshop<br><br>June 9 - 10, 2015<br>North Bethesda, Maryland | • Dr. Reddy's Laboratories Inc.<br>• Dr. Reddy's Laboratories Limited<br>• Mylan Inc.<br>• Mylan Institutional Inc.<br>• Mylan Pharma UK Ltd<br>• Mylan Technologies Inc.<br>• Par Pharmaceutical Companies Inc.<br>• Par Pharmaceuticals<br>• Par Sterile Products<br>• Zydus Cadila Healthcare Limited<br>• Zydus Pharmaceuticals USA Inc. |

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

| Event | Attendees |
|---|---|
| 2015 GPhA Fall Technical Conference<br><br>November 2 - 4, 2015<br>North Bethesda, Maryland | • Dr. Reddy's Laboratories Inc.<br>• Dr. Reddy's Laboratories Limited<br>• Mylan Inc.<br>• Mylan Institutional<br>• Mylan Laboratories Limited<br>• Mylan Pharmaceuticals, Inc.<br>• Mylan Technologies Inc.<br>• Par Pharmaceutical Inc.<br>• Par Sterile Products, LLC<br>• Zydus Cadila Healthcare Limited<br>• Zydus Pharmaceuticals USA Inc. |

111.   **NACDS:**   The NACDS is a national trade association representing chain community pharmacies.  Its members include generic drug manufacturers, wholesalers and retail chain pharmacies. NACDS holds regular industry events, including annual and regional conferences, including the NACDS Annual Meeting and annual Total Store Expo.

112.   NACDS describes the Annual Meeting as "the industry's most prestigious gathering of its most influential leaders," and a "classic 'Top-to-Top' business conference" for the pharmaceutical retailing and manufacturing industries. Attendees to the Annual Meetings are provided a list of participating companies in advance, have access to private meeting rooms where executives can meet in person, and can attend a variety of business programs, invitation-only events, and social functions.  Similarly, NACDS describes the annual "Total Store Expo," as "the industry's largest gathering of its most influential leaders. It is a combination of both strategic and tactical business meetings between existing and new trading partners and is attended by industry decision makers."   Defendants and other generic drug manufacturers attended the NACDS Annual Meetings and Total Store Expos.

47

113.    On April 20-23, 2013, NACDS held its 2013 Annual Meeting in Palm Beach, Florida. NACDS's  2013 Annual Meeting was attended by representatives from all Defendants, including at least the key executives for generic drug sales and pricing:

> (a)    **Dr. Reddy's:**  John Adams, Sr. VP, Sales & Marketing; Jeff Burd, VP, Sales & Marketing; Gary Benedict, EVP;
>
> (b)    **Mylan:**   Joseph Duda, President; Robert Potter, SVP N.A. National Accounts and Channel Development; Tony Mauro, COO;
>
> (c)    **Par:**   Michael Altamuro, Vice President, Marketing; Paul Campanelli, President; Jon Holden, VP, Sales; Renee Kenny, Sr. Advisor, Generic Sales; and
>
> (d)    **Zydus:**   Michael Keenley, President; Joseph Renner, President & CEO; Kristy Ronco, VP, Sales; Laura Short, VP, Sales; Karen Strelau, EVP Sales & Marketing.

114.    Moreover, around the time that Dr. Reddy's and Zydus launched their Divalproex ER, Defendants met at the NACDS 2013 Total Store Expo.  On August 10-13, 2013, NACDS held its 2013 Total Store Expo at the Sands Expo Convention Center in Las Vegas, Nevada. The Expo was attended by the following key executives for generic drug sales and pricing from all Defendants:

> (a)    **Dr. Reddy's:**  Chris Costa, VP of Sales; Victor Borelli, VP & Head, National Accounts, N.A. Generics; Jinping McCormick, VP Rx Marketing, US Generics; Nimish Muzumdar, Director of Marketing; Larry

48

Knupp, Director of National Accounts; Gary Benedict, EVP; Umang Vohra, EVP & Head of NA Generics;

(b) **Mylan**:   Mike Aigner, Director, National Accounts; Joseph Duda, President; Kevin McElfresh, Executive Director, National Accounts; Robert O'Neill, Head of Sales, Generic NA; Robert Potter, SVP, National Accounts & Channel Development; Lance Wyatt, Director, National Accounts; Matt Cestra, Sr. Director Marketing; Rodney Emerson, Director, Pricing & Contracts; Edgar Escoto, Director National Accounts; Stephen Krinke, National Accounts Manager; Damon Pullman, West Regional Account Manager; Sean Reilly, National Accounts Manager;

(c) **Par**:   Michael Altamuro, VP, Marketing; Gerald Burton, VP, National Accounts; Christine Caronna, Director National Accounts; Rick Guillory, VP, National Accounts; Jon Holden, VP Sales; Renee Kenney, Sr. Advisor Generic Sales; Karen O'Connor, VP, National Accounts; and

(d) **Zydus**:   Michael Keenley, President; Joseph Renner, President & CEO; Kristy Ronco, VP, Sales; Laura Short, VP, Sales; Karen Strelau, EVP Sales & Marketing; Elizabeth Purcell, Sr. Director, Marketing and Portfolio Management; Ganesh Nyak, COO & Executive Director; Daniel Lukasiewicz, Sr. Manager, Marketing Ops; Sharvil Patel, Deputy Managing Director.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

115.    On April 26-29, 2014, NACDS held its 2014 annual meeting in Scottsdale, Arizona. NACDS's 2014 annual meeting was attended by the following key executives for generic drug sales and pricing from all Defendants:

    (a)    **Dr. Reddy's:**  Chris Costa, VP of Sales; Victor Borelli, VP & Head, National Accounts, N.A. Generics; Jinping McCormick, VP Rx Marketing, US Generics; Michael Allen, Vice President & Head, Rx Products, N.A. Generics;

    (b)    **Mylan**: Joseph Duda, President; Tony Mauro, President; Robert Potter, SVP N.A. National Accounts & Channel Development; Rob O'Neill, Head of Sales; Hal Korman, EVP & Chief Operating Officer; John Munson, Vice President Global Accounts;

    (c)    **Par**: Jon Holden, Vice President of Sales; Paul Campanelli, President; Renee Kenney, Senior Advisor Generic Sales; Michael Altamuro, VP, Marketing;

    (d)    **Zydus:**  Michael Keenley, President; Joseph Renner, President & CEO; Kristy Ronco, VP, Sales; Scott Goldy, Director, National Account; Kevin Green, AVP, National Accounts.

116.    On August 23-26, 2014, NACDS held its 2014 Total Store Expo at the Boston Convention Center in Boston, Massachusetts. NACDS's August 2014 Total Store Expo was attended by the following key executives for generic drug sales and pricing from all Defendants:

    (a)    **Dr. Reddy's:**  Chris Costa, VP of Sales; Victor Borelli, VP & Head, National Accounts, N.A. Generics; Jinping McCormick, VP Rx

50

Marketing, US Generics; Nimish Muzumdar, Director of Marketing; Larry Knupp, Director of National Accounts; Umang Vohra, EVP & Head of NA Generics; Jake Austin, Director National Accounts;

(b) **Mylan**:  Joseph Duda, President; Robert Potter, SVP N.A. National Accounts; Mike Aigner, Director, National Accounts; Tony Mauro, President; Kevin McElfresh, Executive Director, National Accounts; Gary Tighe, Director, National Accounts; Lance Wyatt, Director, National Accounts; Edgar Escoto, Director, National Accounts; Stephen Krinke, National Account Manager; Sean Reilly, National Account Manager; Michael Scouvart, Head of Marketing, N.A.; John Baranick, Director, Trade Relations; Jim Nesta, Vice President, Sales;

(c) **Par:** Michael Altamuro, Vice President, Marketing & Business Analytics; Gerald Burton, Vice President, National Accounts; Christine Caronna, Director, National Accounts; Rick Guillory, Vice President, National Accounts; Jon Holden, Vice President, Sales; Renee Kenney, Senior Advisor Generic Sales; Karen O'Conner, Vice President, National Account; Antonio Pera, Chief Commercial Officer; and

(d) **Zydus:**  Scott Goldy, Director, National Accounts; Kevin Green, Associate Vice President, National Accounts; Michael Keenley, President; Dr. Ganesh Nayak, Chief Operating Officer & Executive Director, Cadila Healthcare (Zydus' parent); Elizabeth Purcell, Sr. Director, Marketing and Portfolio Management; Joseph Renner, President and Chief Executive

51

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Officer;  Kristy  Ronco,  Vice  President,  Sales;  Maria  Bianco-Falcone, Senior Director Contracting.

117.     In 2015 and 2016, Defendants attended additional NACDS events, including the:

(a)     April 25-28, 2015 NACDS Annual Meeting in Palm Beach, Florida;

(b)     April 16-19, 2016, NACDS 2016 Annual Meeting in Palm Beach, Florida; and

(c)     August  6-9,  2016,  NACDS  2016  Total  Store  Expo  in  Boston, Massachusetts.

118.     ***HDMA***:  The HDMA (now the HDA) is a national trade association that represents "primary pharmaceutical distributors" which links the nation's drug manufacturers and more than 200,000 pharmacies, hospitals, long-term care facilities, and clinics.[59]  HDMA holds  regular  conferences  where  its  members,  including  generic  drug  manufacturers,  meet  to discuss various issues affecting the pharmaceutical industry.  HDMA members during the Class Period have included Defendants Dr. Reddy's, Mylan, Par, and Zydus.

119.     Shortly before Mylan's and Par's Divalproex ER prices increased, Defendants Dr. Reddy's, Mylan, Par, and Zydus attended the HDMA 2013 Business and Leadership Conference ("BLC") in Orlando, Florida, which was held June 2-5, 2013.  The BLC was attended by the following key executives for generic drug sales and pricing at all Defendants:

(a)     **Dr. Reddy's:**  Victor Borelli, VP & Head, National Accounts, N.A. Generics; Patricia Wetzel, Senior Director, National Accounts;

---

[59] HDA website, About, *available at* https://www.healthcaredistribution.org/about.

52

    (b)    **Mylan:**  Janet Bell, National Accounts Director; Joseph Duda, VP, N.A. Sales; Edgar Escoto, National Accounts Director; Kevin McElfresh, Executive Director, National Accounts; James Nesta, Executive Director, National Accounts; Robert O'Neill, VP; Sean Reilly, Key Account Manager; John Shane, Director National Trade Accounts; Gary Tighe, National Accounts Director; Lance Wyatt, National Accounts Director;

    (c)    **Par:**  Sandra Bayer, National Accounts Manager; Peter Gargiulo, Director, National Accounts; Jon Holden, Vice President, Sales; Christopher Neurohr, Director, National Accounts;

    (d)    **Zydus:**  Scott Goldy, Director, National Accounts; Kevin Green, National Accounts Manager; Marc Kikuchi, Senior Vice President, Global Generics.

120.    On June 1-4, 2014, the HDMA held a BLC at the JW Marriott Desert Ridge in Phoenix, Arizona.  The 2014 BLC was attended by the following key executives for generic drug sales and pricing from all Defendants:

    (a)    **Dr. Reddy's:**  Chris Costa, VP of Sales; Victor Borelli, VP & Head, National Accounts, N.A. Generics; Mike Allen, VP & Head, Generics; Katherine Neely, Associate Director, Generics Marketing, North America;

    (b)    **Mylan**:  Joseph Zankus, VP, N.A. Sales & Channel Stretegy; Lance Wyatt, Director National Accounts; Edgar Escoto, Director National Accounts; Michael Aigner, National Accounts Manager; John Baranick, Director Trade Relations; Joseph Duda President; James Nesta, President

53

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Sales; Frank Mullery, Senior Director and Controller; Richard Isaac, Senior Manager, Strategic Accounts;

(c) **Par:**   Sandra Bayer, National Accounts Manager; Peter Gargiulo, Director, National Accounts; Jon Holden, Vice President, Sales;

(d) **Zydus:** Scott Goldy, Director, National Accounts; Kevin Green, National Accounts Manager; Marc Kikuchi, Senior Vice President, Global Generics; Maria McManus, Corporate Account Manager; Jodi Weber, Corporate Account Manager.

121.    In 2015, Defendants also attended the June 7-10, 2015 HDMA BLC in San Antonio, Texas.

122.    *ECRM*:   According to its website, ECRM conducts Efficient Program Planning Sessions that are made up of one-on-one strategic meetings that connect decision makers in an effort to maximize time, grow sales, and uncover industry trends.

123.    At annual meetings organized by ECRM, generic drug manufacturers have scheduled meetings with generic drug buyers at chain drug stores, supermarkets, mass merchants, wholesalers, distributors, and buy groups for independents.

124.    ███████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████

54

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

(a) 

125.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

126.    In addition to providing an opportunity to share information about the generic pharmaceutical business, these trade association events often include recreational and social activities such as golfing, theater performances, cocktail parties and dinners, which allowed Defendants' representatives to interact with their competitors privately and outside the traditional business setting.

127.    As uncovered in the state attorneys' general investigation, representatives of generic drug manufacturers get together separately, in more limited groups, during these conferences, allowing them to further meet face-to-face with their competitors and discuss their business.   In fact, high-level executives of many generic drug manufacturers get together periodically for what at least some of them refer to as "industry dinners."[60]

128.    A large number of generic drug manufacturers, including nearly all Defendants here, are headquartered in close proximity to one another in New York, New Jersey and eastern Pennsylvania, giving them easier and more frequent opportunities to meet and collude.   For example, in January 2014, at a time when the prices of a number of generic drugs were soaring, and a few months before Defendants' Divalproex ER prices hiked, at least thirteen high-ranking male executives, including CEOs, Presidents, and Senior Vice Presidents of various generic drug manufacturers, met at a steakhouse in Bridgewater, New Jersey.

129.    Generic pharmaceutical sales women also get together  regularly for what they refer to as a "Girls' Night Out" ("GNO"), or alternatively "Women in the Industry" meetings and dinners.   During these GNOs, meetings and dinners, these representatives meet with their competitors and discuss competitively sensitive information.   Several different GNOs were held

---

[60] *See, e.g.*, State AG Complaint ¶¶ 50-60.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

in 2015, including one in Baltimore, Maryland in May, and one at the NACDS conference in August.

130.    Through these various interactions, Defendants' sales and marketing executives are often acutely aware of their competition and, more importantly, each other's current and future business plans. This familiarity gives them the opportunity to communicate about bids and pricing strategy, and share information regarding the terms of their contracts with customers, including various terms relating to pricing, price protection, and rebates.

131.    Defendants' common membership in trade associations such as the GPhA and the NACDS, among others, and the participation of industry executives in trade association events and related activities, gave Defendants ample opportunities to exchange information concerning the pricing of Divalproex ER and to reach and implement agreements to increase the prices of those products.

### E.    Defendants' Own Acknowledgements of Lack of Generic Drug Competition

132.    Generic pharmaceutical executives frequently spoke publicly about pricing and competition in the market. Members of the industry publicly acknowledged that they saw competition as causing a problem that generally plagued the generic drug industry—namely, low prices—and praised drug markets involving other companies that did not compete on price.

133.    For instance, on May 2, 2013, Mylan's CEO Ms. Bresch stated in an earnings call: "[F]rom my perspective, we see the generic industry alive and well. We still see a lot of runway room here in the United States."

134.    Similarly, with respect to Par, other pharmaceutical companies viewed Par as a company that exhibited "rational" behavior because it would not compete on price. During

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Lannett's second quarter 2014 earnings call on February 6, 2014, Lannett's CEO discussing another generic drug, stated "we see Par as one of our rational competitors in the marketplace." He elaborated further, saying "we're not troubled by their pricing in the marketplace.  Not at all."

135.    Dr. Reddy's was even more forthright during an October 31, 2013 earnings call: It viewed its launch of generic Divalproex ER as demonstrative of its ability to "build a sustainable limited competition portfolio."

**F.    Defendants' Concerted Efforts to Increase Prices for Divalproex ER Yielded Supracompetitive Profits**

136.    Defendants' collusive price increases provided them with artificially inflated profits—profits that were funded in part by End Payers of Divalproex ER—something Wall Street and the Defendants themselves readily acknowledged.  For example, a January 2014 Morgan Stanley analyst report found that "companies have been raising prices on divalproex and levothyroxine (MYL's [Mylan] top generic drugs) aggressively."  Certain Defendants' themselves made comments about the importance of Divalproex ER to their bottom lines.

137.    For example, during an October 31, 2013 earnings call, Dr. Reddy's Vice Chairman Kallam Satish Reddy recapped Dr. Reddy's "key business highlights":

> I'm pleased to announce the highest ever quarterly performance of Dr. Reddy's, backed by strong growth across the key geographies of the Global Generics segment.  The recent generic launches of . . . divalproex ER . . . in the U.S. demonstrates our ability to build a sustainable limited competition portfolio . . . and has resulted in enhancement of our gross margin and operating margins as well.

138.    In an earnings call the following quarter, on February 11, 2014, Dr. Reddy's President of Global Generics, Abhijit Mukherjee, confirmed that prices in the Divalproex ER market had increased between two- and three-fold.  He also acknowledged that Divalproex ER

58

"is an important product for us," given the value it added to Dr. Reddy's operations, and that Dr. Reddy's had been "choosy about the market share, more value sensitive than share sensitive".

139.    Similarly, Cadila Healthcare Limited, Zydus's parent, reported how price increases on drugs like Divalproex ER was a financial boon for Zydus.  With respect to Divalproex ER, on an October 31, 2013 earnings call, Cadila Chairman and Managing Director, Pankaj Patel, predicted:  "New product growth, in fact, we would see, may be in the next quarter."

140.    During the same call, in response to questions about Dr. Reddy's launch of generic Divalproex ER and "pricing trends on [Cadila's] base business," Mr. Patel noted:

> We are seeing two things.  One is that we have launched Depakote ER [Divalproex ER].  Up to last quarter, we were saying [*sic*] pricing pressure, but now we see that, on selective products we are able to actually up the price.  So it is the kind of a mixed scenario at this moment.  We are seeing some visibility where pricing are firming up given the kind of challenges companies are facing, many players are going out of the market, and as a result there are opportunities to basically [*sic*] products with low margins to increase prices.  So at least in 3 or 4 products, we have seen price being better and increases are ranging between 10-15% and we also see that the trend is likely to continue given the revised wisdom the industry is getting.

141.    In a May 16, 2014 earnings call with investors, Mr. Patel's original prediction about the growth of Divalproex ER became reality.  Cadila Executive Director Dr. Ganesh Nayak reported that Divalproex ER was one of Zydus's cash cows:  "Divalproex Sodium ER . . . helped bouy [*sic*] overall business growth."

142.    The rents secured from Defendants' collusive practices padded Defendants' bottom lines and generated supracompetitive revenues.  This is borne out in the IMS data.  The

59

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

graphs below show monthly sales, as recorded by IMS, for each Defendant for the period June 2010 through May 2016.



PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER



143.    Prior to June 2013, the combined monthly sales of Divalproex ER for Mylan and Par, the two dominant generics in the market at the time, barely eclipsed ███████ for the 250 mg strength and ████████ for the 500 mg strength.  But after May 2013, Mylan's and Par's sales of generic Divalproex ER grew exponentially.

144.    Monthly sales for Mylan's 250 mg strength in September 2013 reached nearly ██ ███████ for the 250 mg strength and an astounding █████████ for the 500 mg strength.  Indeed, between May 2013 and September 2013, monthly sales of Mylan's 250 mg strength increased ████████████████████ And monthly sales of Mylan's 500 mg strength increased ███████████████████ over that same period.

61

145.    Monthly sales of Par's generic Divalproex ER experienced similarly exponential growth.  Between May 2013 and September 2013, monthly sales of Par's 250 mg and 500 mg strengths grew ███████████████████████████████████ ███████████████████████████████████.

146.    Dr. Reddy's and Zydus, when they entered the market, similarly reaped outsized revenues from their sales of Divalproex ER.

**G.    The Generic Divalproex ER Market Is Susceptible to Collusion**

147.    Publicly available data on the generic Divalproex ER market in the United States demonstrate that it susceptible to Defendants' cartelization.   Factors that make a market susceptible to collusion include:  (1) a high degree of industry concentration; (2) the presence of significant barriers to entry; (3) inelastic demand; (4) the lack of available substitutes for the goods involved; (5) a standardized product with a high degree of interchangeability between the products of cartel participants; and (6) inter-competitor contacts and communication.

### 1.    <u>Industry Concentration</u>

148.    A high degree of concentration facilitates the operation of a cartel because it makes it easier to coordinate behavior among a few co-conspirators.  During the Class Period, Defendants controlled about ███ of the generic Divalproex ER market.

149.    The limited number of generic Divalproex ER manufacturers facilitated Defendants' ability to coordinate pricing for generic Divalproex ER.  This concentration also made it easy for them to monitor prices in the downstream market and police deviations from agreed-upon prices.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

2.      **Barriers to Entry**

150.    Supracompetitive pricing in a market normally attracts additional competitors who want to avail themselves of the high levels of profitability that are available. However, the presence of significant barriers to entry makes this more difficult and helps to facilitate the operation of a cartel.

151.    There are significant capital, regulatory, and intellectual property barriers to entry in the generic Divalproex ER market that make such entry time-consuming and expensive.  Par's own 2015 Form 10-K states that its business is to develop and commercialize "generic drugs with limited competition, high barriers to entry and longer life cycles."

152.    Start-up costs and regulatory oversight represent substantial barriers to entry in the generic Divalproex ER market.  Historically, the cost of filing an ANDA is about $1 million.[61]   A generic manufacturer's production facilities must also meet Current Good Manufacturing Practice, which increases production costs.

153.    In addition to the significant out-of-pocket costs required to bring a drug to market, the approval process for generic drugs takes significant time.  As Kansas Senator Jerry Moran commented on September 21, 2016 during Congressional hearings on the FDA's role in the generic drug market, "[T]here are more than 4,000 generic drug applications currently awaiting approval, and the median time it takes for the FDA to approve a generic is now 47

---

[61] Testimony of Dr. Scott Gottlieb, Hearing on *Why Are Some Generic Drugs Skyrocketing in Price?* (Nov. 20, 2014), at 7.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

months or nearly four years."[62]   This significant delay for new market entrants effectively precludes new competition from eroding the supracompetitive prices imposed by the conspiracy.

### 3.   Demand Inelasticity

154.     Price elasticity of demand is defined as the measure of responsiveness in the quantity demanded for a product as a result of change in price of the same product.  It is a measure of how demand for a product reacts to a change in price.  Demand is said to be inelastic when there are no economic substitutes for a given product.  The basic necessities of life—food, water, and shelter—are examples of products that experience nearly perfectly inelastic demand at or near the minimums necessary to sustain life.  In other words, a person on the verge of dying of thirst will pay almost anything for water.

155.     In order for a cartel to profit from raising prices above competitive levels, demand for the product must be sufficiently inelastic such that any loss in sales will be more than offset by increases in revenue on those sales that are made.  Otherwise, increased prices would result in declining sales, revenues, and profits as customers purchased substitute products or declined to buy altogether.  Inelastic demand is a market characteristic that facilitates collusion, allowing producers to raise their prices without triggering customer substitution and lost sales revenue.

156.     Demand for generic Divalproex ER is highly inelastic.   When physicians prescribe Divalproex ER, both physicians and patients view it as necessary to their well-being. Valproate sodium, from which Divalproex ER is derived, is a unique compound without meaningful therapeutic substitutes.   Other drugs, such as gabapentin (anticonvulsant) and

---

[62] Senator Moran, Statement (Sep. 21, 2016), *available at* http://www.appropriations.senate.gov/imo/media/doc/092116-Chairman-Moran-Opening-Statement.pdf

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

topiramate (anticonvulsant and prophylaxis of migraine), can be prescribed to treat conditions treated by Divalproex ER, but each has different chemical and pharmacokinetic properties compared to Divalproex ER. Accordingly, these drugs are not AB-rated therapeutic equivalent to Divalproex ER and cannot be substituted for it.

157.    Even other valproate sodium derivatives, like divalproex sodium, delayed-release tablets ("Divalproex DR"), are not interchangeable with Divalproex ER. These two Divalproex products have different pharmacokinetic properties that affect their therapeutic application. Specifically, *delayed-release* tablets have an "enteric" coating, which "delay[s] [the] release of the medication until the tablet has passed through the stomach to prevent the drug from being destroyed or inactivated by gastric juices or where it may irritate the gastric mucosa." *Extended-release* tablets, by contrast, are "formulated in such a manner to make the contained medicament available over an extended period of time following ingestion."[63]  As explained by staff in the FDA's Office of Surveillance and Epidemiology, substituting Divalproex ER with Divalproex DR (or vice versa) is simply not an option:

> Pharmacokinetic studies have shown that when Depakote ER is given in equal total daily doses, its bioavailability [*i.e.*, the proportion of the drug that enters the blood stream] is approximately 10% less than that of the delayed-release tablets. ***Thus, an equivalent dose of either dosage form does not provide an equivalent pharmacokinetic profile. Product confusion may therefore result in significant clinical effects in patients***.[64]

---

[63] Walter Fava & Carol Holquist, *FDA safety page: Delayed-release vs. extended-release Rx*, Drug Topics (July 23, 2007), http://drugtopics.modernmedicine.com/drug-topics/news/clinical/pharmacy/fda-safety-page-delayed-release-vs-extended-release-rxs?page=full.

[64] *Id.*

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

158.    Branded versions of Divalproex ER also do not serve as economic substitutes for generic versions of these compounds because branded products generally maintain substantial price premiums over even their supra-competitively priced generic counterparts, making them inapt substitutes even when generic prices soar.

159.    The demand inelasticity of Divalproex ER gives Defendants significant pricing power and makes collusion more profitable, as consumers will not and cannot turn to other products.

160.    Thus, Divalproex ER is an excellent candidate for cartelization because price increases will result in more revenue, rather than less, provided that most or all manufacturers participate.

### 4.    Lack of Substitutes

161.    While other drugs on the market seek to treat similar conditions treated by Divalproex ER, Divalproex ER is often the only effective medicine that is reasonably available or medically suitable to patients in need.

162.    Divalproex ER is also differentiated from other drug products by its regulatory status.  A generic drug is considered a therapeutic equivalent of—and AB-rated with respect to—the Reference Listed Drug (RLD) (often the brand name version of a drug). Defendants' Divalproex ER are not therapeutically equivalent to—or AB-rated with respect to—other drug products, even similar ones like Divalproex DR.  Thus, a patient prescribed Divalproex ER could not purchase a different drug using his or her Divalproex ER prescription, regardless of the respective prices of the drugs.

66

163.    In addition, the branded version of Divalproex ER does not serve as economic substitute for generic versions of Divalproex ER because branded products generally maintain substantial price premiums over their generic counterparts, making them inapt substitutes even when generic prices soar.

164.    Thus, purchasers of generic Divalproex ER are held captive to the supracompetitive prices that resulted from Defendants' conspiracy to fix prices and allocate markets and customers.

**5.    Standardized Product with a High Degree of Interchangeability**

165.    A commodity-like product is one that is standardized across suppliers and allows for a high degree of substitutability among different suppliers in the market. When products offered by different suppliers are viewed as interchangeable by purchasers, it is easier for the suppliers to agree on prices for the goods in question and to monitor those prices effectively.

166.    Generic drugs of the same chemical composition are effectively commodity products because the primary mechanism through which they compete is price. When approving an ANDA, the FDA confirms that a generic drug product is bioequivalent to the branded version of the drug.  This allows pharmacists to substitute that generic for the branded counterpart, as well as for any other generic that also is bioequivalent to the branded product.

167.    Defendants' generic versions of Divalproex ER are bioequivalent generics of their branded counterpart Depakote ER, enabling pharmacists to substitute any of them for Depakote ER or for each other.

168.    Moreover, because generic versions of Divalproex ER are interchangeable, there is little utility in attempting to distinguish the products based on quality, branding, or service.

67

Accordingly, manufacturers generally spend little effort advertising or detailing (the practice of providing promotional materials and free samples to physicians) their generic compounds. The primary means for one generic manufacturer to differentiate its product from another's is through price competition.[65] The need to compete on price can drive producers of commodity products to conspire—as they did here—to fix prices.

### 6.   Inter-competitor Contacts and Communications

169.   As detailed above, Defendants' representatives met at conferences convened by customers and trade associations of customers (such as the ECRM and NACDS), private industry dinners, and similar events. Moreover, Defendants are members of and/or participants of the GPhA; thus, their representatives have many opportunities to meet and conspire at industry meetings. As noted in press reports, "prosecutors are taking a close look at trade associations as part of their investigation as having been one potential avenue for facilitating the collusion between salespeople at different generic producers."[66]

170.   The State AG Complaint alleges that Defendants routinely coordinated their schemes through direct interaction with their competitors at industry trade shows, customer conferences, and other events. For example, Glazer and Malek admitted at their guilty plea hearings to engaging in discussions and attending meetings with competitors, during which they reached agreements to allocate customers, rig bids and fix prices of doxycycline hyclate and glyburide.

---

[65] *See, e.g.,* GAO Report at 23 ("If another manufacturer offers a lower price to a customer, manufacturers we interviewed indicated that they are usually asked to match it or risk losing market share to the other manufacturer.").

[66] PaRR Report.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

171.    DOJ's and the Connecticut AG's investigations, and the grand jury subpoenas and investigative demands that have issued in conjunction with them, focus on inter-competitor communications.  These types of communications are not unique or isolated, but are rampant; "[g]eneric drug manufacturers operate, through their respective senior leadership and marketing and sales executives, in a manner that fosters and promotes routine and direct interaction among their competitors."[67] The sheer number of companies implicated in the investigations highlights the prevalence in the generic drug industry of the types of contacts and communications that facilitate collusion.  In addition to the Defendants named in this Complaint, the following companies have also been identified as targets of government investigations:

(a)    **Actavis**: In February 2016, Actavis's former corporate parent, Allergan plc, disclosed that it received a DOJ subpoena "seeking information relating to the marketing and pricing of certain of the Company's generic products and communications with competitors about such products."[68]

(b)    **Aurobindo**: Aurobindo has disclosed receipt of a subpoena relating to DOJ's generic drug investigation.[69] The company stated that it "received a subpoena in Mar[ch] 2016 requesting non-product specific information."[70]

---

[67] State AG Complaint ¶ 7.

[68] Allergan, SEC 2015 Form 10-K (Feb. 26, 2016), at F-106, *available at* https://www.sec.gov/Archives/edgar/data/1578845/000156459016013478/agn-10k_20151231.htm

[69] Zeba Siddiqui, *India's Aurobindo shares hit nine-month low on US price-fixing lawsuit*, Reuters (Dec 16, 2016), *available at* http://www.reuters.com/article/us-aurobindo-pharm-stocks-idUSKBN1450DV

[70] Aurobindo Pharma, Ltd., BSE Disclosure (Dec. 16, 2016), *available at* http://www.bseindia.com/xml-data/corpfiling/AttachHis/3C8E03C7_A46F_4792_AED5_197E6961A77E_125855.pdf

69

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

(c)     **Citron**:  In December 2016, Aceto Corporation (which purchased Citron's generic drugs assets) disclosed that DOJ "executed a search warrant against the Company and also served a subpoena requesting documents and other information concerning potential antitrust violations in the sale of Glyburide, Glyburide/Metformin, and Fosinopril HCTZ products." The Connecticut AG requested that Citron produce all documents produced to DOJ.[71]

(d)     **Dr. Reddy's**:  In November 2016, Dr. Reddy's disclosed that it received subpoenas from DOJ and the Connecticut AG "seeking information relating to the marketing, pricing and sale of certain . . . generic products and any communications with competitors about such products."[72]

(e)     **Heritage**:  As a private company, Heritage is not required to make public disclosures.  Nonetheless, in the wake of the criminal guilty pleas by two of its executives, Heritage confirmed that it is "fully cooperating" with DOJ[73] and press reports indicate that Heritage has applied to DOJ's leniency program seeking amnesty for a cartel violation.[74]

(f)     **Impax**:  In July 2014, Impax disclosed that it received a subpoena from the Connecticut AG concerning sales of generic digoxin.[75]  In November 2014, Impax disclosed that an employee received a broader federal grand jury subpoena that requested testimony and

---

[71] Aceto Corp., SEC Form 8-K, Ex. 99.5, *available at* https://www.sec.gov/Archives/edgar/data/2034/000157104916020771/t1600804_ex99-5.htm

[72] Dr. Reddy's, SEC Form 6-K (Nov. 10, 2016), *available at* http://www.drreddys.com/investors/reports-and-filings/sec-filings/?year=FY17

[73] Tom Schoenberg, David McLaughlin & Sophia Pearson, *U.S. Generic Drug Probe Seen Expanding After Guilty Pleas,* Bloomberg (Dec. 14, 2016), *available at* https://www.bloomberg.com/news/articles/2016-12-14/u-s-files-first-charges-in-generic-drug-price-fixing-probe

[74] *See supra* ¶ 22.

[75] Impax SEC Form 8-K (July 15, 2014), *available at* https://www.sec.gov/Archives/edgar/data/1003642/000143774914012809/ipxl20140715_8k.htm

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

documents about "any communication or correspondence with any competitor (or an employee of any competitor) in the sale of generic prescription medications."[76] In February 2016, Impax disclosed that it received a DOJ subpoena requesting "information and documents regarding the sales, marketing, and pricing of certain generic prescription medications. In particular… digoxin tablets, terbutaline sulfate tablets, prilocaine/lidocaine cream, and calcipotriene topical solution."[77]

      (g)    **Lannett**: In July 2014, Lannett disclosed that it received a subpoena from the Connecticut AG relating to its investigation into the price fixing of digoxin.[78] On November 3, 2014, Lannett disclosed that a Senior Vice President of Sales and Marketing was served with a grand jury subpoena "relating to a federal investigation of the generic pharmaceutical industry into possible violations of the Sherman Act." The subpoena also requested "corporate documents of the Company relating to communications or correspondence with competitors regarding the sale of generic prescription medications, but is not specifically directed to any particular product and is not limited to any particular time period."[79]  On August 27, 2015, Lannett further explained that DOJ sought, among other things, "communications or correspondence with competitors regarding the sale of generic prescription medications, and the marketing, sale, or

---

[76] Impax SEC Form 8-K (Nov. 6, 2014), *available at* https://www.sec.gov/Archives/edgar/data/1003642/000119312514402210/d816555d8k.htm

[77] Impax, SEC 2015 Form 10-K (Feb. 22, 2016), at F-53, *available at* https://www.sec.gov/Archives/edgar/data/1003642/000143774916025780/ipxl20151231_10k.htm

[78] Lannett Press Release (July 16, 2014), *available at* http://lannett.investorroom.com/2014-07-16-Lannett-Receives-Inquiry-From-Connecticut-Attorney-General

[79] Lannett, SEC Form 10-Q (Nov. 6, 2014) at 16, *available at* https://www.sec.gov/Archives/edgar/data/57725/000110465914077456/a14-20842_110q.htm

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

pricing of certain products, generally for the period of 2005 through the dates of the subpoenas."[80]

(h)   **Mayne**:  On August 25, 2016, Mayne Pharma Group Limited (the parent of Mayne) disclosed that it was "one of numerous generic pharmaceutical companies to receive a subpoena . . . seeking information relating to marketing, pricing and sales of select generic products" and that it had received a subpoena from the Connecticut AG seeking similar information.[81]   On November 4, 2016, Mayne Pharma Group Limited issued a press release stating: "Previously on 28 Jun[e] 2016, Mayne Pharma Group Limited disclosed that it was one of several generic companies to receive a subpoena from the Antitrust Division of the US Department of Justice (DOJ) seeking information relating to the marketing, pricing and sales of select generic products. The investigation relating to Mayne Pharma is focused on doxycycline hyclate delayed-release tablets (generic) and potassium chloride powders."[82]

(i)   **Mylan**:   In February 2016, Mylan disclosed that it received a DOJ subpoena "seeking information relating to . . . generic Doxycycline" and a similar subpoena from the Connecticut AG seeking "information relating to . . . certain of the Company's generic products (including Doxycycline) and communications with competitors about such products."[83]   On November 9, 2016, Mylan disclosed that "certain employees and a member of senior

---

[80] Lannett, SEC Form 10-K (Aug. 27, 2015) at 18, available at
http://www.sec.gov/Archives/edgar/data/57725/000110465915062047/a15-13005_110k.htm
[81] Mayne Pharma, 2016 Annual Report (Aug. 25, 2016), at 75, *available at*
https://www.maynepharma.com/media/1788/2016-mayne-pharma-annual-report.pdf
[82] Mayne Pharma, Update on DOJ Investigation (Nov. 4, 2016), *available at*
http://asxcomnewspdfs.fairfaxmedia.com.au/2016/11/04/01798874-137879061.pdf
[83] Mylan, SEC 2015 Form 10-K (Feb. 16, 2016), at 160, *available at*
https://www.sec.gov/Archives/edgar/data/1623613/000162361316000046/myl10k_20151231xdo
c.htm

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

management, received subpoenas from DOJ seeking additional information relating to the marketing, pricing and sale of our generic Cidofovir, Glipizide-metformin, Propranolol and Verapamil products" and that "[r]elated search warrants also were executed" in connection with DOJ's investigation.[84]   In addition, the investigation conducted by the State Attorneys General uncovered the fact that Mylan executives communicated, by phone and by email,  with the Heritage Pharmaceuticals executives who were later indicted for their conduct regarding their price fixing of and allocation of customers for two other drugs.  Indeed, the State Attorneys' General investigation revealed that, "beginning as early as 2013," these communications led to an agreement among Heritage, Mylan and another company "to allocate and divide the market" for another generic drug.  Significantly, the purpose of the agreement was to "maintain high prices."

(j)    **Par**:  In March 2015, Par disclosed that it received subpoenas from the Connecticut AG and DOJ relating to digoxin and doxycycline.[85]   In November 2015, Endo International plc, the parent company of Par, elaborated:  "In December 2014, our subsidiary, Par, received a Subpoena to Testify Before Grand Jury from the Antitrust Division of the DOJ and issued by the U.S. District Court for the Eastern District of Pennsylvania. The subpoena requests documents and information focused primarily on product and pricing information relating to Par's authorized generic version of Lanoxin (digoxin) oral tablets and Par's generic

---

[84] Mylan SEC Form 10-Q, at 58 (Nov. 9, 2016), *available at* https://www.sec.gov/Archives/edgar/data/1623613/000162361316000071/myl10q_20160930xdoc.htm

[85] Par Pharmaceuticals Companies, Inc., SEC 2014 Form 10-K (Mar. 12, 2015) at 37, *available at* https://www.sec.gov/Archives/edgar/data/878088/000087808815000002/prx-20141231x10k.htm

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

doxycycline products, and on communications with competitors and others regarding those products. Par is currently cooperating fully with the investigation."[86]  Endo also disclosed that in December 2015 it "received Interrogatories and Subpoena Duces Tecum from the State of Connecticut Office of Attorney General requesting information regarding pricing of certain of its generic products, including Doxycycline Hyclate, Amitriptyline Hydrochloride, Doxazosin Mesylate, Methotrexate Sodium and Oxybutynin Chloride."[87]

(k)    **Perrigo**:  On May 2, 2017, Perrigo disclosed that "search warrants were executed at the Company's corporate offices associated with an ongoing investigation by the U.S. Department of Justice Antitrust Division related to drug pricing in the pharmaceutical industry."[88]

(l)    **Pfizer:**  On August 10, 2017, Pfizer disclosed: "As of July 2017, the U.S. Department of Justice's Antitrust Division is investigating our Greenstone generics business. We believe this is related to an ongoing antitrust investigation of the generic pharmaceutical industry. The government has been obtaining information from Greenstone."[89]

(m)    **Sandoz**:  In March 2016, Sandoz and Fougera Pharmaceuticals Inc. (a wholly-owned subsidiary of Sandoz) "received a subpoena from the Antitrust Division of the US

---

[86] Endo International plc, SEC Form 10-Q (March 31, 2016) at 30, *available at* https://www.sec.gov/Archives/edgar/data/1593034/000159303416000056/endp-3312016x10q.htm

[87] *Id.* at 31.

[88] Perrigo Press Release (May 2, 2017), *available at* http://perrigo.investorroom.com/2017-05-02-Perrigo-Discloses-Investigation

[89] Pfizer, SEC Form 10-Q (Aug. 10, 2017) at 37, *available at* https://investors.pfizer.com/financials/sec-filings/sec-filings-details/default.aspx?FilingId=12225193.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Department of Justice (DoJ) requesting documents related to the marketing and pricing of generic pharmaceutical products . . . and related communications with competitors."[90]

(n)   **Sun**:  On May 27, 2016, Sun Pharmaceutical Industries, Ltd. (the parent of Sun) stated in a filing with the National Stock Exchange of India that one of its U.S. subsidiaries, namely Sun, "received a grand jury subpoena from the United States Department of Justice, Antitrust Division seeking documents . . . relating to corporate and employee records, generic pharmaceutical products and pricing, communications with competitors and others regarding the sale of generic pharmaceutical products, and certain other related matters."[91]

(o)   **Taro**:  In September 2016, Taro disclosed that the Company "and two senior officers" received DOJ subpoenas seeking documents relating to "generic pharmaceutical products and pricing, communications with competitors and others regarding the sale of generic pharmaceutical products, and certain other related matters."[92]

(p)   **Teva**:  In August 2016, Teva disclosed that it received subpoenas from DOJ and the Connecticut AG seeking documents and other information "relating to the marketing and pricing of certain of Teva USA's generic products and communications with competitors about such products."[93]

---

[90] Novartis 2016 Financial Report at 217, *available at* https://www.novartis.com/sites/www.novartis.com/files/ar-2016-financial-report-en.pdf

[91] Sun Pharmaceuticals Indus., Ltd., BSE Disclosure (May 27, 2016), *available at* http://www.bseindia.com/xml-data/corpfiling/AttachHis/8E568708_8D00_472E_B052_666C76A4263D_081648.pdf

[92] Taro, SEC Form 6-K (Sept. 9, 2016), *available at* https://www.sec.gov/Archives/edgar/data/906338/000115752316006685/a51417528.htm

[93] Teva, SEC Form 6-K at 25 (Aug. 4, 2016), *available at* https://www.sec.gov/Archives/edgar/data/818686/000119312516671785/d187194d6k.htm

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

(q)     **Zydus**:  Press reports have stated the Zydus is a target of DOJ's generic drugs price-fixing investigation.[94]

## X.     THE STATUTES OF LIMITATIONS DO NOT BAR PLAINTIFFS' CLAIMS

### A.     The Statutes of Limitations Did Not Begin to Run Because Plaintiffs Did Not and Could Not Discover Defendants' Unlawful Conspiracy

172.     Plaintiffs had no **knowledge** of the conspiracy alleged above, or of facts sufficient to place them on inquiry notice of the claims pleaded below, until, at the earliest, when Senator Sanders and Representative Cummings sent letters to Defendants' CEO inquiring about their respective pricing of generic Divalproex ER.  Prior to that time, no information in the public domain or available to Plaintiffs suggested that any Defendant was involved in a criminal conspiracy to fix prices for generic Divalproex ER.

173.     Plaintiffs are purchasers who indirectly purchased generic Divalproex ER manufactured by one or more Defendants. They had no direct contact or interaction with any of the Defendants in this case and had no means from which they could have discovered Defendants' conspiracy.

174.     Defendants repeatedly and expressly stated throughout the Class Period, including on their public Internet websites, that they maintained antitrust/fair competition policies, or other legal compliance policies that prohibited the type of illegal conduct alleged in this Complaint. For example:

> (a)     Dr. Reddy's Code of Business Conduct and Ethics provides: "We believe in free and open competition and never engage in improper practices that may hamper fair competition."  The policy directs employees to "Avoid . .

---

[94] *See* Rupali Mukherjeel, *US polls, pricing pressure may hit Indian pharma cos*, The Times of India (Nov. 8, 2016), *available at* http://timesofindia.indiatimes.com/business/india-business/US-polls-pricing-pressure-may-hit-Indian- pharma-cos/articleshow/55301060.cms

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

. Collusion — when companies secretly communicate or agree on how they will compete. This could include agreements or exchanges of information on pricing, terms, wages or allocations of markets."  The policy also warns employees about trade association meetings:  "Trade association meetings and other industry gatherings typically serve perfectly legitimate and worthwhile purposes.  However, these meetings also provide a potential pitfall under the competition and anti-trust laws because they bring together competitors who may be prone to discuss matters of mutual concern.  You must be especially careful to avoid discussions or exchanges of information relating to competitive matters.  During interaction with our competitors it is unlawful to discuss pricing policies, sales terms, inventory levels, business or marketing plans and any other confidential or competitive matters. If a competitor raises any of these issues, no matter how casually, stop the conversation immediately, explain that it is against our policy to discuss such matters, and, if necessary, leave the gathering.  All incidents of this nature should be reported."[95]

(b)    Mylan's Code of Conduct and Business Ethics states:  "Mylan is committed to complying with applicable antitrust and fair competition laws."[96]

(c)    Par's Code of Conduct provides:  "It is Company policy to comply with the antitrust and competition laws of each country in which the Company does business."[97]

(d)    Cadila Healthcare Limited's (the parent of Zydus) Code of Business Conduct and Ethics provides:  "All Directors and senior management employees shall at all times ensure compliance with relevant laws, rules, and regulations affecting the operations of the Company.  They shall stay abreast of the affairs of the Company and be kept informed of the Company's compliance with relevant laws, rules and regulations."[98]

---

[95] Dr. Reddy's Code of Business Conduct and Ethics, *available at* http://www.drreddys.com/media/508807/cobe_booklet.pdf

[96] Mylan Code of Business Conduct and Ethics, *available at* https://www.mylan.com/-/media/mylancom/files/code%20of%20business%20conduct%20and%20ethics.pdf

[97] Par Code of Ethics, *available at* http://corpdocs.msci.com/ethics/eth_19100.pdf.

[98] Cadila Healthcare Limited Code of Business Conduct and Ethics for The Board of Directors and Senior Management Personnel, *available at* https://zyduscadila.com/wp-content/uploads/2015/05/Code-of-Business-Conduct-and-Ethics.pdf.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

175.    It was reasonable for members of the Class to believe that Defendants were complying with their own antitrust and compliance policies.

176.    For these reasons, the statutes of limitations as to Plaintiffs' claims under the federal and state laws identified below did not begin to run, and have been tolled with respect to the claims that Plaintiffs have alleged in this Complaint.

### B.    Fraudulent Concealment Tolled the Statutes of Limitations

177.    In the alternative, application of the doctrine of fraudulent concealment tolled the statutes of limitations on the claims asserted by Plaintiffs.  Plaintiffs had no knowledge of the conspiracy alleged in this Complaint, or of facts sufficient to place them on inquiry notice of their claims, until, at the very earliest, when Senator Sanders and Representative Cummings sent letters to Defendants' CEO inquiring about their respective pricing of generic Divalproex ER. Prior to that time, no information in the public domain or available to Plaintiffs suggested that any Defendant was involved in a criminal conspiracy to fix prices for generic Divalproex ER.

178.    As described in more detail below, Defendants actively concealed, suppressed, and omitted to disclose material facts to Plaintiffs and members of the Classes concerning Defendants' unlawful activities to artificially inflate prices for generic Divalproex ER.  The concealed, suppressed, and omitted facts would have been important to Plaintiffs and members of the Classes as they related to the cost of generic Divalproex ER they purchased.  Defendants misrepresented the real cause of price increases for generic Divalproex ER.  Defendants' false statements and conduct concerning the prices of generic Divalproex ER were deceptive as they had the tendency or capacity to mislead Plaintiffs and members of the Classes to believe that they were purchasing generic Divalproex ER at prices established by a free and fair market.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1.     **Active Concealment of the Conspiracy**

179.     Defendants engaged in an illegal scheme to fix prices, allocate customers and rig bids. Criminal and civil penalties for engaging in such conduct are severe.  Not surprisingly, Defendants took affirmative measures to conceal their conspiratorial conduct.

180.     Through their misleading, deceptive, false and fraudulent statements, Defendants effectively concealed their conspiracy, thereby causing economic harm to Plaintiffs and the Classes. Defendants' misrepresentations regarding their price changes were intended to lull Plaintiffs and the Classes into accepting the price hikes as a normal result of competitive and economic market trends rather than as the consequence of Defendants' collusive acts.  The public statements made by Defendants were designed to mislead Plaintiffs and the Classes into paying unjustifiably higher prices for generic Divalproex ER.

181.     As explained in the State AG complaint, the nature of the generic drug industry—which allows for frequent and repeated face-to-face meetings among competitors—means that "[m]ost of the conspiratorial communications were intentionally done in person or by cell phone, in an attempt to avoid creating a record of their illegal conduct.  The generic drug industry, through the aforementioned opportunities to collude at trade shows, customer events and smaller more intimate dinners and meetings, allowed these communications to perpetuate."[99]

182.     These types of false statements and others made by Defendants helped conceal the illegal conspiracy entered into by Defendants to fix, stabilize, maintain and raise the price of generic Divalproex ER to inflated, supracompetitive levels.

---

[99] State AG Complaint ¶ 13.

79

## 2.     Plaintiffs Exercised Reasonable Diligence

183.    Defendants' anticompetitive conspiracy, by its very nature, was self-concealing. Generic drugs are not exempt from antitrust regulation, and thus, before the disclosure of the government investigations, Plaintiffs reasonably considered the markets to be competitive. Accordingly, a reasonable person under the circumstances would not have had a reason to investigate the propriety of Defendants' prices before these disclosures.

184.    Because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to conceal their illicit conduct, Plaintiffs and the Classes could not have discovered the conspiracy at an earlier date by the exercise of reasonable diligence.

185.    Therefore, the running of any statutes of limitations has been tolled for all claims alleged by Plaintiffs and the Classes as a result of Defendants' anticompetitive and unlawful conduct.  Despite the exercise of reasonable diligence, Plaintiffs and members of the Classes were unaware of Defendants' unlawful conduct, and did not know that they were paying supracompetitive prices throughout the United States during the Class Period.

186.    For these reasons, Plaintiffs' claims are timely under all of the federal, state and common laws pleaded below.

## XI.    <u>CONTINUING VIOLATIONS</u>

187.    This Complaint alleges a continuing course of conduct (including conduct within the limitations periods), and defendants' unlawful conduct has inflicted continuing and accumulating harm within the applicable statutes of limitations.  Thus, Plaintiffs and the

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

members of the Damages Class can recover for damages that they suffered during any applicable limitations period.

## XII.   <u>DEFENDANTS' ANTITRUST VIOLATIONS</u>

188.   During the Class Period, Defendants engaged in a continuing agreement, understanding, and conspiracy in restraint of trade to allocate customers, rig bids, and fix raise and/or stabilize prices for generic Divalproex ER sold in the United States.

189.   In formulating and effectuating the contract, combination or conspiracy, Defendants and their co-conspirators engaged in anticompetitive activities, the purpose and effect of which were to allocate customers, rig bids and artificially fix, raise, maintain, and/or stabilize the price of generic Divalproex ER sold in the United States.  These activities included the following:

(a)     Defendants participated in meetings and/or conversations regarding the price of generic Divalproex ER in the United States;

(b)     Defendants agreed during those meetings and conversations to charge prices at specified levels and otherwise to increase and/or maintain prices of generic Divalproex ER sold in the United States;

(c)     Defendants agreed during those meetings and conversations to allocate customers, rig bids, and fix the price of generic Divalproex ER; and

(d)     Defendants issued price announcements and price quotations in accordance with their agreements.

190.   Defendants and their co-conspirators engaged in the activities described above for the purpose of effectuating the unlawful agreements described in this Complaint.

81

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

191.    During and throughout the period of the conspiracy alleged in this Complaint, Plaintiffs and members of the Classes indirectly purchased generic Divalproex ER at inflated and supracompetitive prices.

192.    Defendants' contract, combination and conspiracy constitutes an unreasonable restraint of trade and commerce in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3) and the laws of various End-Payer Damages Jurisdictions enumerated below.

193.    As a result of Defendants' unlawful conduct, Plaintiffs and the other members of the Classes have been injured in their business and property in that they have paid more for generic Divalproex ER than they would have paid in a competitive market.

194.    General economic principles recognize that any overcharge at a higher level of distribution generally results in higher prices at every level below.  Moreover, the institutional structure of pricing and regulation in the pharmaceutical drug industry assures that overcharges at the higher level of distribution are passed on to end payers such as Plaintiffs.  Wholesalers and retailers passed on the inflated prices to Plaintiffs and members of the Class.  The impairment of generic competition at the direct purchaser level similarly injured Plaintiffs who were equally denied the opportunity to purchase less expensive generic versions of Divalproex ER.

195.    The unlawful contract, combination and conspiracy has had the following effects, among others:

(a)    price competition in the market for generic Divalproex ER has been artificially restrained;

(b)    prices for generic Divalproex ER sold by Defendants have been raised, fixed, maintained, or stabilized at artificially high and non-competitive levels; and

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

(c)      end-payer purchasers of generic Divalproex ER sold by Defendants have

been deprived of the benefit of free and open competition in the market for generic Divalproex

ER.

## XIII.   CLASS ACTION ALLEGATIONS

196.    Plaintiffs bring this action on behalf of themselves and as a class action under

Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, seeking equitable and injunctive

relief on behalf of the following class (the "Nationwide Class"):

> All persons and entities in the United States and its territories, who
> indirectly purchased, paid and/or provided reimbursement for some
> or all purchase price for Defendants' generic Divalproex ER
> (generic divalproex sodium 250 or 500 mg extended release 24
> hour sustained action tablets), other than for resale, from at least as
> early as June 2013 through the present.
>
> This class excludes:   (a) Defendants, their officers, directors,
> management, employees, subsidiaries, and affiliates; (b) all federal
> and state governmental entities except for cities, towns,
> municipalities, or counties with self-funded prescription drug
> plans; (c) all persons or entities who purchased Defendants'
> generic Divalproex ER for purposes of resale or directly from
> Defendants; (d) fully insured health plans (*i.e.*, health plans that
> purchased insurance covering 100% of their reimbursement
> obligation to members); (e) any "flat co-pay" consumers whose
> purchases of Defendants' generic Divalproex ER were paid in part
> by a third party payer and whose co-payment was the same
> regardless of the retail purchase price; (f) pharmacy benefit
> managers; and (g) any judges or justices involved in this action and
> any members of their immediate families.

197.    Plaintiffs also bring this action on behalf of themselves and as a class action under

Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure seeking damages pursuant to the

common law of unjust enrichment and the state antitrust, unfair competition, and consumer

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

protection laws of the states and territories listed below (the "End-Payer Damages Jurisdictions")[100] on behalf of the following class (the "Damages Class"):

> All persons and entities in the End-Payer Damages Jurisdictions, who indirectly purchased, paid and/or provided reimbursement for some or all purchase price for Defendants' generic Divalproex ER (generic divalproex sodium 250 or 500 mg extended release 24 hour sustained action tablets), other than for resale, from at least as early as June 2013 through the present.

> This class excludes: (a) Defendants, their officers, directors, management, employees, subsidiaries, and affiliates; (b) all federal and state governmental entities except for cities, towns, municipalities, or counties with self-funded prescription drug plans; (c) all persons or entities who purchased Defendants' generic Divalproex ER for purposes of resale or directly from Defendants; (d) fully insured health plans (i.e., health plans that purchased insurance covering 100% of their reimbursement obligation to members); (e) any "flat co-pay" consumers whose purchases of Defendants' generic Divalproex ER were paid in part by a third party payer and whose co-payment was the same regardless of the retail purchase price; (f) pharmacy benefit managers; and (g) any judges or justices involved in this action and any members of their immediate families.

198.    The Nationwide Class and the Damages Class are referred to herein as the "Classes."

199.    While Plaintiffs do not know the exact number of the members of the Classes, Plaintiffs believe there are thousands of members in each Class.

200.    Common questions of law and fact exist as to all members of the Classes. This is particularly true given the nature of Defendants' conspiracy, which was generally applicable to all the members of both Classes, thereby making appropriate relief with respect to the Classes as a whole. Such questions of law and fact common to the Classes include, but are not limited to:

---

[100] The "End-Payer Damages Jurisdictions" consist of: all States (except Indiana and Ohio), the District of Columbia, Puerto Rico and the U.S. Virgin Islands.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

(a)      Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain and/or stabilize prices of generic Divalproex ER and/or engaged in market allocation for generic Divalproex ER sold in the United States;

(b)      The identity of the participants of the alleged conspiracy;

(c)      The duration of the alleged conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

(d)      Whether the alleged conspiracy violated the Sherman Act, as alleged in the First Count;

(e)      Whether the alleged conspiracy violated state antitrust and unfair competition laws, and/or state consumer protection laws, as alleged in the Second and Third Counts;

(f)      Whether Defendants unjustly enriched themselves to the detriment of the Plaintiffs and the members of the Classes, thereby entitling Plaintiffs and the members of the Classes to disgorgement of all benefits derived by Defendants, as alleged in the Fourth Count;

(g)      Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiffs and the members of the Classes;

(h)      The effect of the alleged conspiracy on the prices of generic Divalproex ER sold in the United States during the Class Period;

(i)      Whether the Defendants and their co-conspirators actively concealed, suppressed, and omitted to disclose material facts to Plaintiffs and members of the Classes

85

concerning Defendants' unlawful activities to artificially inflate prices for generic Divalproex ER, and/or fraudulently concealed the unlawful conspiracy's existence from Plaintiffs and the other members of the Classes;

(j)     The appropriate injunctive and related equitable relief for the Nationwide Class; and

(k)     The appropriate class-wide measure of damages for the Damages Class.

201.    Plaintiffs' claims are typical of the claims of the members of the Classes. Plaintiffs and all members of the Classes are similarly affected by Defendants' wrongful conduct in that they paid artificially inflated prices for generic Divalproex ER purchased indirectly from Defendants and/or their co-conspirators. Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other members of the Classes.

202.    Plaintiffs will fairly and adequately protect the interests of the Classes.  Plaintiffs' interests are coincident with, and not antagonistic to, those of the other members of the Classes. Plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

203.    The questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

204.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

205.    The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## XIV.   CAUSES OF ACTION

### FIRST COUNT

**Violation of Sections 1 and 3 of the Sherman Act
(on behalf of Plaintiffs and the Nationwide Class)**

206.    Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein.

207.    Defendants and their unnamed co-conspirators entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. § 1, 3).

208.    During the Class Period, Defendants and their co-conspirators entered into a continuing agreement, understanding and conspiracy in restraint of trade to artificially allocate customers, rig bids and raise, maintain and fix prices for generic Divalproex ER, thereby creating anticompetitive effects.

209.    The conspiratorial acts and combinations have caused unreasonable restraints in the market for generic Divalproex ER.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

210.    As a result of Defendants' unlawful conduct, Plaintiffs and other similarly situated End Payers in the Nationwide Class who purchased generic Divalproex ER have been harmed by being forced to pay inflated, supracompetitive prices for generic Divalproex ER.

211.    In formulating and carrying out the alleged agreement, understanding and conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including, but not limited to, the acts, practices and course of conduct set forth herein.

212.    Defendants' conspiracy had the following effects, among others:

(a)    Price competition in the market for generic Divalproex ER has been restrained, suppressed, and/or eliminated in the United States;

(b)    Prices for generic Divalproex ER provided by Defendants and their co-conspirators have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels throughout the United States; and

(c)    Plaintiffs and members of the Nationwide Class who purchased generic Divalproex ER indirectly from Defendants and their co-conspirators have been deprived of the benefits of free and open competition.

213.    Plaintiffs and members of the Nationwide Class have been injured and will continue to be injured in their business and property by paying more for generic Divalproex ER purchased indirectly from Defendants and the co-conspirators than they would have paid and will pay in the absence of the conspiracy.

214.    Defendants' contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

215.    Plaintiffs and members of the Nationwide Class are entitled to an injunction against Defendants, preventing and restraining the continuing violations alleged herein.

## SECOND COUNT

### Violation of State Antitrust Statutes[101]
### (on behalf of Plaintiffs and the Damages Class)

216.    Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein.

217.    During the Class Period, Defendants and their co-conspirators engaged in a continuing contract, combination or conspiracy with respect to the sale of generic Divalproex ER in unreasonable restraint of trade and commerce and in violation of the various state antitrust and other statutes set forth below.

218.    The contract, combination, or conspiracy consisted of an agreement among Defendants and their co-conspirators to fix, raise, inflate, stabilize, and/or maintain the prices of generic Divalproex ER and to allocate customers for generic Divalproex ER in the United States.

219.    In formulating and effectuating this conspiracy, Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including: (a) participating in meetings and conversations among themselves in the United States and elsewhere during which they agreed to price generic Divalproex ER at certain levels, and otherwise to fix, increase, inflate, maintain, or stabilize effective prices paid by Plaintiffs and members of the Damages Class with respect to generic Divalproex ER provided in the United

---

[101] Statutory antitrust violations are alleged herein for the following jurisdictions: Arizona, California, Connecticut, District of Columbia, Hawaii, Illinois, Iowa, Kansas, Maine, Maryland, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Vermont, West Virginia and Wisconsin.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

States; and (b) participating in meetings and trade association conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

220.    Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreement to allocate customers, rig bids, and fix prices for generic Divalproex ER.

221.    Defendants' anticompetitive acts described above were knowing, willful and constitute violations or flagrant violations of the following state antitrust statutes.

222.    [INTENTIONALLY LEFT BLANK]

**Arizona**

223.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Arizona Revised Statutes, § 44-1401, *et seq*. Defendants' combination and conspiracy had the following effects: (1) price competition for generic Divalproex ER was restrained, suppressed, and eliminated throughout Arizona; (2) generic Divalproex ER prices were raised, fixed, maintained and stabilized at artificially high levels throughout Arizona; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Divalproex ER. During the Class Period, Defendants' illegal conduct substantially affected Arizona commerce. Defendants' violations of Arizona law were flagrant. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants entered into an agreement in restraint of trade in

90

violation of Ariz. Rev. Stat. § 44-1401, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Ariz. Rev. Stat. § 44-1401, *et seq*.

**California**

224.    Defendants have entered into an unlawful agreement in restraint of trade in violation of California Business and Professions Code § 16700 *et seq*. During the Class Period, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of California Business and Professions Code §16720. Defendants, and each of them, have acted in violation of § 16720 to fix, raise, stabilize, and maintain prices of generic Divalproex ER at supracompetitive levels. The aforesaid violations of § 16720 consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain, and stabilize the prices of generic Divalproex ER. For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators have done those things which they combined and conspired to do, including, but not limited to, the acts, practices and course of conduct set forth above and creating a price floor, fixing, raising, and stabilizing the price of generic Divalproex ER. The combination and conspiracy alleged herein has had, *inter alia*, the following effects: (1) price competition for generic Divalproex ER has been restrained, suppressed, and/or eliminated in the State of California; (2) prices for generic Divalproex ER provided by Defendants and their co-conspirators have been fixed, raised, stabilized, and pegged at artificially high, non-competitive levels in the State of California; and (3) those who purchased generic Divalproex ER indirectly from Defendants and their co-conspirators have been deprived of the benefit of free and open competition. As a direct and

91

proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property in that they paid more for generic Divalproex ER than they otherwise would have paid in the absence of Defendants' unlawful conduct. During the Class Period, Defendants' illegal conduct substantially affected California commerce. As a result of Defendants' violation of § 16720, Plaintiffs and members of the Damages Class seek treble damages and their cost of suit, including a reasonable attorney's fee, pursuant to California Business and Professions Code § 16750(a).

**Connecticut**

224(a). Defendants have entered into an unlawful agreement in restraint of trade in violation of the Connecticut Antitrust Act, Conn. Gen. Stat. § 35-35, *et seq*. Defendants' combinations and conspiracy had the following effects: (1) price competition for generic Divalproex ER was restrained, suppressed, and eliminated throughout Connecticut; (2) generic Divalproex ER prices were raised, fixed, maintained and stabilized at artificially high levels throughout Connecticut; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Divalproex ER. During the Class Period, Defendants' illegal conduct substantially affected Connecticut commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants entered into an agreement in restraint of trade in violation of Conn. Gen. Stat. § 35-35, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Connecticut law.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**District of Columbia**

225.    Defendants have entered into an unlawful agreement in restraint of trade in violation of District of Columbia Code Annotated § 28-4501, *et seq*. Defendants' combination and conspiracy had the following effects: (1) generic Divalproex ER price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) generic Divalproex ER prices were raised, fixed, maintained and stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiffs and members of the Damages Class, including those who resided in the District of Columbia and/or purchased generic Divalproex ER in the District of Columbia that were shipped by Defendants or their co-conspirators into the District of Columbia, were deprived of free and open competition, including in the District of Columbia; and (4) Plaintiffs and members of the Damages Class, including those who resided in the District of Columbia and/or purchased generic Divalproex ER in the District of Columbia that were shipped by Defendants or their co-conspirators, paid supracompetitive, artificially inflated prices for generic Divalproex ER, including in the District of Columbia. During the Class Period, Defendants' illegal conduct substantially affected District of Columbia commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of District of Columbia Code Ann. § 28-4501, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under District of Columbia Code Ann. § 28-4501, *et seq*.

93

**Hawaii**

226.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Hawaii Revised Statutes Annotated § 480-1, *et seq*. Defendants' unlawful conduct had the following effects: (1) generic Divalproex ER price competition was restrained, suppressed, and eliminated throughout Hawaii; (2) generic Divalproex ER prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Hawaii; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Divalproex ER. During the Class Period, Defendants' illegal conduct substantially affected Hawaii commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Hawaii Revised Statutes Annotated § 480-4, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Hawaii Revised Statutes Annotated § 480-4, *et seq*.

**Illinois**

227.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Illinois Antitrust Act (740 Illinois Compiled Statutes 10/1, *et seq*.) Defendants' combination or conspiracy had the following effects: (1) generic Divalproex ER price competition was restrained, suppressed, and eliminated throughout Illinois; (2) generic Divalproex ER prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Illinois; (3) Plaintiffs and members of the Damages Class were deprived of free and

94

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Divalproex ER. During the Class Period, Defendants' illegal conduct substantially affected Illinois commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under the Illinois Antitrust Act.

**Iowa**

228.     Defendants have entered into an unlawful agreement in restraint of trade in violation of Iowa Code § 553.1, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic Divalproex ER price competition was restrained, suppressed, and eliminated throughout Iowa; (2) generic Divalproex ER prices were raised, fixed, maintained and stabilized at artificially high levels throughout Iowa; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Divalproex ER. During the Class Period, Defendants' illegal conduct substantially affected Iowa commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Iowa Code § 553.1, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Iowa Code § 553, *et seq*.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**Kansas**

229.     Defendants have entered into an unlawful agreement in restraint of trade in violation of Kansas Statutes Annotated, § 50-101, *et seq.* Defendants' combined capital, skills or acts for the purposes of creating restrictions in trade or commerce of generic Divalproex ER, increasing the prices of generic Divalproex ER, preventing competition in the sale of generic Divalproex ER, or binding themselves not to sell generic Divalproex ER, in a manner that established the price of generic Divalproex ER and precluded free and unrestricted competition among themselves in the sale of generic Divalproex ER, in violation of Kan. Stat. Ann. § 50-101, *et seq.* Defendants' combination or conspiracy had the following effects: (1) generic Divalproex ER price competition was restrained, suppressed, and eliminated throughout Kansas; (2) generic Divalproex ER prices were raised, fixed, maintained and stabilized at artificially high levels throughout Kansas; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Divalproex ER. During the Class Period, Defendants' illegal conduct substantially affected Kansas commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Kansas Stat. Ann. § 50-101, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Kansas Stat. Ann. § 50-101, *et seq.*

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**Maine**

230.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Maine Revised Statutes (Maine Rev. Stat. Ann. 10, § 1101, *et seq*.) Defendants' combination or conspiracy had the following effects: (1) generic Divalproex ER price competition was restrained, suppressed, and eliminated throughout Maine; (2) generic Divalproex ER prices were raised, fixed, maintained and stabilized at artificially high levels throughout Maine; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Divalproex ER. During the Class Period, Defendants' illegal conduct substantially affected Maine commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Maine Rev. Stat. Ann. 10, § 1101, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Maine Rev. Stat. Ann. 10, § 1101, *et seq*.

**Maryland**

230(a). Defendants have entered into an unlawful agreement in restraint of trade in violation of the Maryland Antitrust Act, Maryland Code, Com. Law § 11-204, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic Divalproex ER price competition was restrained, suppressed, and eliminated throughout Maryland; (2) generic Divalproex ER prices were raised, fixed, maintained and stabilized at artificially high levels throughout Maryland; (3) Plaintiffs and members of the Damages Class were deprived of free

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Divalproex ER.  During the Class Period, Defendants' illegal conduct substantially affected Maryland commerce.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.  By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of the Maryland Antitrust Act. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Maryland law.

**Michigan**

231.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Michigan Compiled Laws Annotated § 445.771, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic Divalproex ER price competition was restrained, suppressed, and eliminated throughout Michigan; (2) generic Divalproex ER prices were raised, fixed, maintained and stabilized at artificially high levels throughout Michigan; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Divalproex ER. During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Michigan Comp.

98

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Laws Ann. § 445.771, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Michigan Comp. Laws Ann. § 445.771, *et seq*.

**Minnesota**

232.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Minnesota Annotated Statutes § 325D.49, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic Divalproex ER price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) generic Divalproex ER prices were raised, fixed, maintained and stabilized at artificially high levels throughout Minnesota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Divalproex ER. During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Minnesota Stat. § 325D.49, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Minnesota Stat. § 325D.49, *et seq*.

**Mississippi**

233.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Mississippi Code Annotated § 75-21-1, *et seq*. Trusts are combinations, contracts, understandings or agreements, express or implied when inimical to the public welfare and with the effect of, *inter alia*, restraining trade, increasing the price or output of a commodity, or

99

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

hindering competition in the production and sale of a commodity. Miss. Code Ann. § 75-21-1. Defendants' combination or conspiracy was in a manner inimical to public welfare and had the following effects: (1) generic Divalproex ER price competition was restrained, suppressed, and eliminated throughout Mississippi; (2) generic Divalproex ER prices were raised, fixed, maintained and stabilized at artificially high levels throughout Mississippi; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Divalproex ER. During the Class Period, Defendants' illegal conduct substantially affected Mississippi commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Mississippi Code Ann. § 75-21-1, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Mississippi Code Ann. § 75-21-1, *et seq*.

**Nebraska**

234.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Nebraska Revised Statutes § 59-801, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic Divalproex ER price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) generic Divalproex ER prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nebraska; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Divalproex ER. During the Class Period, Defendants' illegal conduct substantially affected Nebraska commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Nebraska Revised Statutes § 59-801, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Nebraska Revised Statutes § 59-801, *et seq*.

**Nevada**

235.   Defendants have entered into an unlawful agreement in restraint of trade in violation of Nevada Revised Statutes Annotated § 598A.010, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic Divalproex ER price competition was restrained, suppressed, and eliminated throughout Nevada; (2) generic Divalproex ER prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nevada; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Divalproex ER. During the Class Period, Defendants' illegal conduct substantially affected Nevada commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Nevada Rev. Stat. Ann. § 598A.010, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Nevada Rev. Stat. Ann. § 598A.010, *et seq*.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**New Hampshire**

236.   Defendants have entered into an unlawful agreement in restraint of trade in violation of New Hampshire Revised Statutes § 356:1, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic Divalproex ER price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) generic Divalproex ER prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Hampshire; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Divalproex ER. During the Class Period, Defendants' illegal conduct substantially affected New Hampshire commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of New Hampshire Revised Statutes § 356:1, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New Hampshire Revised Statutes § 356:1, *et seq*.

**New Mexico**

237.   Defendants have entered into an unlawful agreement in restraint of trade in violation of New Mexico Statutes Annotated § 57-1-1, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic Divalproex ER price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) generic Divalproex ER prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Mexico; (3) Plaintiffs and members of the Damages Class were deprived of free and open

102

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Divalproex ER. During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of New Mexico Stat. Ann. § 57-1-1, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New Mexico Stat. Ann. § 57-1-1, *et seq*.

**New York**

238.    Defendants have entered into an unlawful agreement in restraint of trade in violation of New York's Donnelly Act, New York General Business Law § 340, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic Divalproex ER price competition was restrained, suppressed, and eliminated throughout New York; (2) generic Divalproex ER prices were raised, fixed, maintained and stabilized at artificially high levels throughout New York; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Divalproex ER that were higher than they would have been absent Defendants' illegal acts. During the Class Period, Defendants' illegal conduct substantially affected New York commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of the New York's

103

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Donnelly Act, New York General Business Law § 340, *et seq*. The conduct set forth above is a *per se* violation of the Act. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New York Gen. Bus. Law § 340, *et seq*.

**North Carolina**

239.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the North Carolina General Statutes § 75-1, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic Divalproex ER price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) generic Divalproex ER prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Divalproex ER. During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of North Carolina Gen. Stat. § 75-1, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under North Carolina Gen. Stat. § 75-1, *et. seq*.

**North Dakota**

240.     Defendants have entered into an unlawful agreement in restraint of trade in violation of North Dakota Century Code § 51-08.1-01, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic Divalproex ER price competition was

104

restrained, suppressed, and eliminated throughout North Dakota; (2) generic Divalproex ER prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Dakota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Divalproex ER. During the Class Period, Defendants' illegal conduct had a substantial effect on North Dakota commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of North Dakota Cent. Code § 51-08.1-01, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under North Dakota Cent. Code § 51-08.1-01, *et seq*.

**Oregon**

241.   Defendants have entered into an unlawful agreement in restraint of trade in violation of Oregon Revised Statutes § 646.705, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic Divalproex ER price competition was restrained, suppressed, and eliminated throughout Oregon; (2) generic Divalproex ER prices were raised, fixed, maintained and stabilized at artificially high levels throughout Oregon; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Divalproex ER. During the Class Period, Defendants' illegal conduct had a substantial effect on Oregon commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Oregon Revised Statutes § 646.705, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Oregon Revised Statutes § 646.705, *et seq.*

**Rhode Island**

242.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Rhode Island Antitrust Act, Rhode Island General Laws § 6-36-1, *et seq.* Defendants' combination or conspiracy had the following effects: (1) generic Divalproex ER price competition was restrained, suppressed, and eliminated throughout Rhode Island; (2) generic Divalproex ER prices were raised, fixed, maintained and stabilized at artificially high levels throughout Rhode Island; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Divalproex ER. During the Class Period, Defendants' illegal conduct had a substantial effect on Rhode Island commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property on or after July 15, 2013, and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Rhode Island General Laws § 6-36-1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Rhode Island General Laws § 6-36-1, *et seq.*

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**South Dakota**

243.    Defendants have entered into an unlawful agreement in restraint of trade in violation of South Dakota Codified Laws § 37-1-3.1, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic Divalproex ER price competition was restrained, suppressed, and eliminated throughout South Dakota; (2) generic Divalproex ER prices were raised, fixed, maintained and stabilized at artificially high levels throughout South Dakota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Divalproex ER. During the Class Period, Defendants' illegal conduct had a substantial effect on South Dakota commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of South Dakota Codified Laws Ann. § 37-1-3.1, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under South Dakota Codified Laws Ann. § 37-1-3.1, *et seq*.

**Tennessee**

244.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Tennessee Code Annotated § 47-25-101, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic Divalproex ER price competition was restrained, suppressed, and eliminated throughout Tennessee; (2) generic Divalproex ER prices were raised, fixed, maintained and stabilized at artificially high levels throughout Tennessee; (3)

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Divalproex ER. During the Class Period, Defendants' illegal conduct had a substantial effect on Tennessee commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Tennessee Code Ann. § 47-25-101, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Tennessee Code Ann. § 47-25-101, *et seq*.

**Utah**

245.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Utah Code Annotated § 76-10-3101, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic Divalproex ER price competition was restrained, suppressed, and eliminated throughout Utah; (2) generic Divalproex ER prices were raised, fixed, maintained and stabilized at artificially high levels throughout Utah; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Divalproex ER. During the Class Period, Defendants' illegal conduct had a substantial effect on Utah commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Utah Code Annotated § 76-10-3101, *et seq*.

108

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Utah Code Annotated § 76-10-3101, *et seq.*

### Vermont

246.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Vermont Stat. Ann. 9 § 2453, *et seq.* Defendants' combination or conspiracy had the following effects: (1) generic Divalproex ER price competition was restrained, suppressed, and eliminated throughout Vermont; (2) generic Divalproex ER prices were raised, fixed, maintained and stabilized at artificially high levels throughout Vermont; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Divalproex ER. During the Class Period, Defendants' illegal conduct had a substantial effect on Vermont commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Vermont Stat. Ann. 9 § 2453, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Vermont Stat. Ann. 9 § 2453, *et seq.*

### West Virginia

247.    Defendants have entered into an unlawful agreement in restraint of trade in violation of West Virginia Code § 47-18-1, *et seq.* Defendants' anticompetitive acts described above were knowing, willful, and constitute violations or flagrant violations of West Virginia Antitrust Act. Defendants' combination or conspiracy had the following effects: (1) generic

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Divalproex ER price competition was restrained, suppressed, and eliminated throughout West Virginia; (2) generic Divalproex ER prices were raised, fixed, maintained and stabilized at artificially high levels throughout West Virginia; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Divalproex ER. During the Class Period, Defendants' illegal conduct had a substantial effect on West Virginia commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of West Virginia Code § 47-18-1, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under West Virginia Code § 47-18-1, *et seq*.

**Wisconsin**

248.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Wisconsin Statutes § 133.01, *et seq*. Defendants' and their co-conspirators' anticompetitive activities have directly, foreseeably and proximately caused injury to Plaintiffs and members of the Classes in the United States. Specifically, Defendants' combination or conspiracy had the following effects: (1) generic Divalproex ER price competition was restrained, suppressed, and eliminated throughout Wisconsin; (2) generic Divalproex ER prices were raised, fixed, maintained and stabilized at artificially high levels throughout Wisconsin; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

prices for generic Divalproex ER.  During the Class Period, Defendants' illegal conduct had a substantial effect on the people of Wisconsin and Wisconsin commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Wisconsin Stat. § 133.01, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Wisconsin Stat. § 133.01, *et seq*.

**As to All Jurisdictions Above**

249.    Plaintiffs and members of the Damages Class in each of the above jurisdictions have been injured in their business and property by reason of Defendants' unlawful combination, contract, conspiracy and agreement. Plaintiffs and members of the Damages Class have paid more for generic Divalproex ER than they otherwise would have paid in the absence of Defendants' unlawful conduct. This injury is of the type the antitrust laws of the above states were designed to prevent and flows from that which makes Defendants' conduct unlawful.

250.    In addition, Defendants have profited significantly from the aforesaid conspiracy. Defendants' profits derived from their anticompetitive conduct come at the expense and detriment of Plaintiffs and members of the Damages Class.

251.    Accordingly, Plaintiffs and members of the Damages Class in each of the above jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the above state laws.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

## THIRD COUNT

### Violation of State Consumer Protection Statutes[102]
### (on behalf of Plaintiffs and the Damages Class)

252.   Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein.

253.   Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection and unfair competition statutes listed below.

**Alaska**

254.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of Alaska Statute § 45.50.471, *et seq*.  Defendants knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which generic Divalproex ER were sold, distributed, or obtained in Alaska and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.  The aforementioned conduct on the part of Defendants constituted "unconscionable" and "deceptive" acts or practices in violation of Alaska law.  Defendants' unlawful conduct had the following effects: (1) generic Divalproex ER price competition was restrained, suppressed, and eliminated throughout Alaska; (2) generic Divalproex ER prices were raised, fixed, maintained, and

---

[102] Statutory consumer protection violations are alleged herein for the following jurisdictions: Alaska, Arkansas, California, Colorado, Delaware, District of Columbia, Florida, Georgia, Hawaii, Massachusetts, Michigan, Minnesota, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Rhode Island, South Carolina, South Dakota, Utah, Vermont, Virginia, West Virginia, Wisconsin and the U.S. Virgin Islands.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

stabilized at artificially high levels throughout Alaska; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Divalproex ER. During the Class Period, Defendants' illegal conduct substantially affected Alaska commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Alaska Stat. § 45.50.471, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**Arkansas**

255.   Defendants have knowingly entered into an unlawful agreement in restraint of trade in violation of the Arkansas Code Annotated, § 4-88-101, *et seq*. Defendants knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which generic Divalproex ER were sold, distributed, or obtained in Arkansas and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. The aforementioned conduct on the part of Defendants constituted "unconscionable" and "deceptive" acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10). Defendants' unlawful conduct had the following effects: (1) generic Divalproex ER price competition was restrained, suppressed, and eliminated throughout Arkansas; (2) generic Divalproex ER prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Arkansas; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs

113

and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Divalproex ER. During the Class Period, Defendants' illegal conduct substantially affected Arkansas commerce and consumers. As a direct and proximate result of the unlawful conduct of Defendants, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10) and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**California**

256.     Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of California Business and Professions Code § 17200, *et seq*. During the Class Period, Defendants manufactured, marketed, sold, or distributed generic Divalproex ER in California, and committed and continue to commit acts of unfair competition, as defined by § 17200, *et seq*. of the California Business and Professions Code, by engaging in the acts and practices specified above. This claim is instituted pursuant to §§ 17203 and 17204 of the California Business and Professions Code, to obtain restitution from these Defendants for acts, as alleged herein, that violated § 17200 of the California Business and Professions Code, commonly known as the Unfair Competition Law. Defendants' conduct as alleged herein violated § 17200. The acts, omissions, misrepresentations, practices and non-disclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of California Business and Professions Code §17200, *et*

114

*seq.*, including, but not limited to, the following: (1) the violations of Section 1 of the Sherman Act, as set forth above; (2) the violations of § 16720, *et seq.* of the California Business and Professions Code, set forth above. Defendants' acts, omissions, misrepresentations, practices, and non-disclosures, as described above, whether or not in violation of § 16720, *et seq.* of the California Business and Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful or fraudulent; (3) Defendants' acts or practices are unfair to purchasers of generic Divalproex ER in the State of California within the meaning of § 17200, California Business and Professions Code; and (4) Defendants' acts and practices are fraudulent or deceptive within the meaning of Section 17200 of the California Business and Professions Code. Plaintiffs and members of the Damages Class are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that have been obtained by Defendants as a result of such business acts or practices. During the Class Period, Defendants' illegal conduct substantially affected California commerce and consumers. The illegal conduct alleged herein is continuing and there is no indication that Defendants will not continue such activity into the future. The unlawful and unfair business practices of Defendants, and each of them, as described above, have caused and continue to cause Plaintiffs and members of the Damages Class to pay supracompetitive and artificially-inflated prices for generic Divalproex ER. Plaintiffs and members of the Damages Class suffered injury in fact and lost money or property as a result of such unfair competition. The conduct of Defendants as alleged in this Complaint violates § 17200 of the California Business and Professions Code. As alleged in this Complaint, Defendants and their co-conspirators have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition. Plaintiffs and members of the

115

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Damages Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business practices, pursuant to the California Business and Professions Code, §§17203 and 17204.

**Colorado**

257.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of Colorado Consumer Protection Act, Colorado Rev. Stat. § 6-1-101, *et seq.*  Defendants engaged in an unfair and deceptive trade practices during the course of their business dealings, which significantly impacted Plaintiffs as actual or potential consumers of the Defendants' goods and which caused Plaintiffs to suffer injury. Defendants took efforts to conceal their agreements from Plaintiffs. Defendants' unlawful conduct had the following effects: (1) generic Divalproex ER price competition was restrained, suppressed, and eliminated throughout Colorado; (2) generic Divalproex ER prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Colorado; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Divalproex ER. During the Class Period, Defendants' illegal conduct substantially affected Colorado commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Colorado Rev. Stat. § 6-1-101, *et seq.*, and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute and as equity demands.

116

**Delaware**

258.     Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Delaware Consumer Fraud Act, 6 Del. Code § 2511, *et seq.*  Defendants agreed to, and did in fact, act in restraint of trade or commerce in Delaware, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Divalproex ER were sold, distributed, or obtained in Delaware. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Divalproex ER. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Divalproex ER prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Divalproex ER price competition was restrained, suppressed, and eliminated throughout Delaware; (2) generic Divalproex ER prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Delaware; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Divalproex ER. During the Class Period, Defendants' illegal conduct had a substantial effect on Delaware commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Divalproex

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

ER, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Divalproex ER at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of 6 Del. Code § 2511, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**District of Columbia**

259.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of District of Columbia Code § 28-3901, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which generic Divalproex ER were sold, distributed or obtained in the District of Columbia. During the Class Period, Defendants' illegal conduct substantially affected District of Columbia commerce and consumers. The foregoing conduct constitutes "unlawful trade practices," within the meaning of D.C. Code § 28-3904. Plaintiffs and members of the Damages Class were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged. Defendants had the sole power to set that price and Plaintiffs and members of the Damages Class had no power to negotiate a lower price. Moreover, Plaintiffs and members of the Damages Class lacked any meaningful choice in purchasing generic Divalproex ER because they were unaware of the unlawful overcharge, and there was no alternative source of supply through which Plaintiffs and members of the Damages Class could avoid the overcharges. Defendants' conduct with regard to sales of generic Divalproex ER, including their illegal conspiracy to secretly fix the price of generic Divalproex ER at

118

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

supracompetitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiffs and the public. Defendants took grossly unfair advantage of Plaintiffs and members of the Damages Class. The suppression of competition that has resulted from Defendants' conspiracy has ultimately resulted in unconscionably higher prices for purchasers so that there was a gross disparity between the price paid and the value received for generic Divalproex ER. Defendants' unlawful conduct had the following effects: (1) generic Divalproex ER price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) generic Divalproex ER prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Divalproex ER. As a direct and proximate result of Defendants' conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of District of Columbia Code § 28-3901, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**Florida**

260.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, *et seq*. Defendants' unlawful conduct had the following effects: (1) generic Divalproex ER price competition was restrained, suppressed, and eliminated throughout Florida;

119

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

(2) generic Divalproex ER prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Florida; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Divalproex ER. During the Class Period, Defendants' illegal conduct substantially affected Florida commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Florida Stat. § 501.201, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**Georgia**

261.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Georgia Uniform Deceptive Trade Practices Act, Georgia Code § 10-1-370, *et seq*. and the Georgia Fair Businesses Practices Act, Georgia Code Ann. § 10-1-390, *et seq*.   Defendants agreed to, and did in fact, act in restraint of trade or commerce in Georgia, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Divalproex ER were sold, distributed, or obtained in Georgia. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Divalproex ER. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Divalproex ER prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Divalproex ER price competition was restrained,

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

suppressed, and eliminated throughout Georgia; (2) generic Divalproex ER prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Georgia; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Divalproex ER. During the Class Period, Defendants' illegal conduct had a substantial effect on Georgia commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above and are threatened with further injury. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Divalproex ER, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Divalproex ER at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of Georgia law, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute and as equity demands.

**Hawaii**

262.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Hawaii Revised Statutes Annotated § 480-1, *et seq*. Defendants' unlawful conduct had the following effects: (1) generic Divalproex ER price competition was restrained, suppressed, and eliminated throughout Hawaii; (2) generic Divalproex ER prices were raised, fixed, maintained, and stabilized at artificially high levels

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

throughout Hawaii; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Divalproex ER. During the Class Period, Defendants' illegal conduct substantially affected Hawaii commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Hawaii Rev. Stat. § 480-1 *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**Massachusetts**

263.    Defendants have engaged in unfair competition or unlawful, unfair, unconscionable, or deceptive acts or practices in violation of the Massachusetts Gen. Laws, Ch 93A, § 1, *et seq*. Defendants were engaged in trade or commerce as defined by G.L. 93A. Defendants, in a market that includes Massachusetts, agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which generic Divalproex ER were sold, distributed, or obtained in Massachusetts and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. The aforementioned conduct on the part of Defendants constituted "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce," in violation of Massachusetts Gen. Laws, Ch 93A, § 2, 11. Defendants' unlawful conduct had the following effects: (1) generic Divalproex ER price competition was restrained, suppressed, and eliminated throughout Massachusetts; (2) generic

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Divalproex ER prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Massachusetts; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and the members of the Damages Class paid supracompetitive, artificially inflated prices for generic Divalproex ER. During the Class Period, Defendants' illegal conduct substantially affected Massachusetts commerce and consumers. As a direct and proximate result of the unlawful conduct of Defendants, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Massachusetts Gen. Laws, Ch 93A, § 2, 11, that were knowing or willful, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute, including multiple damages.

**Michigan**

264.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Michigan Consumer Protection Statute, Mich. Compiled Laws § 445.903, *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce in Michigan, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Divalproex ER were sold, distributed, or obtained in Michigan. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Divalproex ER. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Divalproex ER prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Divalproex ER price

123

competition was restrained, suppressed, and eliminated throughout Michigan; (2) generic Divalproex ER prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Michigan; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Divalproex ER. During the Class Period, Defendants' illegal conduct had a substantial effect on Michigan commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Divalproex ER, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Divalproex ER at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of Mich. Compiled Laws § 445.903, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**Minnesota**

265.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. § 325D.43, *et seq*.  Defendants engaged in an unfair and deceptive trade practices during the course of their business dealings, which significantly impacted Plaintiffs as actual or potential consumers of the Defendants' goods and which caused Plaintiffs to suffer injury.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Defendants took efforts to conceal their agreements from Plaintiffs. Defendants' unlawful conduct had the following effects: (1) generic Divalproex ER price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) generic Divalproex ER prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Minnesota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Divalproex ER. During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Minn. Stat. § 325D.43, *et seq*., and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute and as equity demands.

### Missouri

266.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407.010, *et seq*. Plaintiffs and members of the Damages Class purchased generic Divalproex ER for personal or family purposes. Defendants engaged in the conduct described herein in connection with the sale of generic Divalproex ER in trade or commerce in a market that includes Missouri. Defendants agreed to, and did in fact affect, fix, control, and/or maintain, at artificial and non-competitive levels, the prices at which generic Divalproex ER were sold, distributed, or obtained in Missouri, which conduct constituted unfair practices in that it was

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

unlawful under federal and state law, violated public policy, was unethical, oppressive and unscrupulous, and caused substantial injury to Plaintiffs and members of the Damages Class. Defendants concealed, suppressed, and omitted to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Divalproex ER. The concealed, suppressed, and omitted facts would have been important to Plaintiffs and members of the Damages Class as they related to the cost of generic Divalproex ER they purchased. Defendants misrepresented the real cause of price increases and/or the absence of price reductions in generic Divalproex ER by making public statements that were not in accord with the facts. Defendants' statements and conduct concerning the price of generic Divalproex ER were deceptive as they had the tendency or capacity to mislead Plaintiffs and members of the Damages Class to believe that they were purchasing generic Divalproex ER at prices established by a free and fair market. Defendants' unlawful conduct had the following effects: (1) generic Divalproex ER price competition was restrained, suppressed, and eliminated throughout Missouri; (2) generic Divalproex ER prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Missouri; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Divalproex ER. The foregoing acts and practices substantially affected Missouri commerce and consumers and constituted unlawful practices in violation of the Missouri Merchandising Practices Act. As a direct and proximate result of the above-described unlawful practices, Plaintiffs and members of the Damages Class suffered ascertainable loss of money or property. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Missouri's Merchandising Practices Act, specifically Mo. Rev. Stat. § 407.020, which prohibits "[t]he act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce…", as further interpreted by the Missouri Code of State Regulations, 15 CSR 60-7.010, *et seq.*, 15 CSR 60-8.010, *et seq.*, and 15 CSR 60-9.010, *et seq.*, and Mo. Rev. Stat. § 407.025.

**Montana**

267.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Montana Unfair Trade Practices and Consumer Protection Act of 1970, Mont. Code, § 30-14-103, *et seq.*, and § 30-14-201, *et seq.* Defendants' unlawful conduct had the following effects: (1) generic Divalproex ER price competition was restrained, suppressed, and eliminated throughout Montana; (2) generic Divalproex ER prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Montana; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Divalproex ER. During the Class Period, Defendants marketed, sold, or distributed generic Divalproex ER in Montana, and Defendants' illegal conduct substantially affected Montana commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mont. Code, § 30-14-103, *et seq.*, and § 30-14-201, *et.*

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

*seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

### Nebraska

268.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Nebraska Consumer Protection Act, Neb. Rev. Stat. § 59-1601, *et seq*.   Defendants' unlawful conduct had the following effects: (1) generic Divalproex ER price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) generic Divalproex ER prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nebraska; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Divalproex ER. During the Class Period, Defendants marketed, sold, or distributed generic Divalproex ER in Nebraska, and Defendants' illegal conduct substantially affected Nebraska commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Neb. Rev. Stat. § 59-1601, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

### Nevada

269.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Nevada Deceptive Trade Practices Act, Nev. Rev. Stat. § 598.0903, *et seq*.   Defendants agreed to, and did in fact, act in restraint of trade or

128

commerce in Nevada, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Divalproex ER were sold, distributed, or obtained in Nevada. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Divalproex ER. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Divalproex ER prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Divalproex ER price competition was restrained, suppressed, and eliminated throughout Nevada; (2) generic Divalproex ER prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nevada; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Divalproex ER. During the Class Period, Defendants' illegal conduct had a substantial effect on Nevada commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Divalproex ER, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Divalproex ER at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of Nev. Rev. Stat. § 598.0903, *et seq*., and,

129

accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

### New Hampshire

270.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Hampshire Consumer Protection Act, N.H. Rev. Stat. § 358-A:1, *et seq*.  Defendants' unlawful conduct had the following effects: (1) generic Divalproex ER price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) generic Divalproex ER prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Hampshire; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Divalproex ER. During the Class Period, Defendants marketed, sold, or distributed generic Divalproex ER in New Hampshire, and Defendants' illegal conduct substantially affected New Hampshire commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.H. Rev. Stat. § 358-A:1, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

### New Jersey

271.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Jersey Consumer Fraud Act, N.J. Statutes § 56:8-1, *et seq*.  Defendants agreed to, and did in fact, act in restraint of trade or commerce in

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

New Jersey, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Divalproex ER were sold, distributed, or obtained in New Jersey. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Divalproex ER. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Divalproex ER prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Divalproex ER price competition was restrained, suppressed, and eliminated throughout New Jersey; (2) generic Divalproex ER prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Jersey; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Divalproex ER. During the Class Period, Defendants' illegal conduct had a substantial effect on New Jersey commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Divalproex ER, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Divalproex ER at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of N.J. Statutes § 56:8-1,

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

*et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**New Mexico**

272.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Mexico Stat. § 57-12-1, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining at non-competitive and artificially inflated levels, the prices at which generic Divalproex ER were sold, distributed or obtained in New Mexico and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. The aforementioned conduct on the part of Defendants constituted "unconscionable trade practices," in violation of New Mexico Stat. § 57-12-3, in that such conduct, *inter alia*, resulted in a gross disparity between the value received by Plaintiffs and members of the Damages Class and the prices paid by them for generic Divalproex ER as set forth in New Mexico Stat. § 57-12-2E. Plaintiffs and members of the Damages Class were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged. Defendants had the sole power to set that price, and Plaintiffs and members of the Damages Class had no power to negotiate a lower price. Moreover, Plaintiffs and members of the Damages Class lacked any meaningful choice in purchasing generic Divalproex ER because they were unaware of the unlawful overcharge, and there was no alternative source of supply through which Plaintiffs and members of the Damages Class could avoid the overcharges. Defendants' conduct with regard to sales of generic Divalproex ER, including their illegal conspiracy to secretly fix the price of generic Divalproex ER at supracompetitive levels and overcharge consumers, was substantively

132

unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiffs and the public. Defendants took grossly unfair advantage of Plaintiffs and members of the Damages Class. The suppression of competition that has resulted from Defendants' conspiracy has ultimately resulted in unconscionably higher prices for consumers so that there was a gross disparity between the price paid and the value received for generic Divalproex ER. Defendants' unlawful conduct had the following effects: (1) generic Divalproex ER price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) generic Divalproex ER prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Divalproex ER. During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce and consumers. As a direct and proximate result of the unlawful conduct of Defendants, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of New Mexico Stat. § 57-12-1, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**New York**

273.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which generic Divalproex ER

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

were sold, distributed or obtained in New York and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. Defendants and their co-conspirators made public statements about the prices of generic Divalproex ER that either omitted material information that rendered the statements that they made materially misleading or affirmatively misrepresented the real cause of price increases for generic Divalproex ER; and Defendants alone possessed material information that was relevant to consumers, but failed to provide the information. Because of Defendants' unlawful trade practices in the State of New York, New York class members who indirectly purchased generic Divalproex ER were misled to believe that they were paying a fair price for generic Divalproex ER or the price increases for generic Divalproex ER were for valid business reasons; and similarly situated consumers were affected by Defendants' conspiracy. Defendants knew that their unlawful trade practices with respect to pricing generic Divalproex ER would have an impact on New York consumers and not just Defendants' direct customers. Defendants knew that their unlawful trade practices with respect to pricing generic Divalproex ER would have a broad impact, causing consumer class members who indirectly purchased generic Divalproex ER to be injured by paying more for generic Divalproex ER than they would have paid in the absence of Defendants' unlawful trade acts and practices. The conduct of Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of consumers in New York State in an honest marketplace in which economic activity is conducted in a competitive manner. Defendants' unlawful conduct had the following effects: (1) generic Divalproex ER price competition was restrained, suppressed, and eliminated throughout New

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

York; (2) generic Divalproex ER prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Divalproex ER. During the Class Period, Defendants marketed, sold, or distributed generic Divalproex ER in New York, and Defendants' illegal conduct substantially affected New York commerce and consumers. During the Class Period, each of Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed generic Divalproex ER in New York. Plaintiffs and members of the Damages Class seek all relief available pursuant to N.Y. Gen. Bus. Law § 349(h).

**North Carolina**

274.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which generic Divalproex ER were sold, distributed or obtained in North Carolina and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. Defendants' price-fixing conspiracy could not have succeeded absent deceptive conduct by Defendants to cover up their illegal acts. Secrecy was integral to the formation, implementation and maintenance of Defendants' price-fixing conspiracy. Defendants committed inherently deceptive and self-concealing actions, of which Plaintiffs and members of the Damages Class could not possibly have been aware. Defendants and their co-conspirators publicly provided pretextual and false

135

justifications regarding their price increases. Defendants' public statements concerning the price of generic Divalproex ER created the illusion of competitive pricing controlled by market forces rather than supracompetitive pricing driven by Defendants' illegal conspiracy. Moreover, Defendants deceptively concealed their unlawful activities by mutually agreeing not to divulge the existence of the conspiracy to outsiders. The conduct of Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of North Carolina consumers in an honest marketplace in which economic activity is conducted in a competitive manner. Defendants' unlawful conduct had the following effects: (1) generic Divalproex ER price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) generic Divalproex ER prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Divalproex ER. During the Class Period, Defendants marketed, sold, or distributed generic Divalproex ER in North Carolina, and Defendants' illegal conduct substantially affected North Carolina commerce and consumers. During the Class Period, each of Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed generic Divalproex ER in North Carolina. Plaintiffs and members of the Damages Class seek actual damages for their injuries caused by these violations in an amount to be determined at trial and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of North Carolina Gen. Stat. §

136

75-1.1, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**North Dakota**

275.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the North Dakota Unlawful Sales or Advertising Practices Statute, N.D. Century Code § 51-15-01, *et seq*.  Defendants agreed to, and did in fact, act in restraint of trade or commerce in North Dakota, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Divalproex ER were sold, distributed, or obtained in North Dakota. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Divalproex ER. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Divalproex ER prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Divalproex ER price competition was restrained, suppressed, and eliminated throughout North Dakota; (2) generic Divalproex ER prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Dakota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Divalproex ER. During the Class Period, Defendants' illegal conduct had a substantial effect on North Dakota commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Divalproex ER, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Divalproex ER at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of N.D. Century Code § 51-15-01, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**Rhode Island**

276.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Rhode Island Unfair Trade Practice and Consumer Protection Act, R.I. Gen. Laws § 6-13.1-1, *et seq*. Members of the Damages Class purchased generic Divalproex ER for personal, family, or household purposes. Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Rhode Island, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Divalproex ER were sold, distributed, or obtained in Rhode Island. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Divalproex ER. Defendants owed a duty to disclose such facts, and considering the relative lack of sophistication of the average, non-business purchaser, Defendants breached that duty by their silence. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Divalproex ER prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Divalproex ER price competition was restrained,

138

suppressed, and eliminated throughout Rhode Island; (2) generic Divalproex ER prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Rhode Island; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Divalproex ER. Defendants' illegal conduct substantially affected Rhode Island commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Divalproex ER, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Divalproex ER at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of generic Divalproex ER they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Rhode Island Gen. Laws. § 6-13.1-1, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**South Carolina**

277.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of South Carolina Unfair Trade Practices Act, S.C. Code Ann. § 39-5-10, *et seq*. Defendants' combination or conspiracy had the following effects: (1)

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

generic Divalproex ER price competition was restrained, suppressed, and eliminated throughout South Carolina; (2) generic Divalproex ER prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Carolina; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Divalproex ER. During the Class Period, Defendants' illegal conduct had a substantial effect on South Carolina commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Ann. § 39-5-10, *et seq*., and, accordingly, Plaintiffs and the members of the Damages Class seek all relief available under that statute.

**South Dakota**

278.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the South Dakota Deceptive Trade Practices and Consumer Protection Statute, S.D. Codified Laws § 37-24-1, *et seq*.  Defendants agreed to, and did in fact, act in restraint of trade or commerce in South Dakota, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Divalproex ER were sold, distributed, or obtained in South Dakota. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Divalproex ER. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Divalproex ER prices were competitive and fair. Defendants' unlawful conduct had the

140

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

following effects: (1) generic Divalproex ER price competition was restrained, suppressed, and eliminated throughout South Dakota; (2) generic Divalproex ER prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Dakota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Divalproex ER. Defendants' illegal conduct substantially affected South Dakota commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Divalproex ER, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Divalproex ER at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of generic Divalproex ER they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.D. Codified Laws § 37-24-1, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**Utah**

279.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Utah Consumer Sales Practices Act, Ut. Stat. § 13-

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

11-1, *et seq.*  Members of the Damages Class purchased generic Divalproex ER for personal, family, or household purposes. Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Utah, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Divalproex ER were sold, distributed, or obtained in Utah. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Divalproex ER. Defendants owed a duty to disclose such facts, and considering the relative lack of sophistication of the average, non-business purchaser, Defendants breached that duty by their silence. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Divalproex ER prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Divalproex ER price competition was restrained, suppressed, and eliminated throughout Utah; (2) generic Divalproex ER prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Utah; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Divalproex ER. Defendants' illegal conduct substantially affected Utah commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above and are threatened with further injury. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

generic Divalproex ER, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Divalproex ER at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of generic Divalproex ER they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ut. Stat. § 13-11-1 *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute and as equity demands.

**Vermont**

280.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of 9 Vermont Statutes § 2451, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Vermont, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Divalproex ER were sold, distributed, or obtained in Vermont. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Divalproex ER. Defendants owed a duty to disclose such facts, and considering the relative lack of sophistication of the average, non-business purchaser, Defendants breached that duty by their silence. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Divalproex ER prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Divalproex ER price competition was restrained, suppressed, and eliminated throughout Vermont; (2) generic Divalproex ER prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Vermont; (3) Plaintiffs and

143

members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Divalproex ER. During the Class Period, Defendants' illegal conduct had a substantial effect on Vermont commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Divalproex ER, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Divalproex ER at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitutes unfair competition or unfair or deceptive acts or practices in violation of 9 Vt. Stat. § 2451, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**Virginia**

281.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Virginia Consumer Protection Act of 1977, Va. Code § 59.1-196, *et seq*.  Members of the Damages Class purchased generic Divalproex ER to be used for personal, family, or household purposes. Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Virginia, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Divalproex ER were sold, distributed, or obtained in Virginia. Defendants deliberately

144

failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Divalproex ER. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Divalproex ER prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Divalproex ER price competition was restrained, suppressed, and eliminated throughout Virginia; (2) generic Divalproex ER prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Virginia; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Divalproex ER. Defendants' illegal conduct substantially affected Virginia commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Divalproex ER, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Divalproex ER at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of generic Divalproex ER they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Va. Code § 59.1-196, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

145

**West Virginia**

282.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the West Virginia Consumer Credit and Protection Act, W.Va. Code § 46A-6-101, *et seq.*  Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes West Virginia, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Divalproex ER were sold, distributed, or obtained in West Virginia. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Divalproex ER. Defendants affirmatively misrepresented to all purchasers during the Class Period that Defendants' generic Divalproex ER prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Divalproex ER price competition was restrained, suppressed, and eliminated throughout West Virginia; (2) generic Divalproex ER prices were raised, fixed, maintained, and stabilized at artificially high levels throughout West Virginia; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Divalproex ER. Defendants' illegal conduct substantially affected West Virginia commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

generic Divalproex ER, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Divalproex ER at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of generic Divalproex ER they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of W.Va. Code § 46A-6-101, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**Wisconsin**

283.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Wisconsin Consumer Protection Statutes, Wisc. Stat. § 100.18, *et seq.*  Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Wisconsin, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Divalproex ER were sold, distributed, or obtained in Wisconsin. Defendants affirmatively misrepresented to all purchasers during the Class Period that Defendants' generic Divalproex ER prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Divalproex ER price competition was restrained, suppressed, and eliminated throughout Wisconsin; (2) generic Divalproex ER prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Wisconsin; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Divalproex ER. Defendants' illegal conduct substantially affected Wisconsin commerce and consumers. As a direct and proximate

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations concerning the price of generic Divalproex ER, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Divalproex ER at prices set by a free and fair market. Defendants' affirmative misrepresentations constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of generic Divalproex ER they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Wisc. Stat. § 100.18, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**U.S. Virgin Islands**

284.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the U.S. Virgin Islands Consumer Fraud and Deceptive Business Practices Act, 12A V.I.C. §§ 102, 301-35, *et seq*.  Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes U.S.V.I., by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Divalproex ER were sold, distributed, or obtained in U.S.V.I. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Divalproex ER. Defendants affirmatively misrepresented to all purchasers during the Class Period that

148

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Defendants' generic Divalproex ER prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Divalproex ER price competition was restrained, suppressed, and eliminated throughout U.S.V.I.; (2) generic Divalproex ER prices were raised, fixed, maintained, and stabilized at artificially high levels throughout U.S.V.I.; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Divalproex ER. Defendants' illegal conduct substantially affected U.S.V.I. commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above and are threatened with further injury. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Divalproex ER, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Divalproex ER at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of generic Divalproex ER they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 12A V.I.C. §§ 102, 301-35, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute and as equity demands.

149

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

## FOURTH COUNT

### Unjust Enrichment[103]
### (on behalf of Plaintiffs and the Damages Class)

285.    Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein.

286.    To the extent required, this claim is pleaded in the alternative to the other claims in this Complaint.

287.    Defendants have unlawfully benefited from their sales of Divalproex ER because of the unlawful and inequitable acts alleged in this Complaint. Defendants unlawfully overcharged End Payers, who made purchases of or reimbursements for Divalproex ER at prices that were more than they would have been but for Defendants' unlawful actions.

288.    Defendants' financial benefits resulting from their unlawful and inequitable acts are traceable to overpayments by Plaintiffs and the Damages Class.

289.    Plaintiffs and the Damages Class have conferred upon Defendants an economic benefit, in the nature of profits resulting from unlawful overcharges, to the economic detriment of Plaintiffs and the Damages Class.

290.    Defendants have been enriched by revenue resulting from unlawful overcharges for Divalproex ER while Plaintiffs and the Damages Class have been impoverished by the overcharges they paid for Divalproex ER imposed through Defendants' unlawful conduct. Defendants' enrichment and Plaintiffs' and the Damages Class's impoverishment are connected.

---

[103] Unjust enrichment claims are alleged herein under the laws of all States (except Ohio and Indiana) as well as the District of Columbia, Puerto Rico and the U.S. Virgin Islands.

150

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

291.    There is no justification for Defendants' retention of, and enrichment from, the benefits they received, which caused impoverishment to Plaintiffs and the Damages Class, because Plaintiffs and the Damages Class paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges.

292.    Plaintiffs and the Damages Class did not interfere with Defendants' affairs in any manner that conferred these benefits upon Defendants.

293.    The benefits conferred upon Defendants were not gratuitous, in that they constituted revenue created by unlawful overcharges arising from Defendants' illegal and unfair actions to inflate the prices of Divalproex ER.

294.    The benefits conferred upon Defendants are measurable, in that the revenue Defendants have earned due to their unlawful overcharges of Divalproex ER are ascertainable by review of sales records.

295.    It would be futile for Plaintiffs and the Damages Class to seek a remedy from any party with whom they have privity of contract. Defendants have paid no consideration to any other person for any of the unlawful benefits they received indirectly from Plaintiffs and the Damages Class with respect to Defendants' sales of Divalproex ER.

296.    It would be futile for Plaintiffs and the Damages Class to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which they indirectly purchased Divalproex ER, as the intermediaries are not liable and cannot reasonably be expected to compensate Plaintiffs and the Damages Class for Defendants' unlawful conduct.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

297.    The economic benefit of overcharges and monopoly profits derived by Defendants through charging supracompetitive and artificially inflated prices for Divalproex ER is a direct and proximate result of Defendants' unlawful practices.

298.    The financial benefits derived by Defendants rightfully belong to Plaintiffs and the Damages Class, because Plaintiffs and the Damages Class paid supracompetitive prices during the Class Period, inuring to the benefit of Defendants.

299.    It would be inequitable under unjust enrichment principles under the laws of all States (except Ohio and Indiana) and of the District of Columbia, Puerto Rico and the U.S. Virgin Islands, for Defendants to be permitted to retain any of the overcharges for Divalproex ER derived from Defendants' unlawful, unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

300.    Defendants are aware of and appreciate the benefits bestowed upon them by Plaintiffs and the Damages Class. Defendants consciously accepted the benefits and continue to do so as of the date of this filing.

301.    Defendants should be compelled to disgorge in a common fund for the benefit of Plaintiffs and the Damages Class all unlawful or inequitable proceeds they received from their sales of Divalproex ER.

302.    A constructive trust should be imposed upon all unlawful or inequitable sums received by Defendants traceable to indirect purchases of Divalproex ER by Plaintiffs and the Damages Class.

303.    Plaintiffs and the Damages Class have no adequate remedy at law.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

304.     By engaging in the foregoing unlawful or inequitable conduct depriving Plaintiffs and the Damages Class of the opportunity to purchase lower-priced generic versions of Divalproex ER and forcing them to pay higher prices for Divalproex ER, Defendants have been unjustly enriched in violation of the common law of various states, as outlined below:

**Alabama**

305.     Defendants unlawfully overcharged End Payers, who made purchases of or reimbursements for Divalproex ER in Alabama at prices that were more than they would have been but for Defendants' actions.  Defendants received money from Plaintiffs and the Damages Class as a direct result of the unlawful overcharges, and have retained this money. Defendants have benefitted at the expense of Plaintiffs and the Damages Class from revenue resulting from unlawful overcharges for Divalproex ER.  It is inequitable for Defendants to accept and retain the benefits received without compensating Plaintiffs and the Damages Class.

**Alaska**

306.     Defendants unlawfully overcharged End Payers, who made purchases of or reimbursements for Divalproex ER in Alaska at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants appreciated the benefits bestowed upon them by Plaintiffs and the Damages Class. Defendants accepted and retained the benefits bestowed upon them under inequitable and unjust circumstances arising from unlawful overcharges to Plaintiffs and the Damages Class.   Under the circumstances, it would be

153

inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

### Arizona

307.    Defendants unlawfully overcharged End Payers, who made purchases of or reimbursements for Divalproex ER in Arizona at prices that were more than they would have been but for Defendants' actions. Defendants have been enriched by revenue resulting from unlawful overcharges for Divalproex ER. Plaintiffs and the Damages Class have been impoverished by the overcharges for Divalproex ER resulting from Defendants' unlawful conduct.  Defendants' enrichment and Plaintiffs' and the Damages Class's impoverishment are connected.   There is no justification for Defendants' receipt of the benefits causing their enrichment and Plaintiffs' and the Damages Class's impoverishment, because Plaintiffs and the Damages Class paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges. Plaintiffs and the Damages Class have no remedy at law.

### Arkansas

308.    Defendants unlawfully overcharged End Payers, who made purchases of or reimbursements for Divalproex ER in Arkansas at prices that were more than they would have been but for Defendants' actions.  Defendants received money from Plaintiffs and the Damages Class as a direct result of the unlawful overcharges, and have retained this money. Defendants have paid no consideration to any other person in exchange for this money.   Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**California**

309.    Defendants unlawfully overcharged End Payers, who made purchases of or reimbursements for Divalproex ER in California at prices that were more than they would have been but for Defendants' actions.  Defendants have received a benefit from Plaintiffs and the Damages Class as a direct result of the unlawful overcharges.  Defendants retained the benefits bestowed upon them under inequitable and unjust circumstances at the expense of Plaintiffs and the Damages Class.

**Colorado**

310.    Defendants unlawfully overcharged End Payers, who made purchases of or reimbursements for Divalproex ER in Colorado at prices that were more than they would have been but for Defendants' actions.  Defendants have received a benefit from Plaintiffs and the Damages Class in the nature of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Defendants.  Defendants have benefitted at the expense of Plaintiffs and the Damages Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Connecticut**

311.    Defendants unlawfully overcharged End Payers, who made purchases of or reimbursements for Divalproex ER in Connecticut at prices that were more than they would have been but for Defendants' actions.  Defendants were benefitted in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class. Defendants have paid no consideration to any other person in exchange for this benefit.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Defendants retained the benefits bestowed upon them under inequitable and unjust circumstances at the expense of Plaintiffs and the Damages Class.

**Delaware**

312.    Defendants unlawfully overcharged End Payers, who made purchases of or reimbursements for Divalproex ER in Delaware at prices that were more than they would have been but for Defendants' actions.  Defendants have been enriched by revenue resulting from unlawful overcharges for Divalproex ER.   Plaintiffs and the Damages Class have been impoverished by the overcharges for Divalproex ER resulting from Defendants' unlawful conduct.  Defendants' enrichment and Plaintiffs' and the Damages Class's impoverishment are connected.   There is no justification for Defendants' receipt of the benefits causing their enrichment, because Plaintiffs and the Damages Class paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges.  Plaintiffs and the Damages Class have no remedy at law.

**District of Columbia**

313.    Defendants unlawfully overcharged End Payers, who made purchases of or reimbursements for Divalproex ER in the District of Columbia at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants retained the benefit bestowed upon them under inequitable and unjust circumstances arising from unlawful overcharges to Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable and unjust for Defendants to retain such benefits.

156

**Florida**

314.   Defendants unlawfully overcharged End Payers, who made purchases of or reimbursements for Divalproex ER in Florida at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants appreciated the benefits bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Georgia**

315.   Defendants unlawfully overcharged End Payers, who made purchases of or reimbursements for Divalproex ER in Georgia at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Hawaii**

316.   Defendants unlawfully overcharged End Payers, who made purchases of or reimbursements for Divalproex ER in Hawaii at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

economic detriment of Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Idaho**

317.    Defendants unlawfully overcharged End Payers, who made purchases of or reimbursements for Divalproex ER in Idaho at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants appreciated the benefit conferred upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Illinois**

318.    Defendants unlawfully overcharged End Payers, who made purchases of or reimbursements for Divalproex ER in Illinois at prices that were more than they would have been but for Defendants' actions. Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants retained the benefits bestowed upon them under unjust circumstances arising from unlawful overcharges to Plaintiffs and the Damages Class.  It is against equity, justice, and good conscience for Defendants to be permitted to retain the revenue resulting from their unlawful overcharges.

158

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**Iowa**

319.    Defendants unlawfully overcharged End Payers, who made purchases of or reimbursements for Divalproex ER in Iowa at prices that were more than they would have been but for Defendants' actions.  Defendants have been enriched by revenue resulting from unlawful overcharges for Divalproex ER, which revenue resulted from anticompetitive prices paid by Plaintiffs and the Damages Class, which inured to Defendants' benefit.  Defendants' enrichment has occurred at the expense of Plaintiffs and the Damages Class.  Under the circumstances, it would be unjust for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Kansas**

320.    Defendants unlawfully overcharged End Payers, who made purchases of or reimbursements for Divalproex ER in Kansas at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants retained the benefits bestowed upon them under unjust circumstances arising from unlawful overcharges to Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Kentucky**

321.    Defendants unlawfully overcharged End Payers, who made purchases of or reimbursements for Divalproex ER in Kentucky at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic

159

benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants appreciated the benefit conferred upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Louisiana**

322.   Defendants unlawfully overcharged End Payers, who made purchases of or reimbursements for Divalproex ER in Louisiana at prices that were more than they would have been but for Defendants' actions.  Defendants have been enriched by revenue resulting from unlawful overcharges for Divalproex ER.  Plaintiffs and the Damages Class have been impoverished by the overcharges for Divalproex ER resulting from Defendants' unlawful conduct.  Defendants' enrichment and Plaintiffs' and the Damages Class's impoverishment are connected.  There is no justification for Defendants' receipt of the benefits causing their enrichment, because Plaintiffs and the Damages Class paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges.  Plaintiffs and the Damages Class have no other remedy at law.

**Maine**

323.   Defendants unlawfully overcharged End Payers, who made purchases of or reimbursements for Divalproex ER in Maine at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants were aware of or

160

appreciated the benefit bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Maryland**

324.   Defendants unlawfully overcharged End Payers, who made purchases of or reimbursements for Divalproex ER in Maryland at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants were aware of or appreciated the benefit bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Massachusetts**

325.   Defendants unlawfully overcharged End Payers, who made purchases of or reimbursements for Divalproex ER in Massachusetts at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants were aware of or appreciated the benefit conferred upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

161

**Michigan**

326.    Defendants unlawfully overcharged End Payers, who made purchases of or reimbursements for Divalproex ER in Michigan at prices that were more than they would have been but for Defendants' actions.  Defendants have received a benefit from Plaintiffs and the Damages Class in the nature of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Defendants.  Defendants retained the benefits bestowed upon them under unjust circumstances arising from unlawful overcharges to Plaintiffs and the Damages Class.   Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Minnesota**

327.    Defendants unlawfully overcharged End Payers, who made purchases of or reimbursements for Divalproex ER in Minnesota at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants appreciated and knowingly accepted the benefits bestowed upon them by Plaintiffs and the Damages Class.   Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Mississippi**

328.    Defendants unlawfully overcharged End Payers, who made purchases of or reimbursements for Divalproex ER in Mississippi at prices that were more than they would have

162

been but for Defendants' actions.  Defendants received money from Plaintiffs and the Damages Class as a direct result of the unlawful overcharges.  Defendants retain the benefit of overcharges received on the sales of Divalproex ER, which in equity and good conscience belong to Plaintiffs and the Damages Class on account of Defendants' anticompetitive conduct.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Missouri**

329.   Defendants unlawfully overcharged End Payers, who made purchases of or reimbursements for Divalproex ER in Missouri at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants appreciated the benefit bestowed upon them by Plaintiffs and the Damages Class.  Defendants accepted and retained the benefit bestowed upon them under inequitable and unjust circumstances arising from unlawful overcharges to Plaintiffs and the Damages Class.

**Montana**

330.   Defendants unlawfully overcharged End Payers, who made purchases of or reimbursements for Divalproex ER in Montana at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Under the circumstances, it would be

163

inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Nebraska**

331.   Defendants unlawfully overcharged End Payers, who made purchases of or reimbursements for Divalproex ER in Nebraska at prices that were more than they would have been but for Defendants' actions.  Defendants received money from Plaintiffs and the Damages Class as a direct result of the unlawful overcharges, and have retained this money. Defendants have paid no consideration to any other person in exchange for this money.   In justice and fairness, Defendants should disgorge such money and remit the overcharged payments back to Plaintiffs and the Damages Class.

**Nevada**

332.   Defendants unlawfully overcharged End Payers, who made purchases of or reimbursements for Divalproex ER in Nevada at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants in the nature of revenue resulting from unlawful overcharges for Divalproex ER.  Defendants appreciated the benefits bestowed upon them by Plaintiffs and the Damages Class, for which they have paid no consideration to any other person.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**New Hampshire**

333.   Defendants unlawfully overcharged End Payers, who made purchases of or reimbursements for Divalproex ER in New Hampshire at prices that were more than they would

164

have been but for Defendants' actions.  Defendants have received a benefit from Plaintiffs and the Damages Class in the nature of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Defendants.  Under the circumstances, it would be unconscionable for Defendants to retain such benefits.

**New Jersey**

334.    Defendants unlawfully overcharged End Payers, who made purchases of or reimbursements for Divalproex ER in New Jersey at prices that were more than they would have been but for Defendants' actions.  Defendants have received a benefit from Plaintiffs and the Damages Class in the nature of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Defendants.  The benefits conferred upon Defendants were not gratuitous, in that they comprised revenue created by unlawful overcharges arising from arising from unlawful overcharges to Plaintiffs and the Damages Class.  Defendants have paid no consideration to any other person for any of the unlawful benefits they received from Plaintiffs and the Damages Class with respect to Defendants' sales of Divalproex ER.  Under the circumstances, it would be unjust for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**New Mexico**

335.    Defendants unlawfully overcharged End Payers, who made purchases of or reimbursements for Divalproex ER in New Mexico at prices that were more than they would have been but for Defendants' actions.  Defendants have knowingly benefitted at the expense of Plaintiffs and the Damages Class from revenue resulting from unlawful overcharges for Divalproex ER.  To allow Defendants to retain the benefits would be unjust because the benefits

165

resulted from anticompetitive pricing that inured to Defendants' benefit and because Defendants have paid no consideration to any other person for any of the benefits they received.

**New York**

336.     Defendants unlawfully overcharged End Payers, who made purchases of or reimbursements for Divalproex ER in New York at prices that were more than they would have been but for Defendants' actions.  Defendants have been enriched by revenue resulting from unlawful overcharges for Divalproex ER, which revenue resulted from anticompetitive prices paid by Plaintiffs and the Damages Class, which inured to Defendants' benefit.  Defendants' enrichment has occurred at the expense of Plaintiffs and the Damages Class.  It is against equity and good conscience for Defendants to be permitted to retain the revenue resulting from their unlawful overcharges.

**North Carolina**

337.     Defendants unlawfully overcharged End Payers, who made purchases of or reimbursements for Divalproex ER in North Carolina at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Plaintiffs and the Damages Class did not interfere with Defendants' affairs in any manner that conferred these benefits upon Defendants.  The benefits conferred upon Defendants were not gratuitous, in that they comprised revenue created by unlawful overcharges arising from arising from unlawful overcharges to Plaintiffs and the Damages Class.  The benefits conferred upon Defendants are measurable, in

166

that the revenue Defendants have earned due to unlawful overcharges are ascertainable by review of sales records.  Defendants consciously accepted the benefits conferred upon them.

### North Dakota

338.    Defendants unlawfully overcharged End Payers, who made purchases of or reimbursements for Divalproex ER in North Dakota at prices that were more than they would have been but for Defendants' actions. Defendants have been enriched by revenue resulting from unlawful overcharges for Divalproex ER.   Plaintiffs and the Damages Class have been impoverished by the overcharges for Divalproex ER resulting from Defendants' unlawful conduct.  Defendants' enrichment and Plaintiffs' and the Damages Class's impoverishment are connected.   There is no justification for Defendants' receipt of the benefits causing their enrichment, because Plaintiffs and the Damages Class paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges.  Plaintiffs and the Damages Class have no remedy at law. Under the circumstances, it would be unjust for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

### Oklahoma

339.    Defendants unlawfully overcharged End Payers, who made purchases of or reimbursements for Divalproex ER in Oklahoma at prices that were more than they would have been but for Defendants' actions.  Defendants received money from Plaintiffs and the Damages Class as a direct result of the unlawful overcharges, and have retained this money. Defendants have paid no consideration to any other person in exchange for this money.  Plaintiffs and the

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Damages Class have no remedy at law.  It is against equity and good conscience for Defendants to be permitted to retain the revenue resulting from their unlawful overcharges.

### Oregon

340.    Defendants unlawfully overcharged End Payers, who made purchases of or reimbursements for Divalproex ER in Oregon at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants were aware of the benefit bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be unjust for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

### Pennsylvania

341.    Defendants unlawfully overcharged End Payers, who made purchases of or reimbursements for Divalproex ER in Pennsylvania at prices that were more than they would have been but for Defendants' actions. Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants appreciated the benefit bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**Puerto Rico**

342.    Defendants unlawfully overcharged End Payers, who made purchases of or reimbursements for Divalproex ER in Puerto Rico at prices that were more than they would have been but for Defendants' actions.  Defendants have been enriched by revenue resulting from unlawful overcharges for Divalproex ER.   Plaintiffs and the Damages Class have been impoverished by the overcharges for Divalproex ER resulting from Defendants' unlawful conduct.  Defendants' enrichment and Plaintiffs' and the Damages Class's impoverishment are connected.   There is no justification for Defendants' receipt of the benefits causing their enrichment and Plaintiffs' and the Damages Class's impoverishment, because Plaintiffs and the Damages Class paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges. Plaintiffs and the Damages Class have no remedy at law.

**Rhode Island**

343.    Defendants unlawfully overcharged End Payers, who made purchases of or reimbursements for Divalproex ER in Rhode Island at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants appreciated the benefit bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**South Carolina**

344.    Defendants unlawfully overcharged End Payers, who made purchases of or reimbursements for Divalproex ER in South Carolina at prices that were more than they would have been but for Defendants' actions.   The benefits conferred upon Defendants were not gratuitous, in that they comprised revenue created by unlawful overcharges arising from arising from unlawful overcharges to Plaintiffs and the Damages Class.   Defendants realized value from the benefit bestowed upon them by Plaintiffs and the Damages Class.   Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**South Dakota**

345.    Defendants unlawfully overcharged End Payers, who made purchases of or reimbursements for Divalproex ER in South Dakota at prices that were more than they would have been but for Defendants' actions.  Defendants have received a benefit from Plaintiffs and the Damages Class in the nature of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Defendants. Defendants were aware of the benefit bestowed upon them by Plaintiffs and the Damages Class. Under the circumstances, it would be inequitable and unjust for Defendants to retain such benefits without reimbursing Plaintiffs and the Damages Class.

**Tennessee**

346.    Defendants unlawfully overcharged End Payers, who made purchases of or reimbursements for Divalproex ER in Tennessee at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic

170

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants appreciated the benefit bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.  It would be futile for Plaintiffs and the Damages Class to seek a remedy from any party with whom they have privity of contract. Defendants have paid no consideration to any other person for any of the unlawful benefits they received indirectly from Plaintiffs and the Damages Class with respect to Defendants' sales of Divalproex ER.  It would be futile for Plaintiffs and the Damages Class to exhaust all remedies against the entities with which Plaintiffs and the Damages Class have privity of contract because Plaintiffs and the Damages Class did not purchase Divalproex ER directly from any Defendant.

**Texas**

347.   Defendants unlawfully overcharged End Payers, who made purchases of or reimbursements for Divalproex ER in Texas at prices that were more than they would have been but for Defendants' actions.  Defendants have received a benefit from Plaintiffs and the Damages Class in the nature of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Defendants.  Defendants were aware of or appreciated the benefit bestowed upon them by Plaintiffs and the Damages Class.  The circumstances under which Defendants have retained the benefits bestowed upon them by Plaintiffs and the Damages Class are inequitable in that they result from Defendants' unlawful overcharges for Divalproex ER.  Plaintiffs and the Damages Class have no remedy at law.

171

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**Utah**

348.   Defendants unlawfully overcharged End Payers, who made purchases of or reimbursements for Divalproex ER in Utah at prices that were more than they would have been but for Defendants' actions.   Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.   Defendants were aware of or appreciated the benefit bestowed upon them by Plaintiffs and the Damages Class.   Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Vermont**

349.   Defendants unlawfully overcharged End Payers, who made purchases of or reimbursements for Divalproex ER in Vermont at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.   Defendants accepted the benefit bestowed upon them by Plaintiffs and the Damages Class.   Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Virginia**

350.   Defendants unlawfully overcharged End Payers, who made purchases of or reimbursements for Divalproex ER in Virginia at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants were aware of the benefit bestowed upon them.  Defendants should reasonably have expected to repay Plaintiffs and the Damages Class. The benefits conferred upon Defendants were not gratuitous, in that they constituted revenue created by unlawful overcharges arising from Defendants' illegal and unfair actions to inflate the prices of Divalproex ER.  Defendants have paid no consideration to any other person for any of the benefits they have received from Plaintiffs and the Damages Class.

### Washington

351.    Defendants unlawfully overcharged End Payers, who made purchases of or reimbursements for Divalproex ER in Washington at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants were aware of or appreciated the benefit conferred upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

### West Virginia

352.    Defendants unlawfully overcharged End Payers, who made purchases of or reimbursements for Divalproex ER in West Virginia at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants were aware of or

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

appreciated the benefit bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Wisconsin**

353.    Defendants unlawfully overcharged End Payers, who made purchases of or reimbursements for Divalproex ER in Wisconsin at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants appreciated the benefit bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Wyoming**

354.    Defendants unlawfully overcharged End Payers, who made purchases of or reimbursements for Divalproex ER in Wyoming at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants accepted, used and enjoyed the benefits bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**U.S. Virgin Islands**

355.    Defendants unlawfully overcharged End Payers, who made purchases of or reimbursements for Divalproex ER in the United States Virgin Islands at prices that were more than they would have been but for Defendants' actions.  Defendants have been enriched by revenue resulting from unlawful overcharges for Divalproex ER, which revenue resulted from anticompetitive prices paid by Plaintiffs and the Damages Class, which inured to Defendants' benefit.  Defendants' enrichment has occurred at the expense of Plaintiffs and the Damages Class.  Defendants appreciated the benefit bestowed upon them by Plaintiffs and the Damages Class.  It is against equity and good conscience for Defendants to be permitted to retain the revenue resulting from their unlawful overcharges.  Plaintiffs and the Damages Class have no remedy at law.

## XV.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment for the following relief:

356.    The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable Notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Class;

357.    That the unlawful conduct, contract, conspiracy, or combination alleged herein be adjudged and decreed: (a) an unreasonable restraint of trade or commerce in violation of Sections 1 and 3 of the Sherman Act; (b) *per se* violations of Sections 1 and 3 of the Sherman Act; (c) an unlawful combination, trust, agreement, understanding and/or concert of action in violation of

175

the state antitrust and unfair competition and consumer protection laws as set forth herein; and (d) acts of unjust enrichment by Defendants as set forth herein.

358.    Plaintiffs and members of the Damages Class recover damages, to the maximum extent allowed under such state laws, and that a judgment in favor of Plaintiffs and members of the Damages Class be entered against Defendants jointly and severally in an amount to be trebled to the extent such laws permit;

359.    Plaintiffs and members of the Damages Class recover damages, to the maximum extent allowed by such laws, in the form of restitution and/or disgorgement of profits unlawfully obtained;

360.    Plaintiffs and members of the Damages Class be awarded restitution, including disgorgement of profits Defendants obtained as a result of their acts of unfair competition and acts of unjust enrichment, and the Court establish of a constructive trust consisting of all ill-gotten gains from which Plaintiffs and members of the Damages Class may make claims on a *pro rata* basis;

361.    Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

362.    Plaintiffs and members of the Classes be awarded pre- and post- judgment interest

as provided by law, and that such interest be awarded at the highest legal rate;

363.    Plaintiffs and members of the Classes recover their costs of suit, including

reasonable attorneys' fees, as provided by law; and

364.    Plaintiffs and members of the Classes have such other and further relief as the

case may require and the Court may deem just and proper.


## XVI.  **JURY DEMAND**

Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil

Procedure, of all issues so triable.


April 1, 2019                                          Respectfully submitted,

                                                      Roberta D. Liebenberg, Esquire
                                                      Fine, Kaplan and Black, R.P.C.
                                                      One South Broad Street, 23rd Floor
                                                      Philadelphia, PA  19107
                                                      (215) 567-6565
                                                      rliebenberg@finekaplan.com

                                                      **Lead Counsel for the End-Payer Plaintiffs**


Gregory S. Asciolla, Esquire              Michael M. Buchman, Esquire
Labaton Sucharow LLP                      Motley Rice LLC
140 Broadway                              600 Third Avenue, Suite 2101
New York, NY  10005                       New York, NY  10016
(212) 907-0700                            (212) 577-0040
gasciolla@labaton.com                     mbuchman@motleyrice.com

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Elizabeth J. Cabraser, Esquire
Lieff Cabraser Heimann & Bernstein LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
(415) 956-1000
ecabraser@lchb.com

James R. Dugan, II, Esquire
The Dugan Law Firm, APLC
365 Canal Street, Suite 1000
New Orleans, LA 70130
(504) 648-0180
jdugan@dugan-lawfirm.com

Jayne A. Goldstein, Esquire
Shepherd Finkelman Miller & Shah, LLP
1625 N. Commerce Parkway, Suite 320
Fort Lauderdale, FL 33326
(886) 849-7545
jgoldstein@sfmslaw.com

Mindee J. Reuben, Esquire
Lite DePalma Greenberg, LLC
1835 Market Street, 27th Floor
Philadelphia, PA  19103
(267) 314-7980
mreuben@litedepalma.com

Joseph R. Saveri, Esquire
Joseph Saveri Law Firm, Inc.
555 Montgomery Street, Suite 1210
San Francisco, CA  94111
(415) 500-6800
jsaveri@saverilawfirm.com

Dena C. Sharp, Esquire
Girard Sharp LLP
601 California Street, Suite 1400
San Francisco, CA 94108
(415) 981-4800
chc@girardsharp.com

Heidi M. Silton, Esquire
Lockridge Grindal Nauen P.L.L.P.
100 Washington Avenue South
Suite 2200
Minneapolis, MN  55401
(612) 339-6900
hmsilton@locklaw.com

Bonny E. Sweeney, Esquire
Hausfeld LLP
600 Montgomery Street, Suite 3200
San Francisco, CA  94111
(415) 633-1908
bsweeney@hausfeld.com

Adam J. Zapala, Esquire
Cotchett, Pitre & McCarthy, LLP
840 Malcolm Road, Suite 200
Burlingame, CA  94010
(650) 697-6000
azapala@cpmlegal.com

**End-Payer Plaintiffs' Steering Committee**

178

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Audrey A. Browne, Esquire
American Federation of State, County and
 Municipal Employees District Council 37
 Health & Security Plan
125 Barclay Street, Room 313
New York, NY 10007
(212) 815-1304
abrowne@dc37.net

**Attorneys for Plaintiff American
Federation of State, County and
Municipal Employees District
Council 37 Health & Security Plan**

Dan Drachler, Esquire
Zwerling Schachter & Zwerling, LLP
41 Madison Avenue
New York, NY 10010
(212) 223-3900
ddrachler@zsz.com

Marc H. Edelson, Esquire
Edelson & Associates, LLC
3 Terry Drive, Suite 205
Newtown, PA 18940
(215) 867-2399
medelson@edelson-law.com

**Additional End-Payer Plaintiffs' Counsel**

179

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 1st day of April, 2019, the foregoing Consolidated Amended End-Payer Class Action Complaint was filed with the Clerk of Court who will electronically enter this filing on the docket.  Thereafter, via ECF notifications, the filing will be served on all interested parties registered for electronic filing and be available for viewing and downloading from the Court's ECF system.

Roberta D. Liebenberg